Case No. 19-1553

---

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE EIGHT CIRCUIT**

---

**NEBRASKA PUBLIC POWER DISTRICT**
**Petitioner,**
**v.**

**FEDERAL ENERGY REGULATORY COMMISSION**
**Respondent.**

---

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

---

**OPENING BRIEF OF PETITIONER**
**NEBRASKA PUBLIC POWER DISTRICT**

---

David D'Alessandro
Jonathan P. Trotta
STINSON LLP
1775 Pennsylvania Ave., NW
Suite 800
Washington, DC 20006
(202) 785-9100
david.dalessandro@stinson.com
jtrotta@stinson.com

*Counsel for Petitioner*
*Nebraska Public Power District*

May 13, 2019

# SUMMARY OF THE CASE

This case concerns review of two Federal Energy Regulatory Commission (FERC) orders, finding that a significant rate increase resulting from placement of a new transmission owner, Tri-State Generation and Transmission Association, Inc. (Tri-State), into rate Zone 17 of the Southwest Power Pool, Inc. is just and reasonable under Federal Power Act section 205. 16 U.S.C. § 824d (2012). Governing precedent is clear: "cost shifts that result in significant rate increases to customers, but which are unaccompanied by commensurate benefits, are unjust and unreasonable." The issue before the Court is whether substantial evidence supports FERC's finding that the benefits that Petitioner and other Zone 17 customers receive from Tri-State's facilities "are at least roughly commensurate" with the millions of dollars in costs of these facilities shifted to Petitioner and other Zone 17 customers.

FERC avoided confronting evidence of a large imbalance – $550,000 in quantified benefits versus an annual $3.5 million cost shift to existing Zone 17 customers – by claiming that it looked to the "entirety of the record" to determine that other benefits could be greater. FERC, however, made no attempt, as required by law, to quantify these other benefits or to explain how they could offset the large imbalance between quantified benefits and shifted costs.

Oral argument (20 minutes each side) should be heard to provide Petitioner an opportunity to explain why FERC's orders are arbitrary and capricious.

i

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT
## OF THE
## NEBRASKA PUBLIC POWER DISTRICT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Fed. R. App. P. 26.1, and Circuit Rule 26.1A, the Nebraska Public Power District hereby states that it is not required to provide a Corporate Disclosure Statement because it is a governmental entity organized under the laws of the State of Nebraska. Therefore, no Corporate Disclosure Statement has been provided.

*/s/ David D'Alessandro*
David D'Alessandro
Jonathan P. Trotta
STINSON LLP
1775 Pennsylvania Ave., NW
Suite 800
Washington, DC  20006
(202) 785-9100

*Counsel for Petitioner*
*Nebraska Public Power District*

Dated:  May 13, 2019

ii

# TABLE OF CONTENTS

SUMMARY OF THE CASE.................................................................... i

RULE 26.1 CORPORATE DISCLOSURE STATEMENT.................................. ii

TABLE OF AUTHORITIES .................................................................v

GLOSSARY................................................................................ ix

JURISDICTIONAL STATEMENT ............................................................1

RULINGS UNDER REVIEW ................................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW .....................................2

STATEMENT OF THE CASE..............................................................4

A.   Regulatory Framework...........................................................4

B.   Background To Tri-State's Decision To Become A New SPP Transmission Owner ..................................................................6

C.   The Federal Power Act Section 205 Proceeding at Issue in This Case ...........10

SUMMARY OF ARGUMENT .............................................................21

ARGUMENT ..............................................................................24

I.   STANDARD OF REVIEW ........................................................24

II.   FERC FAILED TO CONSIDER EVIDENCE OF A LARGE IMBALANCE BETWEEN QUANTIFIED BENEFITS AND ALLOCATED COSTS ..........25

III.   GOVERNING PRECEDENT REQUIRES FERC TO RELY ON QUANTIFIED BENEFITS, WHEN AVAILABLE, AND TO PROVIDE A PLAUSIBLE REASON FOR FINDING THAT OTHER UNQUANTIFIABLE BENEFITS OFFSET ANY IMBALANCE BETWEEN QUANTIFIED BENEFITS AND THE COSTS ALLOCATED TO CUSTOMERS ...............27

IV.   FERC'S FINDING THAT THE BENEFITS RECEIVED BY NPPD AND OTHER ZONE 17 CUSTOMERS ARE ROUGHLY COMMENSURATE WITH THE COSTS ALLOCATED TO ZONE 17 CUSTOMERS IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE............................................30

V.   FERC FAILED TO CONSIDER EVIDENCE SUPPORTING PLACEMENT OF TRI-STATE IN ZONE 19 ........................................................38

A.   FERC Ignored SPP's New Policy That The Placement Of Transmission Facilities Should Follow The Load That They Serve To The Same

Appellate Case: 19-1553   Page: 4   Date Filed: 05/13/2019 Entry ID: 4787190

Pricing Zone ............................................................................38

B.  FERC's Failure To Consider Evidence That Placing Tri-State In Zone 19 Would Avoid Any Cost Shift To Zone 19 Customers Is Arbitrary And Capricious................................................................................44

CONCLUSION .............................................................................47

CERTIFICATE OF COMPLIANCE.......................................................49

CERTIFICATE OF SERVICE

Appellate Case: 19-1553    Page: 5    Date Filed: 05/13/2019 Entry ID: 4787190

# TABLE OF AUTHORITIES

**Page(s)**

## COURT CASES

*Carpenters and Millwrights* v. *NLRB*,
    481 F.3d 804 (D.C. Cir. 2007)......................................................................3, 25

*Cities of Bethany v. FERC*,
    727 F.2d 1131 (D.C. Cir. 1984).........................................................................45

*Colorado Interstate v. FERC*,
    324 U.S. 591 (1945)........................................................................................ 27

*Illinois Commerce Commission* v. *FERC*,
    576 F.3d 470 (7th Cir. 2009) ................................. 2, 3, 14, 19, 27, 28, 32, 33, 36

*Illinois Commerce Commission* v. *FERC*,
    721 F.3d 764 (7th Cir. 2013) .......................................................................29, 30

*Illinois Commerce Commission* v. *FERC*,
    756 F.3d 556 (7th Cir. 2014) .......................................................2, 28, 29, 30, 36

*KN Energy, Inc. v. FERC*,
    968 F.2d 1295 (D.C. Cir. 1992)...................................................................27, 47

*Midwest Transmission Owners* v. *FERC*,
    373 F.3d 1361 (D.C. Cir 2004)....................................................2, 28, 33, 47

*Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983).....................................................................................2, 24, 46

*Niobrara River Ranch, L.L.C.* v. *Huber*,
    373 F.3d 881 (8th Cir. 2004) .........................................................................2, 24

*Oxy USA v. FERC*,
    64 F.3d 679 (D.C. Cir. 1995).............................................................................45

*Sithe/Independence Power Partners, L.P. v. FERC*,
    285 F.3d 1 (D.C. Cir. 200)..................................................................................27

*St. Luke's Methodist Hosp.* v. *Thompson*,
    315 F.3d 984 (8th Cir. 2003) ..............................................................................24

v

*Tennessee Gas Transmission Co.* v. *FERC*,
789 F.2d 61 (D.C. Cir. 1986)..................................................................38

*Universal Camera Corp.* v. *NLRB*,
340 U.S. 474 (1951)...............................................................3, 25, 26

**ADMINISTRATIVE CASES**

*Grid Liance High Plains, LLC*,
166 FERC ¶ 61,171 (2019)...................................................................25

*ISO New England*,
115 FERC ¶ 61,145 (2006)...................................................................15

*Regional Transmission Organization*, Order No. 2000,
FERC Stats. & Regs. ¶ 31,089 (1999)...............................................46

*San Diego Gas & Elec. v. Sellers of Energy*,
127 FERC ¶ 61,250 (2009)...................................................................15

*Southwest Power Pool, Inc.*,
89 FERC ¶ 61,289 (1999), *order on reh'g*, 98 FERC ¶ 61,038
(2002)......................................................................................................4

*Southwest Power Pool, Inc.*,
106 FERC ¶ 61,110 (2004).....................................................................4

*Southwest Power Pool, Inc.*,
108 FERC 61,003 (2004).........................................................................4

*Southwest Power Pool, Inc.*,
109 FERC ¶ 61,046 (2005).....................................................................4

*Southwest Power Pool, Inc.*,
122 FERC ¶ 61,083 (2008)...................................................................46

*Southwest Power Pool, Inc.*,
125 FERC ¶ 61, 239 (2008)................................................................5, 7

*Southwest Power Pool, Inc.*,
149 FERC ¶ 61,113 (2014).....................................................................7

vi

*Southwest Power Pool, Inc.*,
153 FERC ¶ 61,366 (2015) ...............................................................11

*Southwest Power Pool, Inc.*,
156 FERC ¶ 61,071 (2016) .................................................................5

*Southwest Power Pool, Inc.,* Letter Order, Docket No. ER17-204
(August 25, 2017) .............................................................................43

*Southwest Power Pool, Inc.*,
158 FERC ¶ 63,004 (2017)...................................7, 17, 18, 25, 41, 42

*Southwest Power Pool, Inc.,* Order Denying Motion of the Nebraska
Public Power District, Docket No. ER16-204-001 (Jan. 31, 2017) ...................16

*Southwest Power Pool, Inc.*,
162 FERC ¶ 61,215 (2018) ...............................................................43

*Southwest Power Pool, Inc.*,
Opinion No. 562, 163 FERC ¶ 61,109 (2018)...................  1, 4, 6, 18, 19, 20, 25,
30, 32, 33, 34, 36, 39, 41, 45

*Southwest Power Pool, Inc.*,
Opinion No. 562-A, 166 FERC ¶ 61,019 (2019)........ 1, 5, 20, 21, 25, 26, 27, 31,
32, 33, 34, 35, 36, 38, 45

## STATUTES

Administrative Procedure Act, 5 U.S.C. §706(2)(a) ...........................................3, 24

Federal Power Act, § 203, 16 U.S.C. § 824b........................................................25

Federal Power Act, § 205, 16 U.S.C. § 824d........................................................i, 10

Federal Power Act, § 313*l*(a), 16 U.S.C. § 825*l*(a) .................................................1

Federal Power Act, § 313*l*(b), 16 U.S.C. § 825*l*(b) .................................................1

Appellate Case: 19-1553    Page: 8    Date Filed: 05/13/2019 Entry ID: 4787190

## OTHER AUTHORITIES

Fed. Rule App. P. 26.1 ....................................................................................i

Fed. Rule App. P. 32(a)(5) .........................................................................49

Fed. Rule App. P. 32(a)(6) .........................................................................49

Fed. Rule App. P. 32(a)(7)(B) ...................................................................49

Fed. Rule App. P. 32(f) ..............................................................................49

Circuit Rule 28A(h)(2) ...............................................................................49

Appellate Case: 19-1553     Page: 9     Date Filed: 05/13/2019 Entry ID: 4787190

# GLOSSARY

| | |
|---|---|
| ALJ | Presiding Administrative Law Judge |
| ATRR | Annual Transmission Revenue Requirement |
| FERC | Respondent, Federal Energy Regulatory Commission |
| NETS Agreement | Western Nebraska Joint Transmission Agreement |
| Network Service | SPP Network Integrated Transmission Service |
| NPPD | Petitioner, Nebraska Public Power District |
| RTO | Regional Transmission Organization |
| SPP | Southwest Power Pool, Inc. |
| Tri-State | Tri-State Generation and Transmission Association, Inc. |
| Western-UGP | Western Area Power Administration-Upper Great Plains Region |
| Western-RMR | Western Area Power Administration-Rocky Mountain Region |

Appellate Case: 19-1553    Page: 10    Date Filed: 05/13/2019 Entry ID: 4787190

# JURISDICTIONAL STATEMENT

On May 17, 2018, the Federal Energy Regulatory Commission (FERC) issued Opinion No. 562, approving Tri-State Generation and Transmission Association, Inc.'s (Tri-State) placement in Southwest Power Pool, Inc. (SPP) rate zone 17 (Zone 17) as just and reasonable. Within the timeframe provided by the Federal Power Act, section 313*l*(a), 16 U.S.C. § 825*l*(a), Nebraska Public Power District (NPPD) filed a request for rehearing of that opinion with FERC. FERC subsequently issued Opinion No. 562-A, denying NPPD's rehearing request. That FERC action constitutes final agency action under Federal Power Act section 313*l*(b), 16 U.S.C. § 825*l*(b). NPPD timely-filed a petition for review of FERC's orders with this Court under Federal Power Act section 313*l*(b), which confers jurisdiction on, and establishes venue in, the United States Court of Appeals for the Eighth Circuit. This appeal is from final orders of FERC that dispose of all Petitioner's claims in this docket.

## RULINGS UNDER REVIEW

1. *Southwest Power Pool, Inc.*, Opinion No. 562, 163 FERC ¶ 61,109 (2018) (P. Add. 007).[1]

2. *Southwest Power Pool, Inc.*, Opinion 562-A, 166 FERC ¶ 61,019 (2019) (P. Add. 115).

---

[1] "P. Add." denotes the Addendum of Petitioner and "P. App." denotes the Appendix of Petitioner.

Appellate Case: 19-1553    Page: 11    Date Filed: 05/13/2019 Entry ID: 4787190

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.     Under the Federal Power Act, cost shifts that result in significant rate increases to customers, but that are unaccompanied by commensurate benefits, are unjust and unreasonable. *Illinois Commerce Commission* v. *FERC*, 576 F.3d 470, 477 (7th Cir. 2009); *Midwest Transmission Owners* v. *FERC*, 373 F.3d 1361, 1368 (D.C. Cir 2004). Does the undisputed evidence of a large imbalance between an average annual cost shift of $3.5 million and $550,000 of quantified benefits demonstrate that FERC's finding that the resulting cost shift is roughly commensurate with the benefits is not supported by substantial evidence?

2.     Under the Federal Power Act, even the modest goal of rough commensurability "requires *some* effort" by FERC to quantify the benefits. *Illinois Commerce Commission* v. *FERC*, 756 F.3d 556, 559 (7th Cir. 2014). Did FERC make the requisite effort to quantify the benefits?

3.     Assuming there are benefits that cannot be quantified, is there a reasoned explanation and substantial evidence supporting FERC's implicit finding that NPPD and other Zone 17 customers receive unquantified benefits that offset the large imbalance between the cost shift and quantified benefits? *Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Niobrara River Ranch, L.L.C.* v. *Huber*, 373 F.3d 881, 884 (8th Cir. 2004).

2

4.     The nature of the transmission services a new transmission owner utilized before it joined SPP is a relevant factor in placing that new transmission owner in the appropriate SPP rate zone.  Did FERC consider the evidence placed in the record by NPPD to address this issue?  *Illinois Commerce Commission* v. *FERC*, 576 F.3d at 477, citing Administrative Procedure Act, 5 U.S.C. § 706.

5.     SPP uses a license plate rate design.  The stated purpose of that design is to avoid shifting the costs of facilities built to serve a transmission owner's own load to other customers.  Did FERC arbitrarily ignore evidence that the average unit cost of Tri-State's facilities was nearly *identical* to the cost of Zone 19 facilities – and that placement in Zone 19 would have eliminated any cost shift?  *Universal Camera Corp.* v. *NLRB*, 340 U.S. 474, 488 (1951); *Carpenters and Millwrights* v. *NLRB*, 481 F.3d 804, 809 (D.C. Cir. 2007).

3

## STATEMENT OF THE CASE

### A.  Regulatory Framework

SPP is a Regional Transmission Organization (RTO) authorized by FERC in 2005 to provide electric transmission service across a multi-state region utilizing the transmission facilities of 15 separately-owned utilities placed in 15 separate rate zones within SPP.[2]

Under SPP's license-plate (*i.e.*, zonal) rate design, customers pay a single rate for transmission service initiating from any SPP zone, to the zone of delivery.  The rate is based on the cost of the transmission facilities in the zone of delivery, *i.e.*, where the load is located.[3]  SPP initially had 15 rate zones, each comprised of a single-owner utility system.[4]  This structure accomplished the purpose of zonal license-plate rates: to avoid shifting to other SPP customers the costs of existing transmission facilities built by a transmission owner to serve its own load.[5]

Since 2005, SPP has expanded its footprint, adding large transmission owners into newly established rate zones, and smaller transmission owners into existing

---

[2] *Southwest Power Pool, Inc.,* 106 FERC ¶ 61,110 (2004); *Southwest Power Pool, Inc.,* 108 FERC 61,003 (2004) and *Southwest Power Pool, Inc.,* 109 FERC ¶ 61,046 (2005); Exh. NPP-040 at 1 (P. App. 165).

[3] *See Southwest Power Pool, Inc.,* Opinion No. 562, 163 FERC ¶ 61,109, P 5 (Opinion No. 562) (P. Add. 011); Exh. NPP-040 (P. App. 165).

[4] TR. 159:12-17 (P. App. 195); Exh. NPP-040 at 1 (P. App. 165).

[5] *See* Tr. 159:18-160:4 (Bourne) (P. App. 195-96); *Southwest Power Pool, Inc.*, 89 FERC ¶ 61,289, 61,888 (1999), *order on reh'g*, 98 FERC ¶ 61,038 (2002).

Appellate Case: 19-1553     Page: 14     Date Filed: 05/13/2019 Entry ID: 4787190

zones.[6] The cost of transmission service to deliver power to a zone consisting of multiple transmission owners' transmission facilities is determined by rolling-in the costs of all facilities in that zone.[7] Thus, an SPP Network Integration Transmission Service (Network Service) customer pays a rate based on the total transmission costs of the zone (*i.e.*, zonal revenue requirement multiplied by the customer's percentage share of total electricity load in the zone).[8]

When a new transmission owner is added to an existing zone, its revenue requirement and load are added to the existing zone's totals, producing a new zonal revenue requirement and total load.[9] FERC has explained that this means unless the average unit cost of the new transmission owner's transmission facilities (*i.e.*, its revenue requirement divided by its load) is equal to the existing zone's average unit cost, adding a new transmission owner to an existing zone will either cause Network

---

[6] *See* Exh. NPP-040 at 2 (P. App. 166) (Zone 1 includes AEP-West as the dominant transmission owner, and three other small transmission owners with Annual Transmission Revenue Requirements of less than $2.8 million). NPPD joined SPP in 2009 as a separate Zone 17. *Southwest Power Pool, Inc.*, 125 FERC ¶ 61,239 (2008). In 2015, Central Nebraska Public Power District became a new Transmission Owner incorporated into Zone 17. *Southwest Power Pool, Inc.,* 156 FERC ¶ 61,071 (2016).

[7] *Southwest Power Pool, Inc.,* 166 FERC ¶ 61,019, P 3 (2019) (Opinion No. 562-A) (P. Add. 116).

[8] *Id.*

[9] *Id.*

Appellate Case: 19-1553     Page: 15     Date Filed: 05/13/2019 Entry ID: 4787190

Service rates to increase for existing customers in the zone and decrease for the new transmission owner's customers, or vice versa.[10]

This case is not "vice versa." The average annual unit cost of Tri-State's transmission facilities is $64,333 per MW versus the existing Zone 17 average annual unit cost of $23,581.[11] Tri-State's decision to join SPP, and SPP's placement of Tri-State's facilities in Zone 17, allowed Tri-State to shift $4.3 million, 60 percent of the total $7.2 million cost of Tri-State's entire transmission system, to Zone 17. That caused existing Zone 17 customers' rates to increase by eight percent in the near term.[12] While this cost shift is anticipated to decline somewhat beginning in November 2020, the expected annual cost shift will still average $3.5 million over the ten-year period from 2016-2026,[13] a six percent increase for existing Zone 17 customers.[14]

## B. Background To Tri-State's Decision To Become A New SPP Transmission Owner

SPP experienced a major expansion of its geographic footprint in 2009 when three Nebraska public power utilities joined SPP in three new, separate pricing zones: Lincoln Electric System – Zone 16; NPPD – Zone 17; and Omaha Public

---

[10] *Id.*
[11] Exh. NPP-001 at 3:13-15 (Swartz) (P. App. 079).
[12] *Id.* at 3:13-16 (P. App. 079).
[13] Opinion No. 562, P 158 (P. Add. 083).
[14] $3.5 million ÷ $56.8 (Total Zone 17 ATRR-Exh. No. NPP-002 (P. App. 089)) = 6.1 %.

Appellate Case: 19-1553     Page: 16     Date Filed: 05/13/2019 Entry ID: 4787190

Power District – Zone 18.[15]  Tri-State at that time had not undertaken a cost-benefit analysis of joining SPP.[16]  In fact, joining SPP was not even on Tri-State's radar screen.[17]

SPP's second major expansion, in 2014, saw the addition of the transmission facilities and most of the load of the Integrated System as a separate, new Zone 19.[18] The Integrated System consisted of transmission facilities of Tri-State's wholesale power requirements provider, Basin Electric Power Cooperative (Basin Electric); Western Area Power Administration-Upper Great Plains Region (Western-UGP); and Heartland Consumers Power District.  Tri-State's load was included within the load of the Integrated System.  When the Integrated System joined SPP in new Zone 19, Tri-State became surrounded by transmission facilities transferred to SPP's functional control – a circumstance which drove Tri-State to initiate discussions with SPP in 2014 to join as a new SPP transmission owner.[19]  Tri-State joined SPP effective January 1, 2016.

The nature of transmission service used to deliver power to Tri-State's load prior to Basin Electric and the Integrated System joining SPP, effective October 1,

---

[15] *Southwest Power Pool, Inc.,* 125 FERC ¶ 61,239 (2008); Exh. NPP-040, 2 (P. App. 166).
[16] Tr. 45:4-16 (P. App. 176).
[17] Tr. 46:1-6 (P. App. 177).
[18] *Southwest Power Pool, Inc*., 149 FERC ¶ 61,113 (2014).
[19] *Southwest Power Pool, Inc.,* 158 FERC ¶ 63,004, P 17 (2017) (P. App. 289); Exh. TS-001, 10:17–11:5 (Steinbach) (P. App. 045-46).

7

2015, consisted of the following: Tri-State's wholesale power supplier, Basin Electric, paid approximately $4.3 million for transmission service from the Integrated System to deliver Tri-State's power supplies to interconnections with Tri-State's system.[20] Tri-State paid nearly $6 million under its own transmission tariff,[21] and approximately $2 million for Western Area Power Administration-Rocky Mountain Region (Western-RMR) transmission service, to deliver the power supplies to Tri-State load. [22] Tri-State also paid about $1 million to NPPD for Tri-State's use of NPPD transmission facilities under the Western Nebraska Joint Transmission Agreement (NETS Agreement) between Tri-State and NPPD.[23]  In total, Tri-State paid approximately $13.4 million for transmission services needed to supply electricity to its customers.

Tri-State anticipated that joining SPP would save it approximately $7.9 million per year; *i.e.,* its estimated Annual Transmission Revenue Requirement (ATRR), which SPP recovers in rates and distributes back to Tri-State.[24]  The transmission service provided by the Integrated System to deliver power to Tri-

---

[20] Exh. NPP-033 at 27 (P. App. 156).
[21] FERC's non-discrimination rules require utilities using their own transmission facilities to book service under the same tariffs that apply when third parties use their facilities.
[22] Tr. 78:7-15 (P. App. 187).
[23] NPPD Initial Br. at 34 (P. App. 258), citing Exh. NPP-033 at 27 (P. App. 156); Exh. NPP-008 at 10 (Malone) (P. App. 103).
[24] NPPD Initial Br. at 32 (P. App. 256), citing Exh. NPP-033 at 32 (P. App. 161).

Appellate Case: 19-1553     Page: 18     Date Filed: 05/13/2019 Entry ID: 4787190

State's system, and Tri-State's own transmission tariff, were terminated and replaced by a single SPP Network Service to serve Tri-State load.[25] SPP Network Service costs depend upon the average unit cost of the rate zone where Tri-State's facilities and load are placed.

To maximize savings attributable to zone placement, in December 2014 Tri-State asked SPP to analyze cost shifts that would result from placing Tri-State's facilities in Zone 19 with Basin Electric, in Zone 17 with NPPD, or in a separate Tri-State-only zone.[26] SPP informed Tri-State that its ATRR was too small to qualify for a new, separate pricing zone,[27] and agreed to analyze cost shifts resulting from Tri-State's placement in Zones 19 and 17.[28]

About a month later, SPP informed Tri-State that "a significant benefit" would result from placement in Zone 17 (*i.e.* what turned out to be the $3.5 million average annual cost shift to other Zone 17 customers). In June of 2015, Tri-State's Board of Directors received a presentation upon which to make its final decision to join SPP.[29] That presentation assumed the $7.9 million savings due to elimination of rate pancaking *i.e.*, the replacement of two transmission service arrangements

---

[25] *Id*. at 32 (P. App. 161).
[26] Exh. NPP-008 at 7:18-21 (Malone) (P. App. 100); Exh. No. NPP-010 (P. App. 118).
[27] Exhs. NPP-010 (P. App. 118); NPP-011 at 15 (P. App. 121).
[28] Exhs. NPP-012 at 4 (P. App. 126); Exh. NPP-011 at 15:9-14 (P. App. 121).
[29] Tr. 60:20-24 (Steinbach) (P. App. 183); Exh. NPP-033 (P. App. 131).

Appellate Case: 19-1553    Page: 19    Date Filed: 05/13/2019 Entry ID: 4787190

(transmission service provided by the Integrated System and under Tri-State's own tariff) with a single SPP transmission tariff, plus another $3.5 million – the "significant benefit" of being placed in Zone 17.[30]

## C.    The Federal Power Act Section 205 Proceeding at Issue in This Case

The dispute in this appeal arises out of SPP's proposal in its October 2015 filing under Federal Power Act section 205, 16 U.S.C. § 824d, to add Tri-State's facilities and load into SPP as part of existing Zone 17.  As discussed, *supra*, at 6, the average annual unit cost of Tri-State's transmission system was more than 2.7 times higher than the average annual unit cost of existing Zone 17 facilities.[31]  This meant that adding Tri-State's higher cost facilities to Zone 17 would cause the rates of SPP Network Service for existing customers in Zone 17 to increase by eight percent immediately and six percent over the next decade.[32]

NPPD protested SPP's filing, objecting to the shift of more than 60 percent of the costs of Tri-State's facilities to NPPD and other Zone 17 customers.[33]  On December 30, 2015, FERC issued an order finding SPP's proposal to place Tri-State

---

[30] Exh. NPP-033 at 24 (P. App. 153).

[31] Exh. NPP-001 at 3:13-15 (Swartz) (P. App. 079); NPPD Initial Br. at 19 (P. App. 243); NPPD Reply Br. at 24-26 (P. App. 267-69); NPPD Br. on Exceptions at 7 (P. App. 435); and NPPD Request for Rehearing at 14 (P. App. 483).

[32] NPPD Initial Br. at 19 (P. App. 243), citing Tr. 170:20-171:25 (P. App. 202-03).

[33] *See* NPPD Protest filed on November 20, 2015 at 10-12 (P. App. 038-40).

10

in Zone 17 had not been shown to be just and reasonable.[34]  FERC accepted SPP's filing, subject to refund, and set the matter for hearing.[35]

SPP's witness at the ensuing hearing, L. Patrick Bourne, testified that he had used the following four criteria to determine whether to place Tri-State in an existing SPP pricing zone or in its own zone:

>    (i)    Whether the new Transmission Owner's ATRR is less than the ATRR of the existing pricing zone with smallest ATRR;
>
>    (ii)   The extent to which the new Transmission Owner's facilities substantially increase the SPP footprint;
>
>    (iii)  The extent to which the new Transmission Owner's facilities are embedded within a pre-existing zone; and,
>
>    (iv)   The extent to which the new Transmission Owner's facilities are integrated with (including number of interconnections an existing Transmission Owner's facilities).[36]

Mr. Bourne did not address the cost shifting resulting from placement of Tri-State in Zone 17.  Nor did he address whether Tri-State's facilities provide benefits to Zone 17 customers commensurate with the cost shift.  In fact, Mr. Bourne testified that an RTO bears no responsibility to analyze cost shifts resulting from its zone placement decisions.[37]  Mr. Bourne also admitted that SPP conducted no analysis in

---

[34] *Southwest Power Pool, Inc.*, 153 FERC ¶ 61,366 (2015).

[35] *Id*., PP 41-42.

[36] Exh. SPP-001 at 6:16-22 (Bourne) (P. App. 075).

[37] NPPD Br. on Exceptions at 15 (P. App. 437), citing Tr. 190-194 (Bourne) (P. App. 209-13).

Appellate Case: 19-1553     Page: 21     Date Filed: 05/13/2019 Entry ID: 4787190

this proceeding of any benefits received by Zone 17 customers from Tri-State facilities.[38]

Tri-State's witness, Mr. Steinbach, while asserting that NPPD and other Zone 17 customers would receive benefits from Tri-State's facilities, similarly offered no testimony addressing whether the value of those benefits is commensurate with the level of costs shifted to NPPD and other Zone 17 customers under the terms of SPP's rate filing. Mr. Steinbach testimony on that issue was limited to the following:

> **Q.** **Is there any evidence that NPPD may benefit from the transmission usage rights of Tri-State's facilities under the NETS Agreement more so than Tri-State benefits from the use of NPPD's facilities?**
>
> A. Yes. As stated above, under the NETS Agreement if the ratio of a party's usage of the joint facilities of Tri-State and NPPD to the sum of both parties' use of the facilities exceeds that party's share of the expenses of the facilities, the party makes an equalization payment to the other party. On average, Tri-State makes an equalization payment of $1 million to NPPD. However, Tri-State's current payment does not accurately reflect NPPD's use of the joint system.[39]

As explained by Mr. Steinbach, the current equalization payment of $1 million owed by Tri-State to NPPD under the NETS Agreement is based on the greater use made by Tri-State of the joint facilities, measured by comparing Tri-State's and NPPD's annual coincident (1-CP) peak usage of such facilities.[40] According to Mr.

---

[38] Tr. 190-194 (Bourne) (P. App. 209-13).
[39] Exh. TS-001 at 21:3-11 (Steinbach) (P. App. 049).
[40] *Id.* at 21:15-20 (P. App. 049); Exh. TS-003 at 15 (P. App. 071).

12

Steinbach, FERC's current policy favors use of the monthly coincident peak (12-CP) usage to measure cost responsibility.[41] If the equalization payments were calculated under the 12-CP methodology, Mr. Steinbach estimated that NPPD would have paid an average of $550,000 per year to Tri-State.[42] But Mr. Steinbach did not address whether or how a $550,000 benefit can be viewed as commensurate with the undisputed size of the cost shift–an initial $4.3 million cost shift or an average annual $3.5 million cost shift over ten-years.

FERC Trial Staff and NPPD, on the other hand, demonstrated that the multi-million dollar cost shift to Zone 17's existing customers resulting from placement of Tri-State in Zone 17 was not accompanied by commensurate benefits. As explained by NPPD witness, Paul J. Malone, the NETS Agreement between NPPD and Tri-State provided an agreed-to formula to measure the relative value of the joint use made by each party of the separately owned and operated facilities subject to that agreement (NETS facilities).[43] By its express terms, the resulting $1 million Annual Equalization Payment required to be made by *Tri-State to NPPD* was necessary "to make the benefits of each Party commensurate with its costs."[44] Or stated another

---

[41] Exh. TS-001 at 22:3-10 (Steinbach) (P. App. 050); but see *PJM Interconnection, L.L.C., et al.,* 109 FERC ¶ 61,012, P 44 (2004) (holding 1-CP methodology just and reasonable).
[42] TS-001 at 31:10-12 (P. App. 056).
[43] Exh. NPP-008, 10:7-14 (Malone) (P. App. 103).
[44] *See* section 3.02 of NETS Agreement, Exh. TS-003 at 11 (P. App. 067).

Appellate Case: 19-1553     Page: 23     Date Filed: 05/13/2019 Entry ID: 4787190

way: Tri-State was the net beneficiary of the greater use made of the NETS facilities to the tune of $1 million per year.

Neither SPP nor Tri-State, the parties with the burden to prove the justness and reasonableness of placing Tri-State in Zone 17, made any claim in their initial briefs to the presiding Administrative Law Judge (ALJ) that the benefits received from Tri-State's facilities are roughly commensurate with the $4.3 million cost shift to NPPD and other Zone 17 customers. The first time SPP or Tri-State even addressed that issue was in their reply briefs, in response to FERC Trial Staff and NPPD arguments in their initial briefs that governing precedent provides that a significant cost shift without any evidence of commensurate benefits is unjust and unreasonable.[45]

Tri-State argued the "since Tri-State planned and constructed its NETS facilities for both itself and NPPD with the expectation that both its customers and NPPD's customers would pay for them pursuant to the NETS Agreement, and since NPPD uses those facilities to serve its load, the 'cost causation' principle indicates that NPPD should pay for Tri-State's facilities as part of the Zone 17 costs."[46]

---

[45] *See* Trial Staff Initial Br. at 28-29 (P. App. 236-37) (discussing *Illinois Commerce Commission* v. *FERC*, 576 F.3d 470, 477 (7th Cir. 2009); NPPD Initial Br. at 16-20 (P. App. 240-44) (citing *PJM Interconnnection, L.L.C.*, Opinion No. 494, 119 FERC ¶ 61,063, P 42 (2007); *Illinois Commerce Commission,* 576 F.3d at 476-77.)

[46] Tri-State Reply Brief at 20-21 (P. App. 262-63).

14

SPP, whose witness testified that an RTO "bears no responsibility" to analyze cost shifts resulting from zone placement decisions and admitted that SPP conducted no analysis of any benefits received by SPP Zone 17 customers from Tri-State facilities, made the following argument in search of a witness:

> Because the NETS facilities were constructed under the NETS Agreement for the joint use and benefit of NPPD and Tri-State and their customers, NPPD and its customers in Zone 17 served by the NETS facilities can be said to have caused some of the costs of those facilities (including those NETS facilities built by Tri-State) such that including those facilities in Zone 17 is consistent with the cost causation principle.[47]

Because SPP's cost causation claim was raised for the first time in SPP's Reply Brief, NPPD filed a motion to file a Limited Supplemental Reply Brief, set forth in pertinent part below, to address the new claim:

> [SPP's] argument ignores 40-years of history under the NETS Agreement in which Tri-State and NPPD agreed to keep the costs of their respective facilities *separate*. Prior to joining SPP, Tri-State customers were paying approximately $66,000 per MW for the cost of Tri-State's legacy system and NPPD customers were paying approximately $23,000 per MW for the cost of NPPD's legacy system. SPP's conclusion that combining these costs, and thereby shifting $4.3 million to Zone 17

---

[47] SPP Reply Br. at 44 (P. App. 273), citing *San Diego Gas & Elec. Co.* v. *Sellers of Energy*, 127 FERC ¶ 61,250, P 43 (2009) ("[C]ost causation principles require that "all approved rates reflect to some degree the costs actually caused by the customer who must pay them."); *ISO New England*, 115 FERC ¶ 61,145, P 13 (2006) ("Under cost causation principles, costs are allocated to the parties who cause the incurrence of such costs.").

15

customers, is consistent with cost causation is contrary to 40-years of separate pricing zones under the NETS Agreement. It is also contrary to NPPD witness Mr. Malone's testimony that inclusion of Tri-State in Zone 17 shifts cost of facilities built to serve Tri-State load to other Zone 17 customers. Such testimony is unrebutted.

While the parties to the NETS Agreement could have agreed to combine their respective costs into one rate zone, they did not. Instead, they agreed to each be responsible for the separate costs of their own facilities. The parties to the NETS Agreement, however, did provide for an "Equalization Payment" if the ratio of one party's usage of the joint facilities to the sum of both parties' use exceeded that party's share the cost of the facilities. As explained by Mr. Malone, while there have been benefits to both NPPD and Tri-State from joint planning and joint use, such benefits are recognized and measured in the Equalization Payment. In this respect, Tri-State has been the net beneficiary by virtue of the fact that Tri-State has paid NPPD $1 million per year for the greater use it makes of the NPPD system.[48]

The ALJ denied NPPD's motion and refused to consider NPPD's Limited Supplemental Reply to SPP's cost causation argument.[49] Nevertheless, the ALJ essentially adopted SPP's argument by finding that it is reasonable to infer that "NPPD and its customers in Zone 17 served by the NETS facilities may have caused a portion of the costs of those facilities, including the NETS facilities built by Tri-

_____

[48] *See* NPPD Limited Supplemental Reply Brief at 1-2 (footnotes omitted) (P. App. 283-84).
[49] *Southwest Power Pool*, *Inc.,* Order Denying Motion for Leave to File Limited Supplemental Reply Brief, Docket No. ER16-204-001 (Jan. 31, 2017) (P. App. 287-88).

Appellate Case: 19-1553    Page: 26    Date Filed: 05/13/2019 Entry ID: 4787190

State."[50]  The ALJ here concluded, "[t]here is no indication that the development and construction of Tri-State's facilities […] have not and do not continue to benefit Zone 17 customers […] for the length of time the NETS Agreement has been in effect."[51]  To support this conclusion, the ALJ averred that "NPPD cannot deny that without Tri-State's facilities and before joining SPP, NPPD might have had to expend a considerable amount of money to build and develop transmission facilities" in order to serve its customers.[52]

While the ALJ described NPPD's position that the $1 million payment by Tri-State to NPPD demonstrated that Tri-State was the net beneficiary of the joint use of the NETS facilities,[53] the ALJ did not consider that evidence in concluding that "the record in this case demonstrates that placing Tri-State's facilities in Zone 17 is consistent with the Commission's cost causation principle…."[54]  Nor did the ALJ discuss the alternative method of quantifying benefits advocated by Tri-State.[55] There is no dispute that the ALJ failed to compare the quantified benefits calculated under either methodology to the cost shifts at issue.

---

[50] *Southwest Power Pool, Inc.,* 158 FERC ¶ 63,004, P 344 (2017) (Initial Decision) (P. App. 419).
[51] *Id.*, P 343 (P. App. 419).
[52] *Id.* (P. App. 419).
[53] *Id.*, P 338 (P. App. 417).
[54] *Id.*, P 344 (P. App. 419).
[55] Exh. TS-001 at 31:10-12 (Steinbach) (P. App. 056).

Appellate Case: 19-1553    Page: 27    Date Filed: 05/13/2019 Entry ID: 4787190

Shortly after issuance of the ALJ's recommended decision, SPP revised its internal zone placement criteria to include consideration of the nature of transmission services used by the new transmission owner to serve its load prior to joining SPP.[56] NPPD filed a motion with FERC to reopen the record to consider this new criterion and apply it to evidence previously submitted by NPPD on the nature of transmission services used to serve Tri-State load prior to joining SPP.[57] The premise for the criterion was that an analysis of the transmission facilities the new member had used to serve its load would be important in Zone placement. In Tri-State's case, most of the transmission services use to serve the bulk of Tri-State's load were located in Zone 19.

On May 7, 2018, FERC affirmed the ALJ, finding that the cost shift at issue does not render SPP's proposed placement of Tri-State's facilities in Zone 17 unjust and unreasonable.[58] Specifically, FERC found that the NETS Agreement provides substantial evidence that placing Tri-State in Zone 17 is consistent with cost causation principles.[59] FERC dismissed NPPD's argument that the Annual Equalization Payment demonstrated that Tri-State has been the net beneficiary of the NETS facilities by about $1 million, as "just one measure" of the relative benefits

---

[56] Opinion No. 562, P 209 (P. Add. 108).
[57] *See* NPPD Motion to Reopen Record at 4-7 (P. App. 460-63).
[58] Opinion No. 562, PP 190, 205, 207 (P. Add. 097, 105, 106), citing Initial Decision, PP 342-347 (P. App. 419-20).
[59] Opinion No. 562, P 192. (P. Add. 097-98).

Appellate Case: 19-1553   Page: 28   Date Filed: 05/13/2019 Entry ID: 4787190

and noted that Tri-State had advocated an alternative methodology for measuring benefits,[60] one showing that the net benefits went the other way, i.e., to NPPD. FERC then reasoned under each measure the benefits went in both directions and that this was sufficient to find there is an "articulable and plausible reason to believe that the benefits are at least roughly commensurate" with costs in this case.[61] FERC also denied NPPD's motion to reopen the record to consider evidence relating to the nature of transmission services provided to Tri-State prior to joining SPP.

NPPD filed a Request for Rehearing of these rulings. Among other things, it argued that whether FERC relied on the NETS Agreement's measure of a net benefit to Tri-State of $1 million, or the $550,000 net benefit to NPPD under Tri-State's methodology, was a distinction without a difference.[62] Either way, the $4.3 million cost shift to NPPD far exceeded any quantification of benefits NPPD received from Tri-State's facilities.

NPPD also argued that in approving Tri-State's placement in Zone 17, FERC had failed to consider evidence that placement in other zones was: (1) consistent

---

[60] Opinion No. 562, P 195, citing Tri-State Br. Opposing Exceptions at 42 (discussing alternate method of measuring benefits without mentioning that NPPD would receive only $550,000 of net benefits) (P. Add. 099).

[61] Opinion No. 562, P 195, citing *Illinois Commission,* 576 F.3d at 477 (P. Add. 100).

[62] NPPD Request for Rehearing at 27-28 (P. App. 496-97).

19

with the historic uses and location of the facilities used to serve Tri-State; and, (2) would have virtually eliminated any cost shift.[63]

FERC denied NPPD's rehearing request, rejecting NPPD's argument that FERC had failed to explain how the benefits, as measured either by the agreed-to methodology or by the method deemed appropriate by Tri-State, could be roughly commensurate with the cost shifts at issue. FERC reaffirmed its finding that Tri-State's $1 million annual payment to NPPD under the NETS Agreement was only "one measure" of the relative benefits to the parties and claimed that it "looked at the entirety of the record evidence to determine that the benefits to NPPD could be greater than this amount."[64] As FERC put it:

> In Opinion No. 562, the Commission held that the $4.3 million cost shift alleged by NPPD and Trial Staff, which would translate to an eight percent increase in existing Zone 17 rates, would be just and reasonable in light of all of the facts and circumstances of the case, including the significant integration of Tri-State's transmission facilities with Zone 17, the size of Tri-State's ATRR, the fact that Tri-State's transmission facilities would fill a gap in SPP's geographic footprint rather than expand it, and the benefits Zone 17 customers derive from Tri-State's transmission facilities.[65]

---

[63] *Id.* at 32-36 (P. App. 501-05).
[64] Opinion No. 562-A, P 25 (P. Add. 133).
[65] Opinion No. 562-A, P 20 (P. Add. 128), citing Opinion No. 562, P 160 (P. Add. 084).

Appellate Case: 19-1553    Page: 30    Date Filed: 05/13/2019 Entry ID: 4787190

FERC also denied NPPD's request for rehearing of FERC's determination regarding the nature of transmission service used to deliver power to Tri-State load prior to Tri-State joining SPP.[66]  According to FERC, the ALJ did consider "evidence of the nature of *all* [transmission] services used to deliver power to Tri-State's load."[67]

## SUMMARY OF ARGUMENT

There is no disagreement that cost shifts that result in significant rate increases to customers, but which are unaccompanied by commensurate benefits, are unjust and unreasonable.  And there is no dispute that the cost shifts at issue have resulted in significant rate increases ranging from six to eight percent as a result of Tri-State joining SPP as a new transmission owner in Zone 17.

Governing precedent imposes on FERC the burden to quantify the benefits received by existing Zone 17 customers from Tri-State's facilities and to determine whether such benefits are commensurate with the increased costs allocated to these customers.  If FERC cannot precisely quantify the benefits, then "an articulable and plausible reason to believe that the benefits are at least roughly commensurate with the costs" will suffice.

---

[66]Opinion No. 562-A, P 27 (P. Add. 133).
[67] *Id*., P 28 (emphasis added) (P. Add. 135).

21

NPPD and Tri-State expressly agreed in the 1984 NETS Agreement to a methodology for precisely ensuring that the benefits received by each from the joint planning, operation and use of their separately-owned facilities would be "commensurate with its actual costs." That objective was achieved by keeping separate the costs of each party's facilities and agreeing to a formula for assessing an Annual Equalization Payment. The calculation dictated by that formula demonstrated that Tri-State was required to pay NPPD approximately $1 million per year to ensure that the greater benefits received by Tri-State, compared to NPPD, were commensurate with Tri-State's actual costs. Tri-State, however, now claims that the methodology for measuring benefits that it agreed to in the NETS Agreement needs to be updated by a more current methodology favored by FERC. If that methodology is used, NPPD would pay Tri-State only $550,000.

When confronted with evidence that benefits, regardless of the methodology used for measurement, are nowhere near "roughly commensurate with an average annual $3.5 million cost shift to NPPD and other Zone 17 customers (six times larger than benefits), FERC dismissed reliance upon the formula agreed-to by the parties as "just one measure of the relative benefits" and found that the "entirety of the record" shows that the benefits could be greater.

The entirety of the record does not contain substantial evidence supporting FERC's finding. FERC did not undertake its requisite burden of quantifying the

22

other benefits in the record and explaining how they could possibly offset the large imbalance between quantified benefits and costs allocated to NPPD and other Zone 17 customers.

Even assuming the other benefits identified by FERC had some unquantifiable value, the fundamental flaw with FERC's "additional benefits" claim is that the vast majority of those benefits relate directly to the joint planning, operation and use of the facilities covered by the NETS Agreement. Those benefits have already been quantified under the Annual Equalization Payment set forth in that agreement. Treating these benefits as an offset to the imbalance as measured by the formula in the NETS Agreement constitutes double counting.

In short, FERC's reliance on the NETS Agreement to justify Tri-State shifting $3.5 million per year of its costs to NPPD and other Zone 17 customers stands the purpose of that agreement on its head. Instead of Tri-State recovering from its load 100 percent of the costs of Tri-State's facilities, and paying NPPD $1 million per year to ensure that the benefits received by Tri-State are commensurate with its costs, Tri-State shifted to NPPD and other Zone 17 customers $3.5 million per year of the cost of Tri-State's facilities. This subsidy is in addition to the $7.2 million of Tri-State savings attributable to SPP's distribution to Tri-State of its ATRR. Tri-State – not NPPD – is the big beneficiary, even without shifting 60 percent of its revenue requirement to NPPD and other Zone 17 customers.

23

FERC also failed to consider evidence placed in the record by NPPD concerning transmission services provided from SPP Zone 19 facilities to Tri-State prior to joining SPP.

FERC's refusal to consider evidence that placement of Tri-State in Zone 19 would eliminate any cost shift is arbitrary and capricious. This evidence supports NPPD's position that placement of SPP in Zone 17, rather than in Zone 19, was not just and reasonable. When as here, FERC has failed to take into account evidence that is contrary to its findings, FERC's action, by definition is unsupported by substantial evidence.

**ARGUMENT**

## I.    STANDARD OF REVIEW

The Court will "set aside agency action . . . found to be arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(a); *St. Luke's Methodist Hosp.* v. *Thompson*, 315 F.3d 984, 987 (8th Cir. 2003). In particular, it must ensure that FERC has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted); *accord Niobrara River Ranch, L.L.C.* v. *Huber*, 373 F.3d 881, 884 (8th Cir. 2004) ("[The] agency must provide a satisfactory explanation for its actions

24

based on relevant data"). Agency decisions must not only be supported by substantial evidence, but must also "take into account whatever in the record fairly detracts from its weight." *Universal Camera Corporation* v. *NLRB*, 340 U.S. 474, 488 (1951). Thus, an agency must "explain why it rejected evidence that is contrary to its finding." *Carpenters and Millwrights*, 481 F.3d at 809.

## II. FERC FAILED TO CONSIDER EVIDENCE OF A LARGE IMBALANCE BETWEEN QUANTIFIED BENEFITS AND ALLOCATED COSTS

FERC agreed with NPPD that "cost shifts that result in significant rate increases to customers, but which are unaccompanied by commensurate benefits, are unjust and unreasonable,"[68] and that the cost shifts and resulting rate increases at issue in this case (ranging from six to eight percent) are not insignificant.[69] More precisely, in a recent decision issued after Opinion 562-A, FERC found, in the context of its review of a proposed change in ownership of transmission assets under Federal Power Act section 203, 16 U.S.C. § 824b, that the resulting rate increases ranging from 3.2 to 3.8 percent, in the absence of offsetting benefits, are contrary to the public interest.[70]

---

[68] Opinion No. 562-A, P 21 (P. Add. 129); Opinion No. 562, P 191 (P. Add. 097) citing Initial Decision, P 332) (P. App. 414).
[69] Opinion No. 562-A, P 21 (P. Add. 129).
[70] *GridLiance High Plains, LLC,* 166 FERC ¶ 61,171, P 48 (2019).

25

These holdings serve to narrow the central issue before this Court to whether there is substantial evidence in support of FERC's finding that the benefits that NPPD and other Zone 17 customers receive from Tri-State's transmission facilities are at least roughly commensurate with the six to eight percent rate increase resulting from Tri-State joining SPP and the placement of its facilities in Zone 17.[71] As explained below, FERC's decision is arbitrary and capricious because it failed to consider evidence of a large imbalance between quantified benefits and the significant shift in 60 percent of Tri-State's total costs to existing Zone 17 customers.

A decision not only unsupported by substantial evidence but one that fails to give appropriate weight to evidence in the record that detracts from that decision is, by its very nature, arbitrary and capricious.[72] The failure to address the evidentiary gap between quantified benefits and allocated costs cannot be excused by FERC's reliance on other unquantified benefits it claims can be found in the "entirety of record."[73] Most of those other benefits relate to the joint planning, operation and use of the NETS facilities, the value of which is already quantified under the NETS Agreement or the alternative methodology advocated by Tri-State.

---

[71] Opinion No. 562-A, P 20 (P. Add. 128).
[72] *Universal Camera Corp.*, 340 U.S. at 488.
[73] Opinion No. 562-A, P 25 (P. Add. 133).

Appellate Case: 19-1553    Page: 36    Date Filed: 05/13/2019 Entry ID: 4787190

## III. GOVERNING PRECEDENT REQUIRES FERC TO RELY ON QUANTIFIED BENEFITS, WHEN AVAILABLE, AND TO PROVIDE A PLAUSIBLE REASON FOR FINDING THAT OTHER UNQUANTIFIABLE BENEFITS OFFSET ANY IMBALANCE BETWEEN QUANTIFIED BENEFITS AND THE COSTS ALLOCATED TO CUSTOMERS

There is no dispute about the precedent governing this case. Both NPPD and FERC rely upon *Illinois Commerce Commission v. FERC,* 576 F.3d 470 (7th Cir. 2009) (*Illinois Commission*) to support their cases. The dispute is about whether FERC properly applied that precedent to the facts of this case. As explained further below, FERC failed to do that.

The court in *Illinois Commission* relied upon the well-settled principle that all approved rates, to some degree, must reflect the costs actually caused by the customer who must pay them. *Illinois Commission,* 576 F.3d at 476, citing *KN Energy, Inc.* v. *FERC*, 968 F.2d 1295, 1300 (D.C. Cir. 1992).

To be sure, NPPD agrees with FERC that cost allocation "is not a matter for the slide rule" and does not require a ratemaking agency to allocate cost with exacting precision.[74] Concerns regarding the feasibility of calculating the value of benefits play a role: "If it cannot quantify the benefits" but has "an articulable and plausible reason to believe that the benefits are at least rough commensurate" with

_____

[74] Opinion No. 562-A, P 26 (P. Add. 133) citing, *Colo. Interstate Gas Co.* v. *FERC*, 324 U.S. 581, 589 (1945); *see also, Illinois Commission*, 576 F.3d at 475, citing *Sithe/Independence Power Partners, L.P. v. FERC*, 285 F.3d 1, 5 (D.C. Cir. 2002).

Appellate Case: 19-1553    Page: 37    Date Filed: 05/13/2019 Entry ID: 4787190

the allocated costs, that will suffice. *Illinois Commission*, 576 F.3d. at 477. But that does not mean that FERC is relieved of its duty to review available measures of benefits. While in the absence of quantified benefits, FERC can rely on broad presumptions that benefits are roughly commensurate, it cannot use such presumptions to avoid the "duty of comparing the costs assessed against a party to the burdens imposed or benefits drawn by the party." *Illinois Commission*, 576 F.3d. at 477, citing *Midwest Transmission Owners* v. *FERC*, 373 F.3d 1361, 1368 (D.C. Cir. 2004).

The "roughly commensurate" test articulated in *Illinois Commission* is the default measure of "just and reasonable" in cases where FERC cannot precisely quantify the benefits. In those cases, "an articulable and plausible reason to believe that the benefits are at least roughly commensurate with the costs" will suffice. *Illinois Commission,* 576 F.3d at 477. As made clear by the court, "we require only that the agency have made a reasoned decision based on substantial evidence in the record." *Id*. at 478. Because FERC "failed to do that" the agency decision was vacated and remanded. *Id.*

But as Judge Posner emphasized on review of FERC's order on remand "even the modest goal of rough commensurability requires *some* effort by the Commission, as we insisted, to quantify the benefits." *Illinois Commerce Commission* v. *FERC*, 756 F.3d 556, 562 (7th Cir. 2014) (*Illinois Commission II*) (emphasis in original).

28

FERC, he concluded, "hasn't responded to that directive." *Id.* Instead, FERC simply said such things as the utilities subject to increased allocations of costs "will make use of and benefit from" the newly constructed facilities at issue. *Id.* But the court faulted FERC for failing to explain "how much use or how much benefit" the utilities would receive from the new facilities. *Id.* The case was again remanded because "these questions the Commission ignores." *Id.*

By contrast, FERC did quantify benefits in *Illinois Commerce Commission* v. *FERC,* 721 F.3d 764 (7th Cir. 2013) (*Illinois Commission III*). That case involved review of the allocation of costs different from the type at issue in *Illinois Commission* and *Illinois Commission* II. The court affirmed FERC's finding that the benefits from new transmission projects designed to bring wind generated in western areas of the Midwest Independent Transmission System Operator, Inc. (MISO) to all zones within MISO were commensurate with the increased costs of those new projects. But in *Illinois Commission III*, unlike in FERC's earlier decisions, FERC relied on MISO estimated savings of $297 million because western wind power is cheaper than power from existing sources. *Illinois Commission III*, 721 F.3d at 774. Judge Poser also stressed in this case that the Illinois Commerce Commission "can't counter FERC without presenting evidence of imbalance of costs and benefits, which it hasn't done." *Id.* at 775. As discussed below, unlike FERC's

29

third try in the *Illinois Commission* cases, it has failed to make even the "modest"

effort required by *Illinois Commission II*.

## IV. FERC'S FINDING THAT THE BENEFITS RECEIVED BY NPPD AND OTHER ZONE 17 CUSTOMERS ARE ROUGHLY COMMENSURATE WITH THE COSTS ALLOCATED TO ZONE 17 CUSTOMERS IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

This is not a case, like *Illinois Commission III*, where FERC relied on

quantified benefits and petitioner failed to counter FERC with "evidence of

imbalance of costs and benefits." 721 F.3d at 774-75. To the contrary, in this case,

FERC relied on unquantified benefits to counter evidence presented by NPPD of a

large imbalance between quantified benefits and increased costs.

On the "cost" side of the equation, NPPD demonstrated that the placement of

Tri-State in Zone 17 resulted in the shifting of $4.3 million, 60 percent of Tri-State's

total ATRR of $7.2 million, to NPPD and other Zone 17 customers.[75]  Even

assuming the validity of the adjustments for future changes projected to occur from

2020 to 2023,[76] NPPD calculated that the resulting cost shift would average $3.5

million per year over a ten-year period from 2016-2026.[77]

On the "benefits" side of the equation, NPPD demonstrated that NPPD and

Tri-State had the prescience in 1984 to execute the NETS Agreement to ensure that

---

[75] Exh. NPP-001 at 3:13-18 (Swartz) (P. App. 079).
[76] Opinion No. 562, P 157 (P. Add. 083).
[77] NPPD Brief on Exceptions at 51-52 (P. App. 442-43); Opinion No. 562, P 158 (P. Add. 083).

each party "shall receive benefits commensurate with its actual costs,"[78] an objective the parties achieved by (1) keeping separate the disparate cost of constructing, operating and maintaining their respective facilities;[79] and, (2) assessing an Annual Equalization Payment upon the party having a ratio of annual peak use (1-CP) greater than its ratio of actual costs.[80] As a result, Tri-State has been obligated to pay NPPD an approximate $1 million Annual Equalization Payment to ensure that the costs incurred by Tri-State are commensurate with the benefits received from its greater use of the NETS facilities. This agreed-to measure of benefits demonstrates that Tri-State – rather than NPPD – has been the net beneficiary of the joint planning, operation and use of the facilities subject to the NETS Agreement.

FERC, however, dismissed the NETS Agreement's methodology for measuring benefits as "just one measure of the relative benefits" and found that "NPPD provides no reason" why the 12-CP method advocated by Tri-State is not an appropriate measure of benefits.[81] Based on that finding FERC concluded:

> Examining these two different metrics for assessing the benefits associated with use of the NETS Agreement facilities – usage based on annual coincident peak load and

---

[78] Exh. TS-003 at 10 (P. App. 066).

[79] The annual cost of Tri-State's facilities is $64,333 per MW, 2.7 times higher than the $23,581 per MW cost of NPPD's and other Zone 17 facilities. Exh. NPP-001 at 3:13-15 (Swartz) (P. App. 079).

[80] Exh. NPP-008 at 10:7-14 (Malone) (P. App. 103); NETS Agreement, section 3.01 and 3.02, Exh. TS-003 at 10-11 (P. App. 066-67); NPPD Supplemental Reply Brief at 2 (P. App. 284).

[81] Opinion No. 562-A, P 24 (P. Add. 131-32).

Appellate Case: 19-1553    Page: 41    Date Filed: 05/13/2019 Entry ID: 4787190

usage based on monthly coincident peak load – demonstrates that both Tri-State and NPPD benefit from the facilities and that there is an "articulable and plausible reason to believe that the benefits are at least roughly commensurate…."[82]

NPPD "provide[d] no reason why" Tri-State's methodology is not an appropriate measure of benefits because Tri-State waited until its Brief Opposing Exceptions to discuss that methodology.[83] But even ignoring the procedural unfairness, NPPD immediately countered that there remained a huge cost-benefit gap whichever methodology is used. Even using Tri-State's methodology, NPPD would pay Tri-State only $550,000 per year.[84] This measure of benefits to NPPD is nowhere near "roughly commensurate" with the $4.3 million initial cost shift.[85]

Instead of confronting this evidence, FERC responded with the *non-sequitur* that NPPD's "repeated references" to the $4.3 million initial cost-shift fail to account for FERC's finding that this amount will in fact be reduced in the next 5-7 years.[86] But, as noted above, FERC's criticism ignores the fact even taking future adjustments into account, the 10-year average annual cost shift of $3.5 million still

---

[82] Opinion No. 562, P 195 (P. Add. 099-100), citing, *Illinois Commission*, 576 F.3d at 477.
[83] Tri-State Brief Opposing Exceptions at 42 (P. App. 454).
[84] NPPD Request for Rehearing at 27 (P. App. 496), citing Exh. TS-001 at 31:10-12 (Steinbach) (P. App. 056).
[85] NPPD Request for Rehearing at 27 (P. App. 496).
[86] Opinion No. 562-A, P 26 (P. Add. 133)

Appellate Case: 19-1553     Page: 42     Date Filed: 05/13/2019 Entry ID: 4787190

greatly exceeds even Tri-State's estimate of the benefits to NPPD.[87]  By failing to compare the $550,000 of benefits to the average annual $3.5 million cost shift,[88] FERC avoided its duty of "comparing the costs assessed against a party to the burdens imposed or benefits drawn by the party." *Illinois Commission* at 477, citing, *Midwest ISO Transmission Owners*, 373 F.3d at 1368.

Lacking any evidence of quantified benefits that will fill the large gap between the quantified benefits of at most $550,000 and a cost shift at least six times that amount, FERC instead purports in its rehearing order to fill that gap by claiming it "looked at the entirety of the record evidence to determine that the benefits to NPPD could be greater than this amount."[89]  But this generalized reference to "the entirety of the record" is not supported by substantial evidence because FERC made no effort to quantify these other alleged benefits and failed to recognize that most of the alleged benefits in the record relate directly to those listed in the NETS Agreement.

FERC's finding that the benefits that NPPD and its customers received from Tri-State's transmission facilities are at least roughly commensurate with the costs allocated to NPPD was "[b]ased on the record" of benefits identified in Paragraphs

---

[87] NPPD Request for Rehearing at 19 (P. App. 488), citing Opinion No. 562, P 157 (P. Add. 083); NPPD Brief on Exceptions at 51-52 (P. App. 250), citing NPPD Initial Brief at 26, n.95 (P. App. 250).

[88] $3.5 divided by total existing Zone 17 ATRR of $56,779,222 = 6 percent. Exh. NPP-002 (P. App. 089).

[89] Opinion No. 562-A, P 25 (P. Add. 133).

33

190-208 of Opinion No. 562.[90]  All of the benefits discussed in those paragraphs are directly tied to the NETS Agreement.[91]  As summarized by FERC:

> First, NPPD benefits from Tri-State's facilities by using those facilities to serve NPPD load.  Second, an express purpose of the NETS Agreement was to 'avoid duplication of facilities and to result in the least possible cost.'  The fact that neither NPPD nor Tri-State has a physical path to all of its loads without using the facilities of the other entity indicates that NPPD has benefitted by avoiding duplication of facilities; otherwise, it would have had to construct its own facilities to serve the load that it currently serves using Tri-State facilities.  Third, the NETS Agreement provides that the parties' joint transmission system is for their 'mutual benefit and joint use' and intended to 'serve the Parties' Customers in Western Nebraska.'[92]

The fundamental flaw with FERC's explanation is that the vast majority of the other benefits identified by FERC "in the entirety of the record" are already quantified under the NETS Agreement.[93]  Thus, FERC's reliance on these same benefits "detailed" in the NETS Agreement to fill the gap between the cost shift at

---

[90] Opinion No. 562-A, P 5 (P. Add. 117), citing Opinion No. 562, PP 190-208 (P. Add. 097-107).

[91] *See* Opinion No. 562, PP 190-208 (P. Add. 097-107).

[92] Opinion No. 562, P 205 (footnotes omitted) (P. Add. 105-06): *see also*, Opinion No. 562-A, P 16 (P. Add. 124-25).

[93] Other alleged benefits, such as the size of Tri-State's revenue requirement (Opinion No. 562-A, P 20 (P. Add. 128)) do not benefit NPPD in any way.  In fact, the small size of Tri-State's ATRR prevented SPP from placing Tri-State in its own zone, which would have benefitted NPPD.

34

issue and the quantification of benefits under the NETS Agreement constitutes double counting.

As explained in NPPD's rehearing request, FERC's propensity to rely on select language in the NETS Agreement that speaks to its general purpose is arbitrary because it ignores entirely the specific objective of the NETS Agreement that each party "shall receive benefits commensurate with its actual costs."[94] FERC failed to recognize that Tri-State and NPPD agreed to achieve this objective by keeping the costs of their facilities separate and by agreeing to an Annual Equalization Payment.[95]

Beyond the benefits described in the NETS Agreement, FERC also claimed that the cost shift would be just and reasonable in light of the "facts and circumstances of this case" including: (1) significant integration of Tri-State's transmission facilities with Zone 17; (2) the size of Tri-State's ATRR; (3) the fact that Tri-State's transmission facilities would fill a gap in SPP's geographic footprint rather than expand it; and (4) the benefits Zone 17 customers derive from Tri-State transmission facilities.[96]

FERC's mere identification of alleged benefits falls far short of that required by governing precedent, which directs FERC to make "*some* effort" to quantify the

[94] NPPD Request for Rehearing at 21-22 (P. App. 490-91).
[95] *Id.*
[96] Opinion No. 562-A, P 20 (P. Add. 127-28).

35

benefits.  *Illinois Commission II* at 562.  In this case, FERC has not responded to that directive.  Like the situation in *Illinois Commission II,* FERC made *no* effort to quantify these benefits or to provide a reasoned explanation of "how much use" or "how much benefits" NPPD and other Zone 17 customers received.

The courts have made clear that the inability or difficulty in measuring benefits fails in the absence of any indication that the difficulty exceeds that of measuring the benefits of particular utilities.  *Illinois Commission* at 475.  Here, FERC's finding that it "was not able to quantify the exact benefits to NPPD's customers" is not supported by a reasoned explanation.[97]  FERC's explanation consists of the following statement:

> Although there may not be a specific quantification of the benefits that NPPD received and will continue to receive from the Tri-State transmission facilities, this is unsurprising because the entities treated their transmission facilities under the NETS Agreement as if they were a single system owned by a single entity.  The NETS Agreement detailed the benefits that the parties would realize, and the parties continued that agreement for over 30 years, indicating that they were in fact benefitting from the agreement.[98]

FERC's reliance on the NETS Agreement to explain why it cannot quantify benefits is the height of irony in light of the inclusion in that agreement of a formula

---

[97] *See* Opinion No. 562-A, P 25 (P. Add. 132-33), citing Opinion No. 562, P 207 (P. Add. 106-07).
[98] Opinion No. 562, P 207 (P. Add. 106-07).

Appellate Case: 19-1553     Page: 46     Date Filed: 05/13/2019 Entry ID: 4787190

to measure "commensurate benefits." Moreover, FERC's explanation that "the entities treated their transmission facilities under the NETS Agreement as if they were a single system owned by a single entity" is contrary to the provisions of that agreement relevant to quantification of benefits. As explained above, *supra* at 15-16, the parties agreed to ensure that each party "shall receive benefits commensurate with its actual costs" by (1) keeping *separate* the discrete cost of constructing, operating and maintaining their respective separately-owned facilities; and, (2) assessing an Annual Equalization Payment upon the party making greater use of the facilities under the agreement.[99] These provisions treat the facilities under the NETS Agreement as separately-owned facilities for purposes of determining whether the benefits received by each party are commensurate with the costs of their respective facilities.[100]

In conclusion, FERC's tack here is a paradigm for "arbitrary and capricious" agency action. FERC relies upon an arbitrary reading of select provisions of the NETS Agreement, while ignoring the provisions expressly designed to ensure that the party "shall receive benefits commensurate with its costs." FERC then proceeds to replace the NETS Agreement's explicit metric for measuring commensurate benefits with an alternative metric advocated by Tri-State. When confronted with

[99] Exh. TS-003 at 10-11 (P. App. 066-67) ("Each Party shall receive benefits commensurate with its actual costs").
[100] *Id.*

37

evidence that this alternative fails to quantify benefits at a level roughly commensurate with the average annual $3.5 million cost shift, FERC claims that it relied on the "entirety of the record" to find that the benefits could be greater.[101]  But this explanation fails to recognize that most of the "other" benefits identified in the record have already been quantified under the NETS Agreement.  FERC's fruitless search for evidence to counter the measure of benefits agreed-to by the parties "demonstrates tenacious dedication to a particular result . . . but does not constitute the kind of reasoned decision-making to which [the courts] will defer." *Tenn. Gas Transmission Co.* v. *FERC*, 789 F.2d 61, 62-63 (D.C. Cir. 1986).

## V.  FERC FAILED TO CONSIDER EVIDENCE SUPPORTING PLACEMENT OF TRI-STATE IN ZONE 19

### A.  FERC Ignored SPP's New Policy That The Placement Of Transmission Facilities Should Follow The Load That They Serve To The Same Pricing Zone

NPPD placed into the record in this proceeding substantial evidence relevant to the nature of all transmission service used to serve Tri-State's load prior to the transfer of Tri-State's transmission facilities to SPP.[102]  But the ALJ ignored this evidence, presumably because it was not included in the four internal criteria SPP used to assess Tri-State's zone placement.

---

[101] Opinion No. 562-A, P 25 (P. Add. 133)

[102] NPPD Br. on Exceptions at 30-32 (P. App. 439-41); Exh. NPP-008 at 17-18. (Malone) (P. App. 110-11); Exh. NPP-018 (P. App. 128).

Appellate Case: 19-1553     Page: 48     Date Filed: 05/13/2019 Entry ID: 4787190

Soon after the ALJ issued his Initial Decision, SPP revised its internal zone placement criteria to include a new criterion: the nature of transmission service used to serve load of a new transmission owner prior to its expected date of transfer to SPP.[103] This criterion is important because SPP policy requires transmission facilities used prior to joining SPP to follow the load they serve in the zone placement process.[104]

This policy change prompted NPPD to file a Motion to Reopen the Record, asking FERC to consider existing record evidence pertaining to the nature of transmission services used to deliver power to Tri-State's load prior to its transfer to SPP.[105] That evidence showed that Tri-State prominently used transmission facilities located in Zone 19. FERC denied NPPD's motion, maintaining in Opinion No. 562 and again in Opinion No. 562-A that the ALJ had given "substantial consideration" to NPPD's evidence.[106] But, as discussed below, the portions of the ALJ's decision on which FERC relies considered only the transmission service provided under the NETS Agreement. The ALJ merely summarized, without undertaking any analysis, NPPD's evidence regarding the full nature of the various

---

[103] Opinion No. 562, P 209 (P. Add. 108).
[104] NPPD Request for Rehearing at 33-34 (P. App. 502-03).
[105] *See* December 27, 2017 Motion of NPPD to Reopen Record (P. App. 457).
[106] *See* Opinion No. 562, P 221 (P. Add. 112).

Appellate Case: 19-1553    Page: 49    Date Filed: 05/13/2019 Entry ID: 4787190

transmission services used to deliver power to Tri-State's load prior to Tri-State joining SPP.

The nature of these many transmission services used to serve Tri-State's load prior to joining SPP is complex. Prior to October 1, 2015, Basin Electric paid $4,349,495 for Integrated System transmission service to deliver Tri-State requirements to the edge of the Tri-State system.[107] From there, Tri-State paid $5,966,590 for service under its OATT to deliver such requirements to its own load.[108] Tri-State also paid NPPD $1,064,552 for its greater joint use of NPPD's system,[109] and approximately $2 million for transmission service provided by Western-RMR.[110]

After the Integrated System joined SPP, effective October 1, 2015, service provided by the Integrated System was terminated. Basin Electric utilized SPP Zone 19 Network Service, in place of the Integrated System transmission service and Tri-State's OATT, to deliver power to Tri-State's load.[111] Power was delivered under the Zone 19 Network Service via Western-RMR's facilities to 38 of 40 Tri-State delivery points.[112] SPP witness Mr. Bourne made it clear that such deliveries were

---

[107] NPPD Request for Rehearing at 2 (P. App. 471); NPPD Initial Br. at 34 (P. App. 258), citing Exh. NPP-033 at 27 (P. App. 156).
[108] NPPD Initial Br. at 34 (P. App. 258).
[109] *Id.*
[110] Tr. 78:7-15 (P. App. 187).
[111] Exhs. TS-001 at 11:12-13 and 25:19-24 (Steinbach) (P. App. 046 and 053).
[112] Exh. NPP-044 at 51-53 (P. App. 169-71).

Appellate Case: 19-1553     Page: 50     Date Filed: 05/13/2019 Entry ID: 4787190

at the Zone 19 rate[113] and that none of these 38 delivery points were at an interface with NPPD facilities.[114]  Basin Electric utilized SPP Zone 17 Network Service to deliver power to Tri-State load at *only two* delivery points on NPPD facilities.[115]

This evidence notwithstanding, the ALJ and FERC considered only the transmission service provided under the NETS Agreement and ignored NPPD's evidence regarding the full nature of the various transmission services used to deliver power to Tri-State's load prior to Tri-State joining SPP.[116]

FERC identified only the following portions of the Initial Decision to support its finding that the ALJ considered NPPD's evidence[117]:

- P 115:  discussion of location of generation used to serve Tri-State load without any discussion of the transmission services used to deliver such generation.[118]

- P 171:  description of NPPD's evidence (i.e. evidence that NPPD claims was ignored in the discussion of the merits of evidence).[119]

- P 212:  description of NPPD's evidence without consideration or discussion of the merits.[120]

---

[113] Tr. 208:4-10 (P. App. 219); *see* Exh. NPP-045 (P. App. 172).

[114] Tr. 289:8-23 (P. App. 225); Exh. NPP-044 at 51-53 (P. App. 169-71).

[115] Tr. 290:1-4; Tr. 296:7-18 (P. App. 226 and 232).

[116] *See* Initial Decision, PP 291, 296, 343-44 and 346 (P. App. 400, 401, 419, and 420).

[117]  Opinion No. 562, P 127, n.285 (P. Add. 069).

[118] Initial Decision, P 115 (P. App. 336).

[119] *Id*., P 171 (P. App. 358-59).

[120] *Id*., P 212 (P. App. 371).

Appellate Case: 19-1553     Page: 51     Date Filed: 05/13/2019 Entry ID: 4787190

- P 362:  description of NPPD position without discussion or consideration of merits.[121]

- P 367-368:  no discussion of transmission services.[122]

None of these citations to the Initial Decision supports a finding that the ALJ "considered" transmission services provided by the Integrated System.  Thus, the reference to Paragraph 115 discusses the location of *generation* used to serve Tri-State load without any discussions of the *transmission* services used to deliver that generation to Tri-State load.  Paragraphs 171, 212 and 362 merely describe NPPD's evidence without any *consideration* of its merits.  Paragraphs 367-368 contain no discussion or consideration of transmission services.  The fact that Basin Electric utilized SPP *Zone 19* Network Service to serve Tri-State load at 38 of 40 delivery points via Western-RMR's facilities prior to Tri-State's transfer to SPP is directly relevant to SPP's new policy that requires transmission facilities used prior to joining SPP to follow the load they serve in the zone placement process.[123]

In the first case in which SPP applied its new zone placement criteria, SPP concluded – in circumstances where the new transmission owner is interconnected with SPP Zone 3 and the Zone 10 – that the Zone 10 is appropriate for zone placement because the new transmission owner – the City of Nixa – initiated SPP

---

[121] *Id.*, P 362 (P. App. 426).

[122] *Id.*, PP 367-68 (P. App. 427-28).

[123] Exh. NPP-044 at 51-53 (P. App. 169-71); NPPD Request for Rehearing at 33 (P. App. 502).

Appellate Case: 19-1553     Page: 52     Date Filed: 05/13/2019 Entry ID: 4787190

Network Service in the Zone 10 effective June 1, 2017, prior to the effective date of the transfer of Nixa's assets to SPP.[124]  FERC explained that "SPP asserts that the transmission facilities should follow the load that they serve to the same pricing zone."[125]  Similarly, Tri-State initiated SPP Zone 19 Network Service, through its supplier Basin Electric, to serve its load prior to transfer of Tri-State's facilities to SPP.[126]  Consistent with SPP's rationale that "the transmission facilities should follow the load that they serve to the same pricing zone," Tri-State's facilities should follow its load to Zone 19, the pricing zone from which 38 of 40 Tri-State delivery points were served prior to the transfer to SPP.[127]

The record makes clear that the NPPD NETS facilities are only a small portion of the transmission services used to serve Tri-State load and that Zone 19 facilities and Tri-State's own facilities provided the majority of transmission services needed to deliver power to Tri-State load. In ignoring that evidence, FERC failed to support with substantial evidence its ruling that it (and the ALJ) had taken into account the predominant usage of Zone 19 facilities in evaluating zone placement.

---

[124] *See Southwest Power Pool, Inc.,* 162 FERC ¶ 61,215, P 10 (2018); *Southwest Power Pool, Inc.,* Letter Order, Docket No. ER17-204 (August 25, 2017).
[125] *Southwest Power Pool, Inc.,* 162 FERC ¶ 61,215 at P 10.
[126] Exh. TS-001 at 11:11-13 (Steinbach) (P. App. 046): NPPD Request for Rehearing at 32 (P. App. 501).
[127] Tr. 289:18-23 (P. App. 225); Exh. NPP-044 at 51-53 (P. App. 169-71).

Appellate Case: 19-1553    Page: 53    Date Filed: 05/13/2019 Entry ID: 4787190

**B. FERC's Failure To Consider Evidence That Placing Tri-State In Zone 19 Would Avoid Any Cost Shift To Zone 19 Customers Is Arbitrary And Capricious**

FERC's finding that a $4.3 million cost shift to Zone 17 customers from Tri-State being placed in that zone is just and reasonable is arbitrary and capricious because FERC failed to consider evidence introduced by NPPD that placing Tri-State in Zone 19 would cause no significant cost shift to Zone 19 customers.[128] Specifically, NPPD demonstrated that placing Tri-State in Zone 19 would avoid cost shifts because Tri-State's annual $64,333 per MW cost of its transmission facilities to serve existing Tri-State load is virtually identical to the annual $64,036 per MW cost of existing Zone 19 facilities to serve Zone 19 load.[129] Moreover, NPPD demonstrated that the resulting $579,000 cost shift would increase Zone 19's rates by only two-tenths of one percent.[130] NPPD further demonstrated that this *de minimis* rate increase would be *eliminated* by the $1.2 million of additional revenue attributable to 21.5 MW of existing Zone 17 load served from Tri-State facilities that would be transferred, along with Tri-State's facilities, to Zone 19.[131] The end result is a "win-win" situation: Tri-State benefits from shifting $579,000 of its costs to Zone 19 and the rest of Zone 19 benefits from the inclusion of $1.2 million of

---

[128] NPPD Brief on Exceptions at 56 (P. App. 447); Exhs. NPP-006 and NPP-007 (P. App. 091 and 092).
[129] Exh NPP-001 at 9 (Swartz) (P. App. 085).
[130] NPPD Initial Br.at 30 (P. App. 439).
[131] *Id*. (P. App. 439).

Appellate Case: 19-1553    Page: 54    Date Filed: 05/13/2019 Entry ID: 4787190

offsetting revenue attributable to 21.5 MW of existing Zone 17 load that would be transferred to Zone 19.[132]

FERC refused to consider NPPD's evidence on grounds that the question before FERC is whether SPP has shown that its proposal to place Tri-State in Zone 17 is just and reasonable.[133]  On this basis, FERC concluded that it had no obligation to consider the just and reasonableness of alternative zone placements, or whether SPP's proposal is less reasonable than such alternatives.[134]  FERC explained in Opinion No. 562-A:

> Having found that SPP's proposal is just and reasonable, and having determined that the cost shifted to Zone 17 customers are consistent with cost causation principles and do not render the proposal unjust and unreasonable, the Commission need not consider whether the relative lack of cost shifts to Zone 19 customers alleged by NPPD renders that zone a more just and reasonable alternative.[135]

---

[132] Exh. No. NPP-005 (P. App. 090).

[133] Opinion No. 562, P 145 (P. Add. 076-77).

[134] *Id*. (P. Add. 077), citing *Cities of Bethany* v. *FERC*, 727 F.2d 1131, 1136 (D.C. Cir. 1984) ("FERC has interpreted its authority to review rates [under the FPA] *as* limited to an inquiry into whether the rates proposed by a utility are reasonable - and not to extend to determining whether a proposed rate schedule is more or less reasonable than alternative rate designs."), *cert. denied*, 469 U.S. 917 (1984); *Oxy USA* v. *FERC*, 64 F.3d 679, 692 (D.C. Cir. 1995) (finding that proposed methodologies "need not be the only reasonable methodology, or even the most accurate.")).

[135] Opinion No. 562-A, P 32 (P. Add. 138).

Appellate Case: 19-1553     Page: 55     Date Filed: 05/13/2019 Entry ID: 4787190

FERC in this case was not asked to choose between multiple just and reasonable alternatives. NPPD argued that placing Tri-State in Zone 17, when placement in Zone 19 would have provided Tri-State with the same services without a cost shift, was itself unreasonable. An agency acts arbitrarily where, as here, it has "entirely failed to consider an important aspect of the problem."[136]

That FERC was obligated to give NPPD's argument reasoned consideration follows from FERC's own settled policies:

> The Commission will permit RTO proposals to use license plate rates, . . . for several reasons. First, commenters overwhelmingly support the use of license plate rates, and demonstrate convincingly that problems associated with cost shifting are not easily resolved by means other than the use of license plate rates. Second, the Commission is concerned that the potential for cost shifting could act as an impediment to RTO formation, thereby denying all stakeholders the benefits that come from RTO membership.[137]

There is no dispute that Tri-State's placement in Zone 19 would have eliminated any cost shift – an outcome that would have furthered FERC's own RTO membership policy. The elimination of the cost shift, coupled with the fact that, prior to the transfer of Tri-State facilities to SPP, all Tri-State's requirements were delivered to its load by the Integrated System and subsequently by SPP Zone 19

---

[136] *Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[137] *Southwest Power Pool, Inc.,* 122 FERC ¶ 61,083, P 80 (2008), citing Order No. 2000, FERC Stats. & Regs. ¶ 31,089, 31,177 (1999).

Appellate Case: 19-1553    Page: 56    Date Filed: 05/13/2019 Entry ID: 4787190

transmission service, constitutes compelling evidence that placing Tri-State in Zone 19 is the only just and reasonable zone placement option in the record. FERC's failure to address NPPD's contention to that effect was arbitrary and capricious.

## CONCLUSION

Based on the foregoing, NPPD requests the Court to reverse and remand this case to FERC because its finding that the benefits received by NPPD from Tri-State facilities are commensurate with the costs shifted to NPPD is not supported by substantial evidence. On remand, the Court should direct FERC to consider evidence demonstrating that placing Tri-State in Zone 19 would result in a minimal cost shift that would be completely offset by additional revenue produced from the transfer to Zone 19 of Zone 17 load served directly from Tri-State facilities. That result is consistent with cost causation principles because all load would be paying for the cost of facilities built to serve them.[138]

---

[138] *Midwest ISO Transmission Owners,* 373 F.3d at 1368, quoting *KN Energy, Inc. v. FERC,* 968 F.2d at 1300.

Appellate Case: 19-1553    Page: 57    Date Filed: 05/13/2019 Entry ID: 4787190

Respectfully submitted,

*/s/ David D'Alessandro*
David D'Alessandro
Jonathan P. Trotta
Stinson LLP
1775 Pennsylvania Ave., NW
Suite 800
Washington, DC  20006
(202) 785-9100
david.dalessandro@stinson.com
jtrotta@stinson.com

*Counsel for Petitioner*
*Nebraska Public Power District*

Dated: May 13, 2019

48

# CERTIFICATE OF COMPLIANCE

1. Pursuant to Fed. R. App. P. 32(a)(7)(B), the undersigned certifies that this brief complies with the applicable type-volume limitation. Excluding parts of the brief exempted by Fed. R. App. P. 32(f), the document contains 11,547 words, including footnotes, as determined by the word-count function of Microsoft Word.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared by Microsoft Office Word 2016 in 14-point Times New Roman font.

3. Pursuant to Eighth Circuit Rule 28A(h)(2), the undersigned certifies that the electronic version of this brief and the attached addendum has been scanned for viruses and are virus-free.

*/s/ Jonathan P. Trotta*
Jonathan P. Trotta
STINSON LLP
1775 Pennsylvania Ave., NW
Suite 800
Washington, DC  20006
(202) 785-9100
jtrotta@stinson.com

*Counsel for Petitioner*
*Nebraska Public Power District*

Dated: May 13, 2019

49

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25(c), 25(d), and Circuit Rule 25A, I hereby certify that I have this day electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Eighth Circuit, via the Court's CM/ECF system. Participants in this case who are registered CM/ECF users will be served via the Court's CM/ECF system.

*/s/ Jonathan P. Trotta*
Jonathan P. Trotta
STINSON LLP
1775 Pennsylvania Ave., NW
Suite 800
Washington, DC 20006
(202) 785-9100
jtrotta@stinson.com

*Counsel for Petitioner*
*Nebraska Public Power District*

Dated: May 13, 2019