# In the United States Court of Appeals for the Eighth Circuit

No. 19-1553

_____

Nebraska Public Power District,
*Petitioner*,

v.

Federal Energy Regulatory Commission,
*Respondent*.

_____

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

_____

## BRIEF FOR RESPONDENT
## FEDERAL ENERGY REGULATORY COMMISSION

_____

James P. Danly
General Counsel

Robert H. Solomon
Solicitor

Robert M. Kennedy
Senior Attorney

Matthew W.S. Estes
Senior Legal Advisor

For Respondent
Federal Energy Regulatory Commission

July 10, 2019          Washington, D.C. 20426

# SUMMARY OF THE CASE

This case involves the placement of the electric transmission facilities of Tri-State Generation and Transmission Association, Inc. into one of the Southwest Power Pool, Inc.'s 19 pricing zones. Southwest proposed to place Tri-State in the same zone as the Nebraska Public Power District, which is the Petitioner in this case. Southwest's proposal was driven largely by the fact that Tri-State and the Nebraska District have jointly operated their transmission facilities as a single transmission system for over 30 years. However, the Nebraska District opposed this placement. In its view, the costs allocated to the Nebraska District would be disproportionately higher than the benefits it receives from placing Tri-State in the same zone.

Following an administrative hearing, the Federal Energy Regulatory Commission approved Southwest's proposed placement. The Commission, agreeing with the Administrative Law Judge, found that the long-standing joint operation of the two parties' transmission systems creates numerous specific benefits supporting the placement of the two systems into the same zone. The Nebraska District's arguments to the contrary are unsupported factually and misplaced as a matter of law.

The Commission agrees with the Nebraska District regarding the need for, and length of, oral argument.

# TABLE OF CONTENTS

PAGE

SUMMARY OF THE CASE.........................................................................(i)

STATEMENT OF THE ISSUES...................................................................1

STATUTORY AND REGULATORY PROVISIONS .......................................5

STATEMENT OF THE CASE....................................................................5

I.     THE FEDERAL POWER ACT ......................................................5

II.    SOUTHWEST AND SOUTHWEST'S TRANSMISSION RATES........6

III.   INTEGRATED NATURE OF THE TRI-STATE AND NEBRASKA
       DISTRICT TRANSMISSION SYSTEMS.........................................9

IV.    SOUTHWEST'S SELECTION OF ZONE 17 FOR TRI-STATE.......... 13

V.     POLICY AND PRECEDENT REGARDING
       THE ALLOCATION OF THE COSTS OF TRANSMISSION
       FACILITIES ............................................................................... 15

VI.    THE PROCEEDING UNDER REVIEW............................................ 16

       A. Southwest's Filing to Accommodate Tri-State as a Transmission
          Owner Under the Southwest Tariff ......................................... 16

       B. The Hearing and Initial Decision............................................. 18

       C. The Commission's Rulings .................................................... 19

ii

SUMMARY OF ARGUMENT………...................................................... 20

ARGUMENT…………........................................................................ 24

I.     STANDARD OF REVIEW.................................................... 24

II.    THE COMMISSION REASONABLY AFFIRMED THE
ADMINSTRATIVE LAW JUDGE'S APPROVAL OF
THE PLACEMENT OF TRI-STATE IN ZONE 17……..................... 26

III.   THE NEBRASKA DISTRICT'S RELIANCE ON THE
COST-SHARING MECHANISM OF THE JOINT TRANSMISSION
AGREEMENT IS MISPLACED…… .................................................. 30

   A. The Annual Equalization Payment Calculation Does Not Quantify
All of the Benefits Conferred by the Joint Transmission Agreement…...31

      1.  Annual Equalization Payment Provisions of the Joint
Transmission Agreement………...................................... 32

      2.  The Commission Reasonably Found that the Annual
Equalization Payments Do Not Compensate for Non-Usage
Related Benefits…… .................................................... 33

   B. The Commission's Analysis Fully Comports With the *Illinois
Commission* Cases ………........................................................... 38

      1.  The *Illinois Commission* Cases Addressed Significantly
Different Circumstances ………....................................... 38

      2.  The Commission's Approval of the Placement of Tri-State
in Zone 17 is Consistent With the Rulings in the *Illinois
Commission* Cases ………............................................... 43

IV.   THE COMMISSION CORRECTLY REJECTED ARGUMENTS
THAT PLACEMENT IN ZONE 19 WOULD BE PREFERABLE ……47

CONCLUSION…………........................................................................ 51

Appellate Case: 19-1553   Page: 4   Date Filed: 07/11/2019 Entry ID: 4807000

# TABLE OF AUTHORITIES

**COURT CASES:**                                                    **PAGE**

*Advanced Energy Mgmt. Alliance v. FERC,*
    860 F.3d 656 (D.C. Cir. 2017)......................................... 4, 5, 6, 47, 48, 49

*Alcoa, Inc. v. FERC*, 564 F.3d 1342 (D.C. Cir. 2009)...................................... 25

*Central Iowa Power Co-op. v. Midwest Indep. Transmission*
    *Sys. Operator, Inc.*, 561 F.3d 904 (8th Cir. 2009) ....................................6

*Cities of Bethany v. FERC,*
    727 F.2d 1131 (D.C. Cir. 1984)................................................. 4, 5, 48, 49

*City of Winnfield v. FERC,*
    744 F.2d 871 (D.C. Cir. 1984)........................................ 4, 5, 6, 47, 48, 49

*Colo. Interstate Gas Co. v. FPC*, 324 U.S. 581 (1945) .................................... 16

*E.I. du Pont de Nemours & Co. v. Collins*, 432 U.S. 46 (1977)........................ 24

*FERC v. Elec. Power Supply Ass'n,*
    136 S.Ct. 760 (2016).................................................... 3, 24, 25, 26, 27, 50

*FPC v. Florida Power & Light Co.*, 404 U.S. 453 (1972) ................................ 24

*Ill. Commerce Comm'n v. FERC,*
    576 F.3d 470 (7th Cir. 2009) ................ 2, 3, 15, 16, 28, 31, 37, 39, 40, 45

*Ill. Commerce Comm'n v. FERC,*
    721 F.3d 764 (7th Cir. 2013)  ............................... 3, 16, 31, 41, 42, 43, 46

*Ill. Commerce Comm'n v. FERC,*
    756 F.3d 556 (7th Cir. 2014)  ................................... 16, 31, 39, 40, 42, 45

*Ind. Mun. Power Agency v. FERC,* 56 F.3d 247 (D.C. Cir. 1995).................... 26

*K N Energy, Inc. v. FERC*, 968 F.2d 1295 (D.C. Cir. 1992)....................... 15, 30

*Mid-Continent Area Power Pool v.  FERC,*
    305 F.3d 780 (8th Cir. 2002) .................................................................. 24

Appellate Case: 19-1553    Page: 5    Date Filed: 07/11/2019 Entry ID: 4807000

*Midwest ISO Transmission Owners v. FERC*,
  373 F.3d 1361 (D.C. Cir. 2004) .................................................. 3, 15, 30

*Minnesota v.* FERC, 734 F.2d 1286 (8th Cir. 1984)............................ 24, 25, 38

*Missouri Coalition for Environment v. FERC*,
  544 F. 3d 955 (8th Cir. 2008) ............................................... 24

*Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1*,
  554 U.S. 527 (2008) ........................................................ 6, 25

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ............................................... 24, 26, 27, 50

*New York v. FERC*, 535 U.S. 1 (2002) ................................................ 5

*OXY USA Inc. v. FERC*, 64 F.3d 679 (D.C. Cir. 1995).................................... 48

*Pac. Gas & Elec. Co. v. FERC*, 306 F.3d 1112 (D.C. Cir. 2002) ................... 17

*Pac. Gas & Elec. Co. v. FERC*, 373 F.3d 1315 (D.C. Cir. 2004) ................... 30

*Sithe/Independence Power Partners, L.P. v. FERC*,
  285 F.3d 1 (D.C. Cir. 2002) ............................................. 16, 46

*Town of Norwood v. FERC*, 962 F.2d 20 (D.C. Cir. 1992) .............................. 25

*Transmission Access Policy Study Group v. FERC*,
  225 F.3d 667 (D.C. Cir. 2000) ........................................... 30

*Union Elec. Co. v. FERC*, 668 F.2d 389 (8th Cir.1981)................................... 25

## ADMINISTRATIVE CASES:

*Midwest Indep. Transmission Sys. Operator, Inc.*,
  97 FERC ¶ 61,326 (2001) ........................................................7

*Midwest Indep. Transmission Sys. Operator, Inc.*,
  118 FERC ¶ 61,213 (2007) ................................................. 16

Appellate Case: 19-1553     Page: 6     Date Filed: 07/11/2019 Entry ID: 4807000

*Regional Transmission Organizations*, Order No. 2000, 65 Fed. Reg. 810 (2000), *order on reh'g*, Order No. 2000-A, 65 Fed. Reg. 12,088 (2000), *appeal dismissed sub nom., Pub. Util. Dist. No. 1 v. FERC*, 272 F.3d 607 (D.C. Cir. 2001) ...............................................................................6

*Sw. Power Pool, Inc.*, 153 FERC ¶ 61,366 (2015) ........................................... 17

*Sw. Power Pool, Inc.*, 158 FERC ¶ 63,004 (2017) ......................... 9, 10, 11, 13, 14, 18, 19, 20, 32

*Sw. Power Pool, Inc.*, 159 FERC ¶ 62,098 (2017) ........................................... 18

*Sw. Power Pool, Inc.*, Opinion No. 562,
163 FERC ¶ 61,109 (2018) .................................. 9, 11, 12, 16, 17, 18, 19, 20, 26, 27, 28, 29, 30, 31, 34, 35, 37, 44, 45, 46, 48

*Sw. Power Pool, Inc.*, Opinion No. 562-A,
166 FERC ¶ 61,019 (2019) ................................. 8, 9, 20, 36, 37, 47, 48, 49, 50

**STATUTES:**

Federal Power Act:

Section 201, 16 U.S.C. § 824 ....................................................... 5, 7, 17

Section 205, 16 U.S.C. § 824d ......................... 1, 2, 4, 5, 6, 16, 23, 47, 48

Appellate Case: 19-1553    Page: 7    Date Filed: 07/11/2019 Entry ID: 4807000

# GLOSSARY

| Term | Definition |
| --- | --- |
| Annual Equalization Payment | An annual payment made pursuant to the Joint Transmission Agreement by a party whose use of the jointly operated transmission system for the year was greater than that party's relative share of the costs of the system |
| Initial Decision | The decision below by the Administrative Law Judge, reported as *Sw. Power Pool, Inc.*, 158 FERC ¶ 63,004 (2017) |
| Joint Transmission Agreement | Western Nebraska Joint Transmission Agreement, also referred-to as the "NETS Agreement" |
| Nebraska District | Nebraska Public Power District (NPPD) |
| Opinion No. 562 | *Sw. Power Pool, Inc.*, Opinion No. 562, 163 FERC ¶ 61,109 (2018) |
| Opinion No. 562-A | *Sw. Power Pool, Inc.*, Opinion No. 562-A, 166 FERC ¶ 61,019 (2019) |
| Pet. Add. | Petitioner's Addendum |
| Pet. App. | Petitioner's Appendix |
| Regional Transmission Organization | An independent FERC-jurisdictional entity that controls and operates the transmission facilities of its member utilities. |
| Res. Add. | Respondent's Addendum |
| Res. App. | Respondent's Appendix |
| Southwest | Southwest Power Pool, Inc. |
| Tri-State | Tri-State Generation and Transmission Association, Inc. |

Appellate Case: 19-1553   Page: 8   Date Filed: 07/11/2019 Entry ID: 4807000

# In the United States Court of Appeals
# for the Eighth Circuit

No. 19-1553

————

NEBRASKA PUBLIC POWER DISTRICT,
*Petitioner*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*.

————

ON PETITION FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

————

## BRIEF FOR RESPONDENT
## FEDERAL ENERGY REGULATORY COMMISSION

————

## STATEMENT OF THE ISSUES

1. Section 205 of the Federal Power Act charges the Federal Energy Regulatory Commission (Commission or FERC) with setting "just and reasonable" wholesale electricity rates for public utilities. 16 U.S.C. § 824d(a) (R. Add. 4).[1]  In the case of a proposed allocation of costs among different customers, as opposed to setting the level of rates, the Commission is tasked with determining whether the

---

[1] "R. Add." denominates the Respondent's Addendum.

benefits received by customers from the service they receive "are at least roughly commensurate" with the costs allocated to those customers. *Ill. Commerce Comm'n v. FERC*, 576 F.3d 470, 477 (7th Cir. 2009). If not, the costs must be allocated to different customers.

The cost allocation issue in this case arises from a rate filing made by Southwest Power Pool, Inc. (Southwest), a multi-state Regional Transmission Organization[2] that provides electric transmission service over the combined facilities of its various members. Southwest had accepted Tri-State Generation and Transmission Association, Inc. (Tri-State) as a new transmission-owning member. Southwest therefore was required to place Tri-State's transmission facilities in one of Southwest's 19 existing pricing zones or, alternatively, in a newly-established zone.

In its Federal Power Act section 205 rate filing, Southwest proposed to place Tri-State in Zone 17, a zone that includes the Nebraska Public Power District (Nebraska District). This placement was based primarily on the fact that the Tri-State and Nebraska District transmission systems have been jointly operated as a single system for over 30 years. However, the addition of Tri-State's facilities to

---

[2] As explained in more detail in Section II of the Statement of the Case, a Regional Transmission Organization is an independent FERC-regulated entity that controls and operates the transmission facilities of its member utilities.

2

Zone 17, and the attendant costs of owning and operating those facilities, were projected to cause the transmission rates in Zone 17 to increase by approximately six to eight percent.

After conducting an evidentiary hearing, the Commission concluded—agreeing with the Administrative Law Judge—that Southwest's proposed placement is appropriate. The Commission considered the numerous benefits to the Nebraska District shown on the record to be provided by Tri-State's transmission facilities. Principal among these is that joint operation of the parties' transmission systems allows each party to avoid the cost of duplicative facilities. Based on the record evidence, the Commission concluded that these benefits are "at least roughly commensurate" with the costs allocated to Zone 17. Therefore the Commission approved the placement of Tri-State in Zone17. **THE ISSUE ON REVIEW IS:**

Whether the Commission reasonably concluded, based on substantial record evidence, that the benefits to the Nebraska District are "at least roughly commensurate" with the costs allocated to the Nebraska District as a result of the placement of Tri-State in Zone 17. *FERC v. Elec. Power Supply Ass'n*, 136 S.Ct. 760 (2016); *Ill. Commerce Comm'n v. FERC*, 576 F.3d 470 (7th Cir. 2009); *Ill. Commerce Comm'n v. FERC*, 721 F.3d 764 (7th Cir. 2013); *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361 (D.C. Cir. 2004).

2.     The courts have described the Commission's role in reviewing a rate filing under Federal Power Act section 205, 16 U.S.C. § 824d, as "essentially passive and reactive," restricted to "evaluating the confined proposal." *Advanced Energy Mgmt. Alliance v. FERC*, 860 F.3d 656, 662 (D.C. Cir. 2017) (citing *City of Winnfield v. FERC*, 744 F.2d 871, 875-76 (D.C. Cir. 1984)).  The Commission need find only that the filed rate is just and reasonable, not that it is the sole or the most just and reasonable rate.  *See, e.g. Cities of Bethany v. FERC*, 727 F.2d 1131, 1136 (D.C. Cir. 1984) (describing the Commission's authority under Federal Power Act section 205 as "limited to an inquiry into whether the rates proposed by a utility are reasonable – and not to extend to determining whether a proposed rate schedule is more or less reasonable than alternative rate designs").

In this case, the Nebraska District presented evidence to support its assertion that it would be more appropriate to place Tri-State in Southwest Zone 19 than in Zone 17 as Southwest proposed.  The Commission held, however, that once it found Southwest's proposal to be just and reasonable, its inquiry was at an end.  The Commission therefore did not evaluate whether placement of Tri-State in Zone 19 would be superior to Southwest's proposed placement in Zone 17.  **THE ISSUE ON REVIEW IS:**

Whether, after finding that Southwest's proposed placement of Tri-State in Zone 17 is just and reasonable, the Commission appropriately declined to evaluate

4

further the Nebraska District's arguments that placement in Zone 19 would be superior to placement in Zone 17. *Advanced Energy Mgmt. Alliance v. FERC*, 860 F.3d 656 (D.C. Cir. 2017); *City of Winnfield v. FERC*, 744 F.2d 871 (D.C. Cir. 1984); *Cities of Bethany v. FERC*, 727 F.2d 1131 (D.C. Cir. 1984).

## STATUTORY AND REGULATORY PROVISIONS

Pertinent statutes are contained in the attached Respondent's Addendum.

## STATEMENT OF THE CASE

### I.   THE FEDERAL POWER ACT

Section 201 of the Federal Power Act, 16 U.S.C. § 824 (R. Add. 1), gives the Commission jurisdiction over the rates, terms, and conditions of service for the transmission and sale at wholesale of electric energy in interstate commerce. This grant of jurisdiction is comprehensive and exclusive. *See generally New York v. FERC*, 535 U.S. 1 (2002).

All rates for or in connection with jurisdictional sales and transmission service are subject to the Commission's review under section 205 of the Federal Power Act, 16 U.S.C. § 824d. 16 U.S.C. § 824d (R. Add. 4). Under section 205, the Commission is required to assure that rates are just and reasonable, and not unduly discriminatory or preferential. *Id.* at §§ (a), (b), (e). This review is "essentially passive and reactive," restricted to "evaluating the confined proposal."

5

*Advanced Energy Mgmt. Alliance v. FERC*, 860 F.3d 656, 662 (D.C. Cir. 2017)

(citing *City of Winnfield v. FERC*, 744 F.2d 871, 875-76 (D.C. Cir. 1984)).

## II.   SOUTHWEST AND SOUTHWEST'S TRANSMISSION RATES

In 2000, the Commission promulgated rules for the establishment of

"Regional Transmission Organizations." *Regional Transmission Organizations*,

Order No. 2000, 65 Fed. Reg. 810 (2000), *order on reh'g*, Order No. 2000-A, 65

Fed. Reg. 12,088 (2000), *appeal dismissed sub nom., Pub. Util. Dist. No. 1 v.*

*FERC*, 272 F.3d 607 (D.C. Cir. 2001); s*ee also Morgan Stanley Capital Grp. v.*

*Pub. Utility Dist. No. 1*, 554 U.S. 527, 535-37 (2008) (describing technical and

regulatory developments in the electric utility industry). A Regional Transmission

Organization is an entity, independent of any market participant, that controls and

exercises operational authority over electric transmission facilities owned by its

member utilities. *Central Iowa Power Co-op. v. Midwest Indep. Transmission Sys.*

*Operator, Inc.*, 561 F.3d 904, 907 (8th Cir. 2009).

One of several functions performed by Regional Transmission Organizations

is to provide transmission service over the facilities they control at rates approved

by the Commission under Federal Power Act section 205. *Central Iowa*, 561 F.3d

at 907-08. Because Regional Transmission Organizations provide jurisdictional

transmission service, they are electric utilities subject to the Commission's

6

jurisdiction under Federal Power Act section 201(e), 16 U.S.C. § 824(e) (R. Add. 2).

There currently are six Regional Transmission Organizations[3] that have been approved as such by the Commission (plus another similar organization, located in Texas, that is not subject to the Commission's jurisdiction). *See Electric Power Markets: National Overview*, available at https://www.ferc.gov/market-oversight/mkt-electric/overview.asp (last visited July 10, 2019). Southwest is one of those six, and is located in central United States, spanning from parts of Texas, New Mexico, and Oklahoma at its southern end to the US-Canadian border in North Dakota and Montana at the northern end. Below is a map showing the Southwest footprint.

---

[3] Some of the Commission-approved Regional Transmission Organizations refer to themselves as "Independent System Operators" rather than as Regional Transmission Organizations. For purposes of this case, there is no material difference between the two. *See, e.g.*, *Midwest Indep. Transmission Sys. Operator, Inc.*, 97 FERC ¶ 61,326 (2001) (granting Regional Transmission Organization status to the Midwest Independent Transmission System Operator).

7



https://www.ferc.gov/market-oversight/mkt-electric/spp/elec-spp-footprint.pdf (last visited July 10, 2019).

Like most Regional Transmission Organizations, Southwest employs what are known in the industry as "license plate rates." *Sw. Power Pool, Inc.*, Opinion No. 562-A, 166 FERC ¶ 61,019 at P 3 (2019) (P. Add. 116).[4] This means that Southwest is divided into pricing zones, and the customers located in each zone pay rates based on the cost of the transmission facilities located in that zone. *Id.* Customers transmitting power from one zone to another pay the transmission rate only for the zone where the customers receiving the power are located. *Id.*

---

[4] "P. Add." denominates the Petitioner's Addendum.

8

When a new transmission owner joins Southwest and is placed in a particular pricing zone, the cost of that new owner's transmission facilities is added to the rates charged by Southwest for transmission in that zone. *Sw. Power Pool, Inc.*, Opinion No. 562, 163 FERC ¶ 63,109 at P 5 (2018) (P. Add. 011). Alternatively, Southwest may decide to establish a new zone that consists solely of the transmission facilities owned by the new member. *Sw. Power Pool, Inc.*, 158 FERC ¶ 63,004 at P 97 (2017) (Initial Decision) (P. App. 97).[5] A decision by Southwest to assign the transmission facilities of a new member to a particular zone or zones inevitably will have a rate effect—positive or negative—on the existing customers in that zone. Opinion No. 562-A at P 3 (P. Add. 116).

## III. INTEGRATED NATURE OF THE TRI-STATE AND NEBRASKA DISTRICT TRANSMISSION SYSTEMS

Over 40 years ago, in 1975, Tri-State and the Nebraska District entered into a Memorandum of Understanding (Memorandum) that established principles for the joint operation and planning of their transmission facilities in western Nebraska. Nine years later, in 1984, the Memorandum was replaced by the Western Nebraska Joint Transmission Agreement (Joint Transmission Agreement).

---

[5] "P. App." denominates the Petitioner's Appendix.

Appellate Case: 19-1553    Page: 17    Date Filed: 07/11/2019 Entry ID: 4807000

Initial Decision at P 81 (P. App. 323-24) (citing Bourne Testimony, Ex. SPP-001, at 13-14 (R. App. 13-14)).[6]

The objective of the Joint Transmission Agreement is "to provide for planning, constructing, operating, and maintaining an integrated, interconnected, adequate, and reliable joint electric power transmission system." Initial Decision at P 22 (P. App. 300) (quoting Steinbach Testimony, Ex. TS-001 at 20 (P. App. 048)). In addition, the Joint Transmission Agreement is intended "to provide for fair and equitable allocation of costs and benefits of such system." *Id.*

Section 3.09 of the Joint Transmission Agreement (P. App. 068) provides that "[t]he Parties shall conduct conferences and studies to develop plans for the addition of necessary high voltage transmission facilities to [the joint transmission system] using the *Single-Entity Concept*." Initial Decision at P 21 (P. App. 300) (emphasis added). The Single-Entity Concept is used in planning, designing, constructing, operating, and maintaining a transmission system in which the system is treated as though it were owned by only one party. *Id.*

---

[6] "R. App." denominates the Respondent's Appendix. The Joint Transmission Agreement is referred-to in the Nebraska District's brief and below as the "NETS Agreement." In some portions of the Initial Decision, the Transmission Agreement also is referenced as "GFA [Grandfathered Agreement] 494," because the agreement is listed in Attachment W, Grandfathered Agreements, of the Southwest Tariff and is designated there as GFA 494. Initial Decision at P 18 (P. App 298).

Among other things, the Joint Transmission Agreement gives Tri-State and the Nebraska District the right to use each other's transmission system to serve their own customers. Initial Decision at P 81 (P. App. 323-24) (citing Bourne Testimony, Ex. SPP-001, at 13-14 (R. App. 13-14)). All of the Nebraska District's facilities and most of the Tri-State facilities turned over to Southwest's functional control are governed by the Joint Transmission Agreement. *Id.*

The two parties recognized that, although their transmission facilities would be operated as a single transmission system, each party's use of the joint transmission system likely would differ from its share of the system's costs. Consequently, the Joint Transmission Agreement provides for an "Annual Equalization Payment" to ensure that each party's share of the total costs of operating the system is commensurate with its use of the system. Initial Decision at P 23 (P. App. 300-01) (citing Steinbach Testimony, Ex. TS-001 at 21-23 (P. App. 049-51)).

There are different methods used in the electric industry for measuring the use of a transmission system. Opinion No. 562 at P 195 (P. Add. 099-100). Under the method employed by the Joint Transmission Agreement, each party's use is measured at the time the combined use of the transmission system is at its highest for the entire year (the annual coincident peak methodology). *Id.*; s*ee also* Steinbach Testimony, Ex. TS-001 at 21 (P. App. 049). Under this method, Tri-

11

State was deemed to have made greater use of the combined transmission system each year and, as a result, Tri-State paid the Nebraska District approximately $1 million per year to compensate for its greater use. *Id.*

However, another accepted way to measure use is the method employed by Southwest for establishing its transmission rates. Opinion No. 562 at P 195 (P. Add. 099-100). Under this approach, each party's use of the transmission system is measured each month at the time when the combined use of the system is at its highest for that month. Those monthly measurements then are averaged out over the year (monthly coincident peak methodology). *Id.*

Under this alternative approach, instead of Tri-State being deemed to have made greater use of the combined system, the Nebraska District would have been deemed to have made use of 59 percent of the system and Tri-State 41 percent. *Id.*; *see also* Steinbach Testimony, Ex. TS-001 at 22 (P. App. 050). If the monthly coincident peak methodology had been used for the Annual Equalization Payment calculation, the Nebraska District would have been required to make payments to Tri-State of approximately $550,000 per year. Steinbach Testimony, Ex. TS-001 at 31 (P. App. 056).

Today, after over 40 years of coordinated operations, the transmission systems of Tri-State and the Nebraska District are highly integrated. Opinion No. 562 at P 113 (P. Add. 062). There are at least five points of interconnection

12

between the two systems. *Id.* at P 114 (P. Add. 062). The Nebraska District does not have a transmission path to some of its customers without using the Tri-State facilities. *Id.* at P 194 (P. Add. 098-99). And the Nebraska District relies on its ability to use the facilities owned by Tri-State to serve its customers. *Id.*

## IV. SOUTHWEST'S SELECTION OF ZONE 17 FOR TRI-STATE

When Southwest accepted Tri-State for membership in 2015, Southwest was obligated to place Tri-State's transmission facilities in one or more of its existing zones or else create a new zone for Tri-State. Southwest applied four criteria in making this determination. Initial Decision at P 251 (P. App. 386) (citing Bourne Testimony, Ex. SPP-001, at 6 (R. App. 6)). The first two were used to determine whether Tri-State's facilities should be placed in a new zone. *Id.* (citing Bourne Rebuttal Testimony, Ex. SPP-003 at 6) (R. App. 24)). And if Southwest determined, based on its first two criteria, not to create a new zone, the third and fourth criteria were used to determine the appropriate existing zone or zones for Tri-State's transmission facilities. *Id.*

The first criterion was whether the annual cost of owning and operating Tri-State's transmission system, known as the Annual Transmission Revenue Requirement, was less than the Annual Transmission Revenue Requirement of the smallest existing Southwest zone. *Id.* The second criterion was whether the Tri-State facilities substantially increased Southwest's "footprint" (i.e. its geographic

scope). Southwest determined that the Tri-State transmission facilities did not meet either of these criteria and therefore that it would not be appropriate to establish a new pricing zone. *Id.* at P 78 (P. App. 322-23) (citing Bourne Testimony, Ex. SPP-001 at 10-11 (R. App. 10-11)).

Once it concluded that establishment of a new pricing zone was not warranted, Southwest determined the most appropriate existing zone for Tri-State's transmission facilities, through the use of the third and fourth of its four criteria. The third criterion was the extent to which Tri-State's transmission facilities were integrated with the transmission facilities of other owners in existing zones. Initial Decision at P 251 (P. App. 386). Under the fourth criterion, Southwest also considered the extent to which Tri-State's transmission facilities were embedded within an existing zone. *Id.*

In applying these criteria, Southwest observed that the Tri-State and Nebraska District transmission systems have been jointly operated and planned under the Joint Transmission Agreement since 1985, Initial Decision at P 81 (P. App. 323-24) (citing Bourne Testimony, Ex. SPP-001 at 13-14 (R. App. 13-14)), and are "highly integrated." *Id.* at P 79 (P. App. 323) (citing Bourne Testimony, Ex. SPP-001 at 11-12 (R. App. 11-12)). Southwest concluded that the degree to which the Tri-State and Nebraska District transmission facilities were integrated

14

and dependent upon each other warranted inclusion of Tri-State in Zone 17. *Id.* at

P 83 (P. App. 324) (citing Bourne Testimony, Ex. SPP-001 at 17 (R. App. 17)).

## V. POLICY AND PRECEDENT GOVERNING THE ALLOCATION OF THE COSTS OF TRANSMISSION FACILITIES

The Commission has developed cost causation principles for use in cost

allocation cases in order to satisfy the statutory mandate that rates be just and

reasonable. "[T]raditionally, [this] required that all approved rates reflect to some

degree the costs actually caused by the customer who must pay them." *K N*

*Energy, Inc. v. FERC*, 968 F.2d 1295, 1300 (D.C. Cir. 1992).

In the electric transmission context, "[t]o the extent that a utility benefits

from the cost of the new facilities, it may be said to have 'caused' a part of these

costs to be incurred, as without the expectation of its contributions the facilities

might not have been built, or been delayed." *Ill. Commerce Comm'n v. FERC*, 576

F.3d 470, 476 (7th Cir. 2009) (*Illinois Commission I*); *see also Midwest ISO*

*Transmission Owners v. FERC*, 373 F.3d 1361, 1368 (D.C. Cir. 2004) ("We have

described this principle as 'requir[ing] that all approved rates reflect to some

degree the costs actually caused by the customer who must pay them.'" (quoting

*K N Energy*, 968 F.2d at 1300)).

If it is not possible to quantify the benefits provided by transmission

facilities, the Commission must provide "an articulable and plausible reason to

believe that the benefits are at least roughly commensurate" to the costs being

15

allocated. *Illinois Commission I,* 576 F.3d at 477. And this evaluation of a

proposed cost allocation "requires *some* effort by the Commission . . . to quantify

the benefits." *Ill. Commerce Comm'n v. FERC*, 756 F.3d 556, 562 (7th Cir. 2014)

(*Illinois Commission II*) (emphasis in original).

The standard that cost allocation be "at least roughly commensurate with

benefits" does not require that a cost allocation decision rest entirely on a

comparison of costs and benefits. "Allocation of costs is not a matter for the slide-

rule. It involves judgment on a myriad of facts. It has no claim to an exact

science." *Midwest Indep. Transmission Sys. Operator, Inc.*, 118 FERC ¶ 61,213 at

P 84 n.24 (2007) (quoting *Colo. Interstate Gas Co. v. FPC*, 324 U.S. 581, 589

(1945)). And "[i]t's not enough . . . to point out that . . . FERC's attempt to match

the costs and the benefits . . . is crude; if crude is all that is possible, it will have to

suffice." *Ill. Commerce Comm'n v. FERC*, 721 F.3d 764, 775 (7th Cir. 2013)

(*Illinois Commission III*); s*ee also Sithe/Independence Power Partners, L.P. v.

FERC*, 285 F.3d 1, 5 (D.C. Cir. 2002) ("FERC is not bound to reject any rate

mechanism that tracks the cost-causation principle less than perfectly.").

## VI.   THE PROCEEDING UNDER REVIEW

### A. Southwest's Filing to Accommodate Tri-State as a Transmission Owner Under the Southwest Tariff

On October 30, 2015, Southwest submitted to the Commission, for its

review under Federal Power Act section 205, proposed revisions to Southwest's

16

Open Access Transmission Tariff. Opinion No. 562 at P 4 (P. Add. 010). These revisions were intended to accommodate Tri-State joining Southwest as a transmission owner. *Id.*[7] As explained above, Southwest proposed in this filing to place Tri-State's transmission facilities into Zone 17. *Id.* (P. Add. 011).

Southwest's filing was supported by Tri-State and a number of other Southwest customers (located outside of Zone 17). Opinion No. 562 at P 6 (P. Add. 011).[8] However, the Nebraska District (located in Zone 17) opposed the filing, arguing that Tri-State's facilities instead should be placed in their own pricing zone or, alternatively, in Southwest pricing Zone 19. *Id.*

On December 30, 2015, the Commission issued an order accepting Southwest's proposed Tariff revisions, subject to refund. *Sw. Power Pool, Inc.*, 153 FERC ¶ 61,366 at P 1 (2015). The Commission also established hearing and

---

[7] Tri-State is exempt from Commission jurisdiction pursuant to Federal Power Act section 201(f), 16 U.S.C. § 824(f) (R. Add. 2). Accordingly, Tri-State is not subject to the Commission's rate jurisdiction. However, transmission service over the Tri-State facilities is provided by Southwest, which is subject to the Commission's jurisdiction. Consequently, the Commission has jurisdiction over the rates charged by Southwest for transmission service over Tri-State's transmission facilities, even though the Commission would not have jurisdiction over any rates charged by Tri-State itself for service over those same facilities. *See* Steinbach Testimony, Ex. TS-001 at 8-9 (P. App. 043-44); *see also Pac. Gas and Elec. Co. v. FERC*, 306 F.3d 1112, 1114-15 (D.C. Cir. 2002).

[8] The other customers supporting Southwest's filing were Northwest Iowa Power Cooperative, Basin Electric Power Cooperative, and Western Area Power Administration. Opinion No. 562 at P 6 (P. Add. 011).

Appellate Case: 19-1553     Page: 25     Date Filed: 07/11/2019 Entry ID: 4807000

settlement judge procedures to address whether Southwest's proposed Tariff revisions were just and reasonable. *Id.* at PP 43-44.

The parties subsequently reached a settlement resolving all issues except for the proposed placement of Tri-State in Southwest Zone 17. *Sw. Power Pool, Inc.*, 159 FERC ¶ 62,098 (2017). Consequently, the Commission initiated a hearing before an Administrative Law Judge to address this issue. Opinion No. 562 at P 7 (P. Add. 012).

## B. The Hearing and Initial Decision

The hearing was held from November 7-9, 2016. Initial Decision at P 13 (P. App. 297). It focused on two issues: (1) whether it is just and reasonable to place Tri-State in Zone 17 based on the scope, configuration, and operational characteristics of Tri-State's transmission facilities; and (2) whether the proposed placement of Tri-State in Zone 17 is unjust and unreasonable because it shifts some costs of Tri-State's existing transmission facilities to transmission owners and customers in Zone 17. Opinion No. 562 at P 8 (P. Add. 012).

Tri-State and Southwest asserted that Tri-State's facilities are operated jointly with those of the Nebraska District and thus are highly integrated with and embedded in the facilities of Zone 17. *Id.* at P 12 (P. Add. 013-15). Tri-State and Southwest also argued that the cost increase to existing Zone 17 customers is consistent with cost causation principles. *Id.* at P 13 (P. Add. 015).

18

The Nebraska District argued that, based on its size and integration with other zones, Tri-State should be placed either in its own, separate zone, or in Zone 19. *Id.* at P 9 (P. Add. 012-13). The Nebraska District also asserted that Southwest's proposed placement of Tri-State in Zone 17 would result in an unjust and unreasonable eight percent increase (cost shift) in the cost of serving Zone 17 customers. *Id.* at P 10 (P. Add. 013).

On February 23, 2017, the Administrative Law Judge issued his Initial Decision. (P. App. 289). The Administrative Law Judge accepted Southwest's and Tri-State's evidence that the Tri-State and Nebraska District transmission facilities are highly integrated. Initial Decision at P 347 (P. App. 420-21). He also found that the placement of Tri-State in Zone 17 is consistent with cost-causation principles. *Id.* at PP 342-47 (P. App. 419-21). From this evidence, the Administrative Law Judge concluded that Southwest's proposal to include Tri-State's transmission facilities in Zone 17 is just and reasonable. Initial Decision at P 378 (P. App. 431).

### C. The Commission's Rulings

The Nebraska District filed exceptions to the Initial Decision, requesting that the Commission reverse the Administrative Law Judge's determination that Tri-State's transmission facilities should be included in Zone 17. Opinion No. 562 at P 17 (P. Add. 017). On May 17, 2018, the Commission issued Opinion No. 562,

19

which affirmed the Administrative Law Judge's determination that Southwest's proposed placement of Tri-State's transmission facilities in Zone 17 is just and reasonable. Opinion No. 562 at P 18 (P. Add. 017).

On January 17, 2019, the Commission issued Opinion No. 562-A (P. Add. 115), which denied the Nebraska District's request for rehearing. In so doing, the Commission found that the Nebraska District "repeats arguments that it previously presented on issues that were fully explored on the record during the course of the hearing and that both the Presiding Judge (in the Initial Decision) and the Commission (in Opinion No. 562) squarely addressed." *Id.* at P 10 (P. Add. 120). The Nebraska District's timely Petition for Review followed.

## SUMMARY OF ARGUMENT

1.     The Commission's affirmance of the Administrative Law Judge's approval of Southwest's proposed placement of Tri-State in Zone 17 was reasonable and supported by substantial record evidence. First, the uncontroverted evidence showed that Tri-State and the Nebraska District have jointly operated their transmission systems for over 30 years under the Joint Transmission Agreement, employing a "Single Entity Concept." Based on this long history of joint operations, it is reasonable to include the two systems in the same pricing zone.

Appellate Case: 19-1553     Page: 28     Date Filed: 07/11/2019 Entry ID: 4807000

Second, substantial evidence developed by the Administrative Law Judge supports the Commission's determination that the benefits derived by the Nebraska District from Tri-State's transmission facilities are roughly commensurate with the costs allocated to the Nebraska District. The most important of these benefits is that the operation of the two parties' transmission facilities as a single system makes it possible to avoid the duplication of facilities and operate the combined system at the least possible cost. This benefit is not quantifiable, but the record confirms that the Nebraska District serves some of its customers using Tri-State facilities and the benefit is real.

The Nebraska District does not contest these facts. Instead, the Nebraska District—echoed by *amicus* the Edison Electric Institute (Edison Institute)—asserts that the benefits of joint operations are quantified in their entirety by the Annual Equalization Payment provisions of the Joint Transmission Agreement. They claim that the benefits quantified by the Annual Equalization Payments are significantly outweighed by the increased costs of $3.4 million per year allocated to the Nebraska District as a result of the placement of Tri-State in Zone 17. They argue that this result violates cost causation principles established in three Seventh Circuit *Illinois Commission* cases.

This argument fails for a number of reasons, the most fundamental of which is that it rests on an incorrect premise. The Annual Equalization Payments do not,

21

and cannot, represent the quantification of all benefits obtained by the two parties under the Joint Transmission Agreement. Those payments simply align the parties' costs with their usage of the transmission system so that each party's payment of costs equals its utilization.

An important additional benefit of the Joint Transmission Agreement is that it allows the parties avoid having to construct duplicative facilities to serve their customers. This benefit is enjoyed by *both* parties and cannot be quantified by the Annual Equalization Payment provisions requiring that the *one* party making greater use of the joint transmission system must make usage-based payments to the other party.

The Nebraska District's (and the Edison Institute's) reliance on the Seventh Circuit *Illinois Commission* cases also is misplaced. Those cases involved the allocation of hundreds of millions of dollars of costs of expensive new transmission facilities to utilities that did not use them in any way. The Seventh Circuit held that the Commission could not approve the proposed allocation without identifying on the record some specific benefits that would be derived by such utilities.

Here, the Commission engaged in the analysis required by the Seventh Circuit. The Commission first considered the uncontested evidence that—unlike the *Illinois Commission* cases—the Nebraska District makes considerable use of

Appellate Case: 19-1553    Page: 30    Date Filed: 07/11/2019 Entry ID: 4807000

the Tri-State transmission facilities placed in Zone 17. The Commission next determined the benefits of joint operations, including both the benefits quantified by the Annual Equalization Payments and the other unquantified benefits, most importantly the avoidance of the duplication of facilities. Although many of the benefits are not quantifiable, the record demonstrates that they are real and not speculative.

Based on its consideration of all of these factors, the Commission reasonably concluded that the benefits to the Nebraska District of including Tri-State in Zone 17 are at least roughly commensurate with the associated costs allocated to the Nebraska District. Nothing more was required by the *Illinois Commission* cases or any other cost allocation precedents.

2.     The Nebraska District also asserts that the Commission improperly failed to consider its two arguments supporting the contention that Southwest should have placed Tri-State in Zone 19 instead of Zone 17. However, under section 205 of the Federal Power Act, 16 U.S.C. § 824d, the Commission's review is essentially passive in nature, and limited to consideration of the proposed rate filed by the public utility. If the utility's proposed rate is just and reasonable, it must be approved, regardless of whether some other rate could be said to be superior and even more just and reasonable. Consequently, the Commission

23

appropriately limited its review here to the question of whether placement of Tri-State in Zone 17, as proposed by Southwest, is just and reasonable.

## ARGUMENT

## I. STANDARD OF REVIEW

The Court reviews the Commission's orders under the Administrative Procedure Act's arbitrary and capricious standard. *See, e.g.*, *Missouri Coalition for Environment v. FERC*, 544 F. 3d 955, 958 (8th Cir. 2008); *Mid-Continent Area Power Pool v. FERC*, 305 F.3d 780, 782 (8th Cir. 2002). "The 'scope of review under the 'arbitrary and capricious standard is narrow.'" *FERC v. Elec. Power Supply Ass'n*, 136 S.Ct. 760, 782 (2016) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "A court is not to ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *Id*. "Rather, the court must uphold a rule if the agency has "'examine[d] the relevant [considerations] and articulate[d] a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Id*. (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

Further, the Court "must defer to the Commission's judgment in making determinations within its area of administrative expertise." *Minnesota v. FERC*, 734 F.2d 1286, 1288 (8th Cir. 1984) (citing *E.I. du Pont de Nemours & Co. v. Collins*, 432 U.S. 46, 54–57 (1977); *FPC v. Florida Power & Light Co.*, 404 U.S.

24

453, 463 (1972); *Union Elec. Co. v. FERC*, 668 F.2d 389, 392–93 (8th Cir.1981)).

When the "disputed question . . . involves both technical understanding and policy judgment," the Court's "important but limited role is to ensure that the Commission engaged in reasoned decisionmaking that it weighed competing views, selected [a result] with adequate support in the record, and intelligibly explained the reasons for making that choice." *Elec. Power Supply Ass'n*, 136 S. Ct. at 784.

"[N]owhere is that more true than in a technical area like [] rate design: '[W]e afford great deference to the Commission in its rate decisions.'" *Id.*, 136 S.Ct. at 782 (quoting *Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 532 (2008)). "In matters of ratemaking, [the Court's] review is highly deferential, as '[i]ssues of rate design are fairly technical and, insofar as they are not technical, involve policy judgments that lie at the core of the regulatory mission.'" *Alcoa, Inc. v. FERC*, 564 F.3d 1342, 1347 (D.C. Cir. 2009) (quoting *Town of Norwood v. FERC*, 962 F.2d 20, 22 (D.C. Cir. 1992)).

The Court is "required to accept as conclusive the 'findings of the Commission as to facts, if supported by substantial evidence.'" *Minnesota v. FERC*, 734 F.2d at 1288 (quoting 16 U.S.C. § 825*l*(b)). "Once assured the Commission has engaged in reasoned decisionmaking, it is not for [the Court] to reweigh the conflicting evidence or otherwise to substitute [its] judgment for that

25

of the Commission." *Ind. Mun. Power Agency v. FERC,* 56 F.3d 247, 254 (D.C. Cir. 1995).

## II. THE COMMISSION REASONABLY AFFIRMED THE ADMINSTRATIVE LAW JUDGE'S APPROVAL OF THE PLACEMENT OF TRI-STATE IN ZONE 17

The Commission's approval of the placement of Tri-State in Southwest Zone 17 was reasonable and supported by substantial evidence. *See Elec. Power Supply Ass'n*, 136 S.Ct. at 782; *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. As the Administrative Law Judge found, and the Commission affirmed, the Joint Transmission Agreement "demonstrates substantial integration and interdependence between Tri-State's facilities and [the Nebraska District's] Zone 17 facilities." Opinion No. 562 at P 106 (P. Add. 058).

This is because the two parties' transmission facilities "were developed and operated as an integrated whole." *Id.* Further, "it is undisputed that Tri-State has more interconnections with Zone 17 than with any other [Southwest] zone, and . . . Tri-State's interconnections with Zone 17 have more than twice the transfer capacity than Tri-State's interconnections with other [Southwest] zones." *Id.*

In addition, record evidence showed the use made by the Nebraska District of Tri-State's transmission facilities in order to serve the Nebraska District's customers. Opinion No. 562 at P 194 (P. Add. 098-99). The record shows that the Nebraska District does not have a physical path to all of its customers without

26

using Tri-State's transmission facilities. *Id.* (citing Affidavit of NPPD Contracts Manager Rod Rinne, Ex. TS-013 at 5, explaining that "neither party has the ability, solely through the use of its own facilities, to serve all of its load in Western Nebraska." (R. App. 43)).

Further, the Nebraska District relies on Tri-State's facilities to serve its customers. Opinion No. 562 at P 194 (P. Add. 099) (citing Nebraska District Response to Data Request TS-NPPD 1.15, Ex. TS-032, stating that the Nebraska District "does not have the ability, solely through use of its own facilities, to serve its entire load in the Eastern Interconnection without use of Tri-State's Eastern Interconnection facilities." (R. App. 51)).

This determination, based on undisputed record evidence, represents a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quoted in *Elec. Power Supply Ass'n*, 136 S.Ct. at 782). Southwest's placement of Tri-State in Zone 17 simply confirmed the choice made by Tri-State and the Nebraska District themselves—over 30 years ago—to operate their transmission systems as a single system. This is the epitome of a reasonable result, and it cannot have been arbitrary or capricious for the Commission to have approved Southwest's proposed placement of the jointly-operated Tri-State and Nebraska District transmission systems in the same Zone.

Appellate Case: 19-1553     Page: 35     Date Filed: 07/11/2019 Entry ID: 4807000

To be sure, because the placement of Tri-State in pricing Zone 17 raised cost allocation issues, the Commission also was obligated to consider whether the benefits to the Nebraska District of placing Tri-State in Zone 17 "are at least roughly commensurate" with the costs allocated to the Nebraska District. *Ill. Commerce Comm'n v. FERC*, 576 F.3d 470, 477 (7th Cir. 2009). But the Commission considered this question, and its conclusion again was reasonable and based on substantial evidence.

In affirming the Administrative Law Judge's findings, the Commission noted, "an express purpose of the [Joint Transmission] Agreement is to 'establish a joint transmission system for the Parties' *mutual benefit* and joint use.'" Opinion No. 562 at P 192 (P. Add. 098) (quoting Ex. No. TS-003 at 6) (P. App. 062)) (emphasis in original). The Commission found that joint operation of the two transmission systems pursuant to the Joint Transmission Agreement provides two categories of benefits.

First, it allows the parties "to *avoid duplication of facilities* and to *result in the least possible cost* without jeopardizing the adequacy or reliability of the system." Opinion No. 562 at P 192 (P. Add. 098) (quoting Joint Transmission Agreement section 3.09, Ex. No. TS-003 at 12 (P. App. 068)) (emphasis in original). "In addition," the Joint Transmission Agreement also "provides for an Annual Equalization Payment to be made 'from one Party to the other to make the

28

benefits of each Party commensurate with its costs.'" *Id.* (quoting Joint Transmission Agreement section 3.02, Ex. No. TS-003 at 7 (P. App. 067)).

The Commission found that these benefits of the Joint Transmission Agreement are not just theoretical, but supported by the record evidence developed by the Administrative Law Judge. This evidence shows that the Nebraska District's transmission facilities are not connected to all of its customers and that the Nebraska District cannot serve all of its customers without using Tri-State's transmission facilities. Opinion No. 562 at P 194 (P. Add. 099).

Consequently, "the record shows that [the Nebraska District] in fact has, and currently does, benefit from Tri-State's facilities that are governed by the [Joint Transmission] Agreement by relying on and using those facilities to serve its loads." *Id.* Indeed, the Commission noted that the Nebraska District "itself acknowledges that 'there have been benefits to both [the Nebraska District] and Tri-State from joint planning and joint use.'" *Id.* (P. Add. 098).

The Commission also relied on record evidence regarding the Nebraska District's course of action during the lengthy term of the Joint Transmission Agreement. "[W]e do not believe [the Nebraska District's] benefit is 'generalized' when an agreement to which it has remained a party for over 30 years explicitly provides that it is intended to allow the parties to 'avoid duplication of facilities.'" *Id.* (P. Add. 098).

29

Finally, the Commission considered general cost causation principles, summarized in *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1368 (D.C. Cir. 2004) ("all approved rates [must] reflect to some degree the costs actually caused by the customer who must pay them.'"). *See* Opinion No. 562 at P 196 (P. Add. 100). [9] The Commission concluded that "it is reasonable to infer that [the Nebraska District's] customers have caused part of the costs of [Tri-State's] facilities" because those facilities "were partly built to serve [the Nebraska District's] customers." *Id.* Allocation of a portion of the costs of Tri-State's facilities to the Nebraska District's facilities therefore was consistent with general cost allocation principles. *Id.*

## III. THE NEBRASKA DISTRICT'S RELIANCE ON THE COST-SHARING MECHANISM OF THE JOINT TRANSMISSION AGREEMENT IS MISPLACED

The Nebraska District does not contest that its facilities are operated jointly with those of Tri-State, or that it has benefitted in numerous ways from such joint operation. Instead, the Nebraska District asserts that the benefits it receives under the Transmission Agreement "are already quantified." Nebraska District Br. 34. According to the Nebraska District, this quantification is achieved through the

---

[9] The Court in *Midwest ISO* cited to *K N Energy, Inc. v. FERC*, 968 F.2d 1295, 1300 (D.C. Cir. 1992); *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 708 (D.C. Cir. 2000); *Pac. Gas & Elec. Co. v. FERC*, 373 F.3d 1315, 1320-21 (D.C. Cir. 2004).

Appellate Case: 19-1553     Page: 38     Date Filed: 07/11/2019 Entry ID: 4807000

Annual Equalization Payment provisions of the agreement. *Id.* at 31. The Edison

Institute similarly claims that the Joint Transmission Agreement "quantif[ies] those

exact benefits down to the last dollar." Edison Institute Br. 7.

The Nebraska District asserts that this quantification of the benefits was

exceeded by a cost shift of at least six times that amount. Nebraska District Br. 33.

The Nebraska District (with the Edison Institute's support) argues that, as a

consequence, the Commission's decision approving the placement of Tri-State in

Zone 17 violates a series of three Seventh Circuit cases addressing cost allocation.

*Ill. Commerce Comm'n v. FERC*, 576 F.3d 470 (7th Cir. 2009) (*Illinois

Commission I*); *Ill. Commerce Comm'n v. FERC*, 756 F.3d 556 (7th Cir. 2014)

(*Illinois Commission II*); and *Ill. Commerce Comm'n v. FERC*, 721 F.3d 764 (7th

Cir. 2013) (*Illinois Commission III*). Nebraska District Br. 27-29; Edison Institute

Br. 8.

These arguments are both factually and legally erroneous.

### A. The Annual Equalization Payment Calculation Does Not Quantify All of the Benefits Conferred by the Joint Transmission Agreement

As noted above, the Commission found that the benefits quantified by the

Annual Equalization Payment calculations are "in addition" to the other benefits

obtained under the Joint Transmission Agreement, including the avoidance of

duplication of facilities. Opinion No. 562 at P 192 (P. Add. 097-98). The

Nebraska District disputes this finding, asserting that "[t]hose benefits have already

31

been quantified under the Annual Equalization Payment set forth in that agreement." Nebraska District Br. 23. This is incorrect. The Annual Equalization Payment calculations quantify some, but not all, of the benefits conferred on the parties by the Joint Transmission Agreement.

### 1. Annual Equalization Payment Provisions of the Joint Transmission Agreement

The Joint Transmission Agreement provides that each party is responsible for the costs of the facilities that it owns. *See* Joint Transmission Agreement sections 3.01-02, Ex. TS-003 at 10-11 (P. App. 066-67). However, the parties recognized that a party's usage of the combined transmission system likely could exceed its share of the costs of the system. The Annual Equalization Payment provisions of the Joint Transmission Agreement were intended to address this possibility. *Id.*, section 3.02, Ex. TS-003 at 11 (P. App. 067).

The Administrative Law Judge, relying on the testimony of Tri-State witness Steinbach, explained how the Annual Equalization Payment calculations are performed. First, it is necessary to determine "the ratio of a party's usage of the joint facilities of Tri-State and NPPD to the sum of both parties' use of the facilities." Initial Decision at P 23 (P. App. 300). If this ratio exceeds a party's share of the cost of the joint facilities, then that party is required to make an Annual Equalization Payment to the other party. *Id.*

32

In other words, a party that uses more than its share of the joint transmission facilities is required to make a payment to the other party to compensate for its use of the joint transmission system in excess of its share of the costs. Based on this calculation, Tri-State was required to make payments to the Nebraska District that averaged approximately $1 million a year. *Id.* (P. App. 301).

The Joint Transmission Agreement states that the intent of this payment is "to make the benefits of each Party commensurate with its costs." Joint Transmission Agreement section 3.02, Ex. TS-003 at 11 (P. App. 067). However, the agreement is careful to narrowly define what "benefits" are being equalized in the Annual Equalization Payment calculation. "Such benefits shall be in the form of transmission use of [the joint facilities] and in the form of Annual Equalization Payments from one Party to another." *Id.*, section 3.01, Ex. TS-003 at 10 (P. App. 066). The Joint Transmission Agreement does not purport to quantify or equalize the other benefits realized from joint operations of the transmission system, such as savings from the avoidance of duplicative facilities.

### 2. The Commission Reasonably Found that the Annual Equalization Payments Do Not Compensate for Non-Usage Related Benefits

The Nebraska District's argument that the Annual Equalization Payment calculations quantify all benefits achieved from the Joint Transmission Agreement is based solely on the language in Section 3.02 that the payments are intended "to make the benefits of each Party commensurate with its costs." Nebraska District

Appellate Case: 19-1553     Page: 41     Date Filed: 07/11/2019 Entry ID: 4807000

Br. 13, 22, 23, 31, 35, 37. But this isolated phrase appearing in one section of the Joint Transmission Agreement cannot take on the meaning ascribed to it by the Nebraska District.

That the usage-based calculations of the Annual Equalization Payment could not capture all of the benefits of a joint ownership arrangement can be illustrated by the simple analogy of two people who jointly buy a car. They agree to a compensation arrangement applicable when one person uses the car more than the other over the course of a year. In that event, the person making the greater use of the car will make payments to the other, so that the parties' share of the total costs of the car is commensurate with their respective uses of the car.

The fact that one person can pay the other person to make greater use of the car does represent a benefit, but this is not the only, or even the principal, benefit of the arrangement. Rather, the principal benefit is that *each person* is able to avoid the expense of paying the entire cost of purchasing and operating a car. It would be erroneous to conclude that only the person who made greater use of the car, and thus made additional payments, benefitted from the arrangement.

Similarly, here the Commission found that each party's principal benefit from the Joint Transmission Agreement is that it can avoid the cost of duplicative facilities. Opinion No. 562 at P 194 (P. Add. 099). This benefit to each party is not captured by the calculation of the Annual Equalization Payments any more

34

than the payment for greater use of the jointly-owned car quantifies the benefit to each person of not having to purchase and operate his or her own car.

The record shows that Tri-State consistently made Annual Equalization Payments to the Nebraska District averaging $1 million a year. Opinion No. 562 at P 195 (P. Add. 099); *see also* Steinbach Testimony, Ex. TS-001 at 21 (P. App. 049). If this payment represented the quantification of all of the benefits of the Joint Transmission Agreement, the Nebraska District would have suffered a *negative* $1 million a year benefit (detriment) from the agreement, as the Edison Institute observes. Edison Institute Br. 7.

But that would make no sense. A calculation showing benefits of negative $1 million cannot represent the quantification of the full benefits enjoyed by the Nebraska District of avoiding the cost of duplicative facilities. Nor, as the Commission found, does it make sense that the Nebraska District would remain a party to the Joint Transmission Agreement for 30 years if it was not benefitting from that agreement. *Id.* at P 194 (P. Add. 099); *see also id.* at P 207 (P. Add. 107) ("The [Joint Transmission] Agreement detailed the benefits that the parties would realize, and the parties continued that agreement for over 30 years, indicating that they were in fact benefitting from the agreement.").

The Joint Transmission Agreement does not provide otherwise. The agreement establishes that the benefits being equalized by the Annual Equalization

35

Payments "shall be in the form of transmission use of [the joint facilities] and in the form of Annual Equalization Payments from one Party to another." Joint Transmission Agreement, section 3.01, Ex. TS-003 at 6 (P. App. 066). The agreement does not suggest that the Annual Equalization Payments quantify the other non-usage-related benefits of joint operation of the Tri-State and Nebraska District transmission systems.

The Nebraska District makes much of the fact that the Commission found the Annual Equalization Payment methodology represents "just one measure of the relative benefits," and that use of a monthly coincident peak method would yield a different Annual Equalization Payment. Nebraska District Br. 31 (quoting Opinion No. 562-A at P 24 (P. Add. 131)). According to the Nebraska District, even under the monthly coincident peak methodology, pursuant to which the Nebraska District's use of the combined system averaged 59 percent, the Nebraska District would pay Tri-State only approximately $550,000 a year. "This measure of benefits to [the Nebraska District] is nowhere near 'roughly commensurate' with the $4.3 million initial cost shift." *Id.* at 32.

The Nebraska District misconstrues the point made by the Commission. Contrary to the Nebraska District's argument, the Commission was not attempting to develop a precise quantification of benefits quantified by the Annual

Appellate Case: 19-1553   Page: 44   Date Filed: 07/11/2019 Entry ID: 4807000

Equalization Payment calculations that, in and of itself, would justify placement of Tri-State in Zone 17.

Rather, the Commission recognized that the Annual Equalization Payments were associated only with the parties' relative use of the joint facilities. "Examining these two different metrics for assessing the benefits *associated with use of* the [Joint Transmission] Agreement facilities . . . demonstrates that both Tri-State and [the Nebraska District] benefit from these facilities." Opinion No. 562 at P 195 (P. Add. 099-100) (emphasis added). In other words, the Commission found that, regardless of which party made relatively greater use of the joint transmission system, "*both* Tri-State and [the Nebraska District] benefit" from the joint operation of their transmission systems, including not having to construct duplicative facilities. *Id.* (emphasis added).

The Commission consistently found in Opinion Nos. 562 and 562-A that the benefits associated with the use of the joint facilities include unquantifiable benefits, such as avoidance of the duplication of facilities. *See* Opinion No. 562 at PP 192-94 (P. Add. 097-99); P 205 (P. Add. 105-06); P 207 (P. Add. 106-07); Opinion No. 562-A at P 25 (P. Add. 132-33). Based on this finding, "there is an 'articulable and plausible reason to believe that the benefits are at least roughly commensurate' with costs in this case." Opinion No. 562 at P 195 (P. Add. 100) (quoting *Illinois Commission I,* 576 F.3d at 477). The determination by the

37

Commission that the Annual Equalization Payment calculations do not quantify all benefits conferred by the Joint Transmission Agreement is well within the Commission's technical expertise and should not be disturbed by this Court. *See Minnesota v. FERC*, 734 F.2d at 1288.

## B. The Commission's Analysis Fully Comports With the *Illinois Commission* Cases

The Nebraska District's reliance on the *Illinois Commission* cases likewise is misplaced. These cases involved significantly different circumstances, and the Nebraska District has taken their holdings out of context.

### 1. The *Illinois Commission* Cases Addressed Significantly Different Circumstances

The first two *Illinois Commission* cases involved two different phases of the same Commission proceeding involving the allocation of the costs of newly constructed high-voltage transmission facilities among the utilities located in the PJM Regional Transmission Organization (PJM), which operates in various Mid-Atlantic and Midwestern states. *Illinois Commission I* addressed the initial appeal of the Commission's decision approving the proposed allocation, and *Illinois Commission II* addressed the subsequent appeal of the Commission's order on remand confirming its original approval of the allocation. The new high-voltage facilities at issue were very expensive. The cost initially was estimated at $6.6

38

billion and, even after some projects were cancelled, the cost estimate was $2.7 billion. *Illinois Commission II*, 756 F.3d at 558.

Although all of the proposed new high-voltage transmission facilities were located in the eastern part of PJM, the Commission approved PJM's proposal to allocate the costs pro rata among all PJM utilities, including utilities located in the western part of PJM where none of the facilities were located. *Illinois Commission I*, 576 F.3d at 474-75. This pro rata approach resulted in the allocation of hundreds of millions of dollars in costs to just one of the western utilities for just a single project. *Id.* at 474.

The record of the proceeding indicated that almost all of the benefits of the new high-voltage facilities accrued to utilities in the eastern part of PJM. As the Seventh Circuit explained, "the lines at issue are all located in PJM's eastern region, [and] primarily benefit that region." *Illinois Commission II*, 756 F.3d at 565. Therefore, they "should not be allowed to shift a grossly disproportionate share of their costs to western utilities on which the eastern projects will confer only future, speculative, and limited benefits." *Id.*

The only justification provided by the Commission for this result given any credence by the court was the potential for "the greater reliability that the larger-capacity transmission facilities might confer on the network as a whole." *Illinois Commission I*, 576 F.3d at 476. These potential reliability benefits could result

39

from the fact that "the more transmission capacity there is, the less likely are blackouts or brownouts caused by surges of demand for electricity on hot summer days or by accidents that shut down a part of the electrical grid." *Id.*

However, in each case, the Seventh Circuit held that the Commission failed to support its contention that the reliability benefits justified the proposed allocation. In *Illinois Commission I*, the Seventh Circuit stated that the Commission provided "no data," "no particulars," and "[n]ot even the roughest estimate of likely benefits to the objecting utilities." *Illinois Commission I*, 576 F.3d at 474-75. It was in light of this failure to provide any evidence to support the allocation of hundreds of millions of dollars of costs to western utilities that the court made the holding frequently cited by the Nebraska District: the Commission must have "an articulable and plausible reason to believe that the benefits are at least roughly commensurate with" allocated costs. *Id.* at 477.

In *Illinois Commission II*, the Seventh Circuit held that the Commission failed to establish on remand any additional evidence of the degree of reliability benefits. It was this failure that led to the quote, also relied upon by the Nebraska District, that "even the modest goal of rough commensurability requires *some* effort by the Commission, as we insisted, to quantify the benefits." *Illinois Commission II*, 756 F.3d at 562 (emphasis in original). The court held that, if the Commission justified the allocation of costs to western utilities on the ground that

40

they "'will make use of and benefit from' the new eastern . . . transmission lines," the Commission must "explain how much use or how much benefit." *Id.*

The results in *Illinois Commission I and Illinois Commission II* are in contrast with *Illinois Commission III*, a similar cost allocation case involving a different Regional Transmission Organization—the Midwest Independent System Operator (Midwest ISO), which operates in various central and Midwestern states.[10]  As in the first two cases, *Illinois Commission III* involved the allocation of the cost of expensive new high voltage transmission facilities located in one part of the Midwest ISO region pro rata to all Midwest ISO utilities.  *Illinois Commission III*, 721 F.3d at 771-72.

In *Illinois Commission III*, the Commission justified its approval of the pro rata cost allocation on the ground that the new transmission facilities would be used to transmit inexpensive wind power from the sparsely populated western part of Midwest ISO to population centers in the east.  The Midwest ISO estimated that this would result in cost savings of some $297 million to $423 million annually because western wind power is cheaper than power from existing sources.  *Id.* at 774.  The Commission also relied on the fact that the new facilities would improve

---

[10] Effective April 26, 2013, the Midwest ISO changed its name to the "Midcontinent Independent System Operator."

Appellate Case: 19-1553     Page: 49     Date Filed: 07/11/2019 Entry ID: 4807000

reliability and facilitate power flows to underserved areas in the Midwest ISO region. *Id.*

This time, the Seventh Circuit—in an opinion by Judge Posner, who also wrote the opinions in *Illinois Commission I and II*—upheld the Commission's cost allocation. The court did so notwithstanding that "[n]one of [the] eligibility criteria ensures that every utility in MISO's vast region will benefit from every MVP project, let alone in exact proportion to its share of the MVP tariff." *Illinois Commission III*, 721 F.3d at 774. Further, the court's approval came despite the Commission's "failure to determine the costs and benefits of the projects subregion by subregion and utility by utility." *Id.*

The reason for the different result in *Illinois Commission III* is that access to inexpensive wind power will "confer substantial benefits on the region served by [the Midwest ISO] by replacing more expensive local wind power, and power plants that burn oil or coal, with western wind power." *Id.* at 775. This is in contrast to *Illinois Commission I and II*, where the Seventh Circuit concluded that "[t]he Commission *assumes* — it does not demonstrate — that the benefits of the" transmission lines are distributed proportionately across PJM. *Illinois Commission II*, 756 F.3d at 561 (emphasis in original).

Nor was the Seventh Circuit persuaded by arguments that the benefits of the inexpensive wind power would not be shared proportionally by all utilities paying

42

the costs of the new transmission facilities, or that some utilities would not receive any such benefits at all. "It's not enough . . . to point out that [the] attempt to match the costs and the benefits of the MVP program is crude; if crude is all that is possible, it will have to suffice." *Illinois Commission III*, 721 F.3d at 775.

Further, unlike the unsupported assumption in *Illinois Commission I and II* that western utilities would obtain reliability benefits from the new high-voltage facilities, the Seventh Circuit found in *Illinois Commission III* that the claimed reliability benefits "are real and will benefit utilities and consumers in all of [the Midwest ISO's] subregions." *Illinois Commission III*, 721 F.3d at 775. Consequently, the court had no difficulty in finding that the unquantified reliability benefits justified allocating costs of the new transmission facilities to utilities that would not directly benefit from the inexpensive wind power. *Id.* at 774.

### 2. The Commission's Approval of the Placement of Tri-State in Zone 17 is Consistent With the Rulings in the *Illinois Commission* Cases

The circumstances in this case are significantly different from the *Illinois Commission* cases. Those cases involved attributing benefits from expensive new facilities constructed on one side of a large Regional Transmission Organization to distant utilities located on the other side of the region that did not use the new facilities. By contrast, this case involves determining the benefits to the Nebraska District of existing Tri-State transmission facilities that have been jointly operated

43

with the Nebraska District's own transmission facilities as a single system for over 30 years.

As a consequence, here the benefits are not abstract or theoretical, but are practical and easily determinable, if not easily quantified. And here the Commission determined that there are significant benefits, affirming the Administrative Law Judge's conclusions based on the record evidence presented at the hearing.

As described in detail above, these benefits flow from the joint operations of the combined Tri-State/Nebraska District facilities pursuant to the Joint Transmission Agreement. Opinion No. 562 at PP 192-94 (P. Add. 097-99); P 205 (P. Add. 105-06). The record shows that the Nebraska District in fact uses the transmission facilities owned by Tri-State, and in fact cannot serve some of its customers without Tri-State's facilities. *Id.* at P 194 (P. Add. 098-99). And, in addition to other benefits, the Nebraska District's use of Tri-State facilities to serve its own customers allows the Nebraska District to avoid the cost of building duplicative facilities. *Id.*

The Commission's identification, based on record evidence, of specific benefits derived by the Nebraska District distinguishes this case from the *Illinois Commission I and II* cases. There, the Seventh Circuit criticized the Commission for simply assuming without any supporting evidence that reliability benefits from

44

transmission facilities built in eastern PJM would accrue to utilities located in western PJM.  *See Illinois Commission II*, 756 F.3d at 561.

As the Seventh Circuit held in *Illinois Commission I*, allocation of costs to a utility may be appropriate "[t]o the extent that a utility benefits from the costs of new facilities,"  because in that circumstance the utility "may be said to have 'caused' a part of those costs to be incurred."  *Illinois Commission I*, 576 F.3d at 476.  Here, the uncontested record evidence shows that the Nebraska District relies on the use of Tri-State facilities to serve some of its customers.  Opinion No. 562 at P 194 (P. Add. 098-99).  Thus, as the Seventh Circuit held, the Nebraska District "may be said to have 'caused'" a part of the costs of the Tri-State facilities to be incurred.  Consequently, it is appropriate to allocate a part of the costs of the Tri-State facilities to the Nebraska District.

Further, the Commission's identification of specific benefits here satisfied the Seventh Circuit's insistence in *Illinois Commission II* that the Commission make "*some* effort . . . to quantify the benefits." *Illinois Commission II*, 756 F.3d at 562 (emphasis in original).  The Commission's analysis also satisfied the Seventh Circuit's requirement that the Commission "explain how much use or how much benefit."  *Id.*  The Commission described the two alternate ways to measure the Nebraska District's use of the jointly-owned system, each of which shows the extensive use the Nebraska District makes of the joint transmission system.

Appellate Case: 19-1553    Page: 53    Date Filed: 07/11/2019 Entry ID: 4807000

Opinion No. 562 at P 195 (P. Add. 099-100); *see also* Statement of the Case, Section III (explaining the annual and monthly measures of transmission system use). The Commission also explained how the Nebraska District uses Tri-State's facilities to serve its own customers, and explained the benefit of this arrangement to the Nebraska District. *Id.* at PP 192-94 (P. Add. 097-99).

To be sure, the non-usage-related benefits obtained by the Nebraska District from the Joint Transmission Agreement are not quantifiable. But as was the case in *Illinois Commission III*, the Commission pointed to record evidence demonstrating that the benefits "are real and will benefit" the Nebraska District and its customers. *Illinois Commission III*, 721 F.3d at 775. In such a circumstance, "if crude [matching of costs and benefits] is all that is possible, it will have to suffice." *Id.*; s*ee also Sithe/Independence Power Partners, L.P. v. FERC*, 285 F.3d 1, 5 (D.C. Cir. 2002) ("FERC is not bound to reject any rate mechanism that tracks the cost-causation principle less than perfectly.").

The Commission held that, when the unquantifiable benefits it identified on the record are considered in combination with the benefits quantified by the Annual Equalization Payment calculations, the benefits of the Joint Transmission Agreement are roughly commensurate with the costs allocated to the Nebraska District. Opinion No. 562 at P 207 (P. Add. 106-07). This finding is reasonably based on substantial record evidence detailing the real, but unquantified, benefits.

46

And it satisfies the standard enunciated by the Seventh Circuit in the *Illinois Commission* cases.

## IV. THE COMMISSION CORRECTLY REJECTED ARGUMENTS THAT PLACEMENT IN ZONE 19 WOULD BE PREFERABLE

The Nebraska District's final two arguments both relate to its contention that the Commission should have required Southwest to place Tri-State in Zone 19 instead of Zone 17. First, the Nebraska District asserts that the Commission improperly ignored evidence that Tri-State predominately uses transmission facilities located in Zone 19 to serve Tri-State's customers. Nebraska District Br. 38-43. Second, the Nebraska District asserts that the Commission improperly failed to consider evidence that placing Tri-State in Zone 19 would avoid any cost shift. *Id.* at 44-47.

These arguments share a common defect. As the Commission explained in Opinion No. 562-A, the courts have described the Commission's role in reviewing a rate filing under Federal Power Act section 205, 16 U.S.C. § 824d, as "essentially passive and reactive," restricted to "evaluating the confined proposal." Opinion No. 562-A at P 31 (P. Add. 136-37) (quoting *Advanced Energy Mgmt. Alliance v. FERC*, 860 F.3d 656, 662 (D.C. Cir. 2017) (citing *City of Winnfield v. FERC*, 744 F.2d 871, 875-76 (D.C. Cir. 1984)).

The Commission explained that it need find only that the filed rate is just and reasonable, not that it is the only or even the most just and reasonable rate. *Id.*

47

(citing *Cities of Bethany v. FERC*, 727 F.2d 1131, 1136 (D.C. Cir. 1984)

(describing the Commission's authority under Federal Power Act section 205 as

"limited to an inquiry into whether the rates proposed by a utility are reasonable –

and not to extend to determining whether a proposed rate schedule is more or less

reasonable than alternative rate designs")); s*ee also OXY USA Inc. v. FERC*, 64

F.3d 679, 692 (D.C. Cir. 1995) ("the Commission may approve the methodology

. . . if it is "just and reasonable"; it need not be the only reasonable methodology,

or even the most accurate.").

As demonstrated above, the Commission reasonably found, based on

substantial evidence, that Southwest's proposed placement of Tri-State in Zone 17

was just and reasonable as required by Federal Power Act section 205. Once the

Commission made this determination, its inquiry was over, as the *Advanced

Energy*, *City of Winnfield*, *Cities of Bethany,* and *OXY USA* cases provide. *See*

Opinion No. 562 at P 145 (P. Add. 076-77) ("the record demonstrates that

[Southwest's] proposal is just and reasonable; therefore it is unnecessary to also

determine whether the alternative proposals are themselves just and reasonable.");

Opinion No. 562-A at P 31 (P. Add 137) ("The Commission need only find that the

proposal is just and reasonable, not that it is the only or even the most just and

reasonable proposal."). The Commission's decision not to evaluate Southwest's

additional evidence purporting to demonstrate that placement in Zone 19 was

48

superior to Zone 17 was proper and consistent with the Commission's statutory authority.

The Nebraska District attempts to avoid this statutory limitation on the Commission's authority. It characterizes its argument as an assertion "that placing Tri-State in Zone 17, when placement in Zone 19 would have provided Tri-State with the same services without a cost shift, *was itself unreasonable*." Nebraska District Br. 46 (emphasis added). But this is simply another way of saying that the Commission should have rejected Southwest's proposed placement of Tri-State in Zone 17 because placement in Zone 19 would avoid a cost shift and therefore would be superior. And that, under *Advanced Energy*, *City of Winnfield*, and *Cities of Bethany*, the Commission is not required to do.

The Nebraska District also is incorrect when it asserts that the Commission failed to consider "evidence regarding the full nature of the various transmission services used to deliver power to Tri-State's load prior to Tri-State joining" Southwest. Nebraska District Br. 41. In response to this claim in Opinion No. 562-A, the Commission explained that it did consider the Nebraska District's evidence. The Commission concluded that the evidence "highlighted the interdependent nature of [the Nebraska District's] and Tri-State's transmission systems, because Tri-State required the use of [the Nebraska District's]

49

transmission facilities to deliver power from the interface with the Integrated System to Tri-State's load."  Opinion No. 562-A at P 29 (P. Add. 135-36).

Consequently, "[b]ased on the circumstances of this proceeding," the Commission did not find that the evidence on transmission services presented by the Nebraska District "necessitates placement of Tri-State transmission facilities in Zone 19."  *Id.* at P 30 (P. Add. 136).  The Nebraska District may disagree with the Commission's conclusion reached from the record evidence, but the Commission did "examine the relevant [considerations] and articulate a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs.*, 463 U.S. at 43.  This is all that was required. *Elec. Power Supply Ass'n*, 136 S.Ct. at 784 ("not our job" to supplant the Commission's reasoned, explained choice).

## CONCLUSION

For the foregoing reasons, the petition for review should be denied.

Respectfully submitted,

James P. Danly
General Counsel

Robert H. Solomon
Solicitor

Robert M. Kennedy
Senior Attorney

/s/ *Matthew W.S. Estes*
Matthew W.S. Estes
Senior Legal Advisor

Federal Energy Regulatory
  Commission
Washington, DC 20426
Office:  (202) 502-8822
Fax:  (202) 273-0901
Matthew.Estes@ferc.gov

July 10, 2019

51

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,515 words, including footnotes and excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Times New Roman 14-point font using Microsoft Word 2013.

I further certify pursuant to Eighth Circuit Rule 28A(h)(2) that this brief and addendum have been scanned for viruses and are virus-free.

/s/ *Matthew W.S. Estes*
Matthew W.S. Estes
Senior Legal Advisor

Federal Energy Regulatory
  Commission
Washington, DC 20426
Office:  (202) 502-8822
Fax:  (202) 273-0901
Matthew.Estes@ferc.gov

July 10, 2019

## **CERTIFICATE OF SERVICE**

I hereby certify that, on July 10, 2019, I electronically filed the foregoing

Respondent's Brief with the Clerk of the Court for the United States Court of

Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all

participants in the case are registered CM/ECF users and that service will be

accomplished by the CM/ECF system.

/s/ *Matthew W.S. Estes*
Matthew W.S. Estes
Senior Legal Advisor

2