Case No. 19-1553

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE EIGHT CIRCUIT

## NEBRASKA PUBLIC POWER DISTRICT
Petitioner,
v.

## FEDERAL ENERGY REGULATORY COMMISSION
Respondent.

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

## REPLY BRIEF OF PETITIONER
## NEBRASKA PUBLIC POWER DISTRICT

David D'Alessandro
Jonathan P. Trotta
STINSON LLP
1775 Pennsylvania Ave., NW
Suite 800
Washington, DC 20006
(202) 785-9100
david.dalessandro@stinson.com
jtrotta@stinson.com

*Counsel for Petitioner*
*Nebraska Public Power District*

August 12, 2019

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

GLOSSARY ................................................................................... v

REPLY TO STATEMENT OF CASE ................................................ 1

SUMMARY OF REPLY ARGUMENT .............................................. 2

ARGUMENT ................................................................................. 4

I.   STANDARD OF REVIEW ........................................................ 4

II.  THERE IS NO DISPUTE THAT PLACEMENT IN ZONE 17 HAS
     CAUSED COST SHIFTS THAT RESULT IN SIGNIFICANT RATE
     INCREASES TO ZONE 17 CUSTOMERS. ................................... 5

III. THERE IS NO DISPUTE THAT GOVERNING PRECEDENT
     REQUIRES THAT FERC MAKE SOME EFFORT TO QUANTIFY
     BENEFITS. ............................................................................. 6

IV.  RESPONDENT'S CLAIM THAT UNQUANTIFIED BENEFITS OF
     THE NETS AGREEMENT AND OTHER BENEFITS ARE
     ROUGHLY COMMENSURATE WITH THE LARGE GAP
     BETWEEN QUANTIFIED BENEFITS AND COSTS ALLOCATED
     TO NPPD IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE. ......... 10

     A. FERC Did Not Find That Equalization Payments Do Not
        Compensate For Non-Usage Benefits. ................................ 11

        1. Equalization Payments Were Not Intended To Address Only
           Usage Benefits Under the NETS Agreement. ...................... 12

        2. No Party Argued That the Equalization Payment Provided
           Compensation Only For Usage Related Benefits. ............... 15

        3. The NETS Agreement does not "narrowly define what benefits
           are being equalized." ................................................... 20

     B. Even Assuming The Equalization Payment Does Not Compensate
        For The Benefit Of Avoiding Duplication Of Facilities, There Is No
        Support For Respondent's Claim That Such Benefit Constitutes
        Evidence That Benefits Received By NPPD Are Roughly
        Commensurate With Allocated Costs. .................................. 21

        1. FERC made no effort to quantify the benefit of avoiding
           duplication of facilities or any other benefit. ..................... 22

i

2. FERC did not find that avoiding duplication of facilities is "the most important" or "principal benefit" under the NETS Agreement...........................................................................23

3. This case is not distinguishable from *Illinois Commission* due to dollars at stake. ....................................................................25

V. FERC UNLAWFULLY IGNORED RELEVANT EVIDENCE SUBMITTED BY NPPD. .............................................................26

A. Respondent Failed To Consider Evidence Concerning The Nature Of Transmission Services Utilized To Serve Tri-State Load Prior To Transfer To SPP. ...................................................................26

B. FERC Ignored NPPD's Evidence That Placing Tri-State In Zone 19 Would Eliminate The Unjust And Unreasonable Cost Shift To Zone 17 Customers.............................................................................28

VI. CONCLUSION ...............................................................................29

CERTIFICATE OF COMPLIANCE.......................................................30

CERTIFICATE OF SERVICE

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Energy Mgmt. Alliance v. FERC,*
    860 F.3d 656 (D.C. Cir. 2017)............................................................28

*City of Winnfield v. FERC,*
    744 F.2d 871 (D.C. Cir. 1985)............................................................28

*FPC v. Texaco Inc.,*
    417 U.S. 380 (1974)............................................................................25

*Illinois Commerce Comm'n* v. *FERC,*
    576 F.3d 470 (7th Cir. 2009) (*Illinois Commission I*)...............6, 7, 9, 10, 19, 25

*Illinois Commerce Comm'n* v. *FERC,*
    721 F.3d 764 (7th Cir. 2013) (*Illinois Commission III*) .................................9, 10

*Illinois Commerce Comm'n* v. *FERC,*
    756 F.3d 556 (7th Cir. 2014) (*Illinois Commission II*)................9, 17, 21, 23, 24

*KN Energy, Inc, v. FERC,*
    968 F.2d. 1295 (D.C. Cir. 1992)........................................................29

*Midwest ISO Transmission Owners v. FERC,*
    373 F.3d 1361 (D.C. Cir. 2004)....................................................7, 29

*Minnesota v. FERC,*
    734 F.2d 1286 (8th Cir. 1984) ...........................................................4

*Missouri Pub. Serv. Comm'n.* v. *FERC,*
    234 F.3d 36 (D.C. Cir. 2000)..............................................................5

*Motor Vehicle Mfrs. Assn'n* v. *State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)..........................................................................4, 18

*SEC v. Chenery Corp.,*
    332 U.S. 194 (1947).............................................................................17

*Universal Camera Corp.,* v. *NLRB,*
    340 U.S. 474 (1951)..........................................................................4, 28

Appellate Case: 19-1553    Page: 4    Date Filed: 08/14/2019 Entry ID: 4819065

*Western Resources, Inc.* v. *FERC*,
    9 F.3d 1568 (D.C. Cir. 1993)........................................................5, 17

*Xcel Energy Servs., Inc. v. FERC*,
    815 F.3d 947 (D.C. Cir. 2016)........................................................25

**Administrative Decisions**

*PJM Interconnection, L.L.C.*,
    109 FERC ¶ 61,012 (2004)...........................................................12

*Sw. Power Pool, Inc.,* Opinion No. 562,
    163 FERC ¶ 61,109 (2018) .................................... 1, 6, 8, 12, 13, 14, 22, 24, 29

*Sw. Power Pool, Inc.,* Opinion No. 562-A,
    166 FERC ¶ 61,019 (2019)........................... 6, 7, 8, 9, 14, 15, 17, 22, 23, 24, 29

**Other Authorities**

Fed. R. App. P. 32(a)(5)..............................................................30

Fed. R. App. P. 32(a)(6)..............................................................30

Fed. R. App. P. 32(a)(7)(B)..........................................................30

Fed. R. App. P. 32(f)...................................................................30

Eighth Circuit Rule 28A(h)(2).......................................................30

Appellate Case: 19-1553   Page: 5   Date Filed: 08/14/2019 Entry ID: 4819065

# GLOSSARY

| | |
|---|---|
| Equalization Payment | Annual Equalization Payment |
| FERC | Respondent, Federal Energy Regulatory Commission |
| GridLiance | GridLiance High Plains LLC |
| NETS Agreement or Joint Agreement | Western Nebraska Joint Transmission Agreement |
| Network Service | SPP Network Integrated Transmission Service |
| NPPD | Petitioner, Nebraska Public Power District |
| RTO | Regional Transmission Organization |
| SPP | Southwest Power Pool, Inc. |
| Tri-State | Tri-State Generation and Transmission Association, Inc. |

v

## REPLY TO STATEMENT OF CASE

GridLiance High Plains LLC (GridLiance) and Southwest Power Pool (SPP) include in their briefs assertions that are inaccurate or that address issues not before the Court.

Gridliance falsely asserts that NPPD's appeal is intended to "erect barriers to new entrants who want to spread the benefits" of Regional Transmission Organization (RTO) participation to the many small cooperatives that have not yet joined an RTO.[1] But GridLiance knows this case is not about opposing the $7.2 million in benefits associated with RTO participation that Tri-State Generation and Transmission Association (Tri-State) will receive regardless of zone placement.[2] Rather, this case is about an electric cooperative shopping for a subsidy *on top of* RTO-related benefits. As Petitioner explained, Tri-State, before deciding to join SPP, asked SPP which zone placement would produce the maximum cost shift.[3] SPP performed a cost-shift analysis and informed Tri-State that placement in Zone 17 would best achieve that objective.[4] This quest to maximize cost shifting far

---

[1] GridLiance Br. at 3.

[2] *Sw. Power Pool, Inc.,* 163 FERC ¶ 61,109, P 170 (2018) (Opinion No. 562) (P. Add. 088-89). Tri-State attempts to create confusion regarding the source of such savings (Tri-State Br. at 6-7), but cannot deny their existence. Exh. NPP-033 (P. App. 131).

[3] Petitioner Br. at 9, citing Exh. NPP-008 at 7:18-21 (P. App. 100); Exh. No. 010 (P. App. 118).

[4] Petitioner Br. at 9 (emphasis added).

1

exceeds any "due diligence" to determine whether it was beneficial for Tri-State to join SPP.[5]

## SUMMARY OF REPLY ARGUMENT

GridLiance and SPP, the party with the burden of proof, mischaracterize NPPD's position as saying that the Annual Equalization Payment (Equalization Payment) in the NETS Agreement must be the "sole" or "only" measure of benefits that NPPD receives from Tri-State facilities. NPPD's position is that, after coming forward with evidence quantifying the cost shift as six times larger than the benefits under the NETS Agreement, the burden shifts back to SPP, Tri-State and FERC to identify and quantify other benefits, beyond those in the NETS Agreement, that offset the large imbalance between quantified benefits and allocated costs. If, after making "*some* effort," other benefits cannot be quantified, FERC must provide an articulable and plausible reason to believe that these other benefits are roughly commensurate with the gap between measured benefits and allocated costs.

FERC's counsel relies heavily on *post hoc* rationale in claiming that the Equalization Payment measures only "usage related" benefits, and that "non-usage" related benefits under the NETS Agreement – such as avoiding duplication of facilities – support FERC's finding that benefits are roughly commensurate with

---

[5] Tri-State Br. at 14.

2

costs. FERC never held that the Equalization Payment measured only usage related benefits provided by the NETS Agreement. Ignoring such *post hoc* rationale, as governing precedent requires, tasks the Court with determining whether there is substantial evidence supporting a finding that other benefits, beyond those provided by the NETS Agreement, offset the large imbalance between benefits calculated under the Equalization Payment and costs allocated to NPPD. Respondent's brief makes no mention of any other benefits. Tri-State, on the other hand, identifies other "purported" benefits beyond those in the NETS Agreement, but fails to draw a rational connection between the facts found and the zone-placement choices made.

Even assuming the Equalization Payment compensates only for "usage related" benefits under the NETS Agreement, substantial evidence does not support Respondent's claim that "non-usage related" benefits are sufficient to offset the large imbalance between quantified benefits and costs. Respondent does not deny that FERC made no effort to quantify non-usage benefits. Instead, Respondent claims it satisfied governing precedent by relying on the Equalization Payment to quantify benefits. Again, FERC fails to follow the Seventh Circuit's clear directive to make "*some* effort" to quantify the other benefits it relied upon to offset the large imbalance between quantified benefits and allocated costs.

3

FERC's failure to do so demonstrates that its finding that benefits "are at least roughly commensurate with costs" is unsupported by substantial evidence.

## ARGUMENT

## I.   STANDARD OF REVIEW

Petitioner and Respondent are on the same page (literally) that this Court must ensure FERC has "examined the relevant data and articulated a satisfactory explanation for its actions, including a rational connection between the facts found and choices made."  Respondent Brief at 24 and Petitioner's Brief at 24, both quoting *Motor Vehicle Mfrs. Assn'n* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).[6]  Respondent also agrees that this Court is "required to accept as conclusive" only those findings of facts "supported by substantial evidence." Respondent Brief at 25, *citing*, *Minnesota v. FERC*, 734 F.2d 1286, 1288 (8th Cir. 1984).

However, Respondent fails to recognize that to be supported by substantial evidence, the agency decision must "take into account whatever in the record fairly detracts from its weight."  Petitioner's Brief at 25, quoting, *Universal Camera Corp.*, v. *NLRB*, 340 U.S. 474, 488 (1951).  Moreover, the inclusion of *post hoc* rationale in Respondent's brief highlights why reviewing courts "must judge the propriety of [agency] action solely by the grounds invoked by the agency."

---

[6] *See also* SPP Br. at 17.

4

*Western Resources, Inc. v. FERC*, 9 F.3d 1568, 1576, (D.C. Cir. 1993). The Court

cannot give the agency the benefit of its counsel's *post hoc* rationale. *Missouri*

*Pub. Serv. Comm'n. v. FERC*, 234 F.3d 36, 41 (D.C. Cir. 2000).

## II. THERE IS NO DISPUTE THAT PLACEMENT IN ZONE 17 HAS CAUSED COST SHIFTS THAT RESULT IN SIGNIFICANT RATE INCREASES TO ZONE 17 CUSTOMERS.

Tri-State, in support of Respondent, accuses NPPD of "falsely" claiming

that the size of the cost shift is "an initial $4.3 million cost shift or an average

annual $3.5 million cost shift over ten-years."[7] Such accusation contradicts

substantial evidence, including statements of Tri-State's own witness, who

admitted that the initial $4.3 million cost shift, in fact, commenced on January 1,

2016.[8] To date, more than $15 million of Tri-State's costs have been shifted to

NPPD and other Zone 17 customers. Moreover, the average $3.5 million cost shift

over the ten-year 2016 – 2025 period reflects the impact of the two known and

measurable changes that Tri-State argued would occur within five to seven years.[9]

Tri-State's claim – that approximately $1.2 million in "baseline" costs will be

incurred by existing SPP customers as a result of Tri-State joining SPP "*regardless*

*of Tri-State's zone placement*" – is not true.[10] The $1.2 million represents

---

[7] Tri-State Br. at 7.

[8] Tr. 61:20-25 (P. App. 184).

[9] NPPD Post-Hearing Initial Br. at 25-26 (P. App. 249-50).

[10] Tri-State Br. at 8.

customers and associated revenue that would be transferred from Zone 17 only *if* Tri-State is placed in its own pricing zone or in Zone 19.[11]

Respondent, meanwhile, does not dispute that Tri-State's placement in Zone 17 would initially shift (*i.e.* allocate) $4.3 million,[12] and on average $3.5 million per year over ten years,[13] which will result in significant six to eight percent rate increases to NPPD and other Zone 17 customers.[14]

## III. THERE IS NO DISPUTE THAT GOVERNING PRECEDENT REQUIRES THAT FERC MAKE SOME EFFORT TO QUANTIFY BENEFITS.

Respondent and NPPD similarly agree that "cost shifts that result in significant rate increases to customers, but which are unaccompanied by commensurate benefits, are unjust and unreasonable."[15] Governing precedent thus requires FERC to quantify benefits from Tri-State's facilities received by existing Zone 17 customers, and determine whether such benefits are commensurate with increased costs allocated to customers.[16] *Illinois Commerce Comm'n* v. *FERC*, 576 F.3d 470, 477 (7th Cir. 2009) (*Illinois Commission I*). If FERC cannot precisely

---

[11] Opinion No. 562 at P 170 (P. Add. 088).

[12] Respondent Br. at 36.

[13] Petitioner Br. at 30.

[14] *Id*. at 26; Respondent Br. at 3.

[15] *Sw. Power Pool, Inc.,* 166 FERC ¶ 61,019, P 21 (2019) (Opinion No. 562-A) (P. Add. 129).

[16] Petitioner Br. at 27-30; Respondent Br. at 15-16.

Appellate Case: 19-1553    Page: 12    Date Filed: 08/14/2019 Entry ID: 4819065

quantify benefits, after making some effort to do so, it must provide "an articulable and plausible reason to believe that the benefits are at least roughly commensurate" with the costs. *Id.*

As NPPD discussed on brief, FERC in its orders never attempted to quantify benefits. FERC claimed it "looked at the entirety of the record" to determine the benefits to NPPD could be greater than the amount calculated by the Equalization Payment,[17] but never explained *how*, if at all, it determined the benefits exceeded the undisputed, quantified multimillion dollar annual cost shift to Zone 17 customers. Unsurprisingly, Respondent's brief does not and cannot point to any such analysis. In the absence of quantified benefits, FERC cannot, as it does here, employ broad presumptions to avoid the "duty of comparing the costs assessed against a party to the burdens imposed or benefits drawn by that party." *Illinois Commission I*, 576 F.3d at 477, citing *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1368 (D.C. Cir. 2004). As FERC trial staff in this case explained:

> [T]he Commission cannot grant Tri-State a presumption of benefit; the Commission must analyze the disparity between costs and benefits in order to make a just and reasonable determination. Here, the significant disparity between the shift of 60 percent of Tri-State's costs from Tri-State and its customers to Zone 17 Transmission Owners and their customers and the lack of any

---

[17] Petitioner Br. at 33, citing Opinion No. 562-A at P 25 (P. Add. 133).

demonstration of benefit by Tri-State and SPP requires a finding that the proposed SPP Tariff changes are unjust and unreasonable.[18]

SPP seeks to elude the burden of proof by arguing that NPPD and Edison Electric Institute inaccurately view this case as a mere "math exercise."[19]  It attributes to NPPD the assertion that "FERC, and now this Court, are required *only* to quantify the benefits that NPPD will receive as a result of SPP's placement of the Tri-State facilities in Zone 17 and then weigh that figure against the alleged 'cost shift.'"[20]  Similarly, GridLiance claims NPPD argues the NETS Agreement must be the *sole* means to determine relative costs and benefits.[21]  This mischaracterizes NPPD's position.

To be sure, it is NPPD's position that the Equalization Payment is "the only methodology" agreed-to by Tri-State and NPPD to measure the relative costs incurred and benefits received "*under the NETS Agreement*."[22]  NPPD also agreed, for the sake of eliminating a disputed factual issue, that the benefits under the NETS Agreement could be measured under the alternative methodology advocated

---

[18] FERC Trial Staff Br. on Exceptions at 51 (I.R. App. 089).

[19] SPP Br. at 11.

[20] *Id.* (emphasis added).

[21] GridLiance Br. at 22.  NPPD and Intervenors refer to the Western Nebraska Joint Transmission Agreement as the "NETS Agreement."

[22] Opinion No. 562 at P 195 (P. Add. 099); NPPD Request for Rehearing at 26. (P. App. 495); Opinion No. 562-A at P 25 (P. Add. 133).

Appellate Case: 19-1553     Page: 14     Date Filed: 08/14/2019 Entry ID: 4819065

by Tri-State. But NPPD has never claimed that the Equalization Payment is the "only" or "sole" measure of all potential benefits in "the entirety of the record."[23] Rather, NPPD's point is that whatever broader set of presumptions FERC may have in mind regarding other benefits, it failed to meet its two-fold burden to: (1) *try* to quantify them; and, (2) if unable to do so, provide a "plausible reason to believe that the benefits are at least roughly commensurate" with the [large gap between quantified benefits and allocated] costs.[24]

Neither burden, as NPPD explained, could be countered by merely identifying other benefits in "the entirety of the record"[25] without making "some effort" to quantify them – particularly where the annualized cost shift is so large. *Illinois Commerce Comm'n v. FERC*, 756 F.3d 556, 562 (7th Cir. 2014) (*Illinois Commission II*). Governing precedent makes clear that evidence of quantified benefits commensurate with costs "can't [be] counter[ed] without presenting evidence of imbalance of costs and benefits." *Illinois Commerce Comm'n v. FERC*, 721 F.3d 764, 775 (7th Cir. 2013) (*Illinois Commission III*). The corollary applies here: evidence of quantified benefits that are *not* commensurate with allocated costs "can't [be] counter[ed] without presenting evidence" that the large

---

[23] Opinion No. 562-A at P 25 (P. Add. 133).

[24] Petitioner Br. at 27-28 (quoting *Illinois Commission I*, 576 F.3d at 477).

[25] Opinion No. 562-A at P 25 (P. Add. 132-33).

Appellate Case: 19-1553    Page: 15    Date Filed: 08/14/2019 Entry ID: 4819065

imbalance is offset by other benefits that provide "an articulable and plausible reason to believe that the benefits are at least roughly commensurate" with its costs. *Id.*, quoting *Illinois Commission I*, 576 F.3d at 477.

## IV. RESPONDENT'S CLAIM THAT UNQUANTIFIED BENEFITS OF THE NETS AGREEMENT AND OTHER BENEFITS ARE ROUGHLY COMMENSURATE WITH THE LARGE GAP BETWEEN QUANTIFIED BENEFITS AND COSTS ALLOCATED TO NPPD IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE.

Respondent claims on brief that FERC found the Equalization Payment quantifies *only* usage related benefits under the NETS Agreement and does not compensate for non-usage benefits, "such as avoiding the cost of duplicative facilities."[26] Respondent claims that when non-usage benefits, such as avoiding duplication, are considered in addition to use benefits quantified by the Equalization Payment, there is an "articulable and plausible reason to believe that the benefits are at least roughly commensurate with the costs" allocated to Zone 17 customers.[27]

But, discussed below, FERC could not have rationally concluded that the sum of usage and non-usage related benefits to Zone 17 customers are roughly commensurate with the cost shift because FERC never attempted to quantify "non-

---

[26] Respondent Br. at 33-38. Respondent uses the term "Joint Transmission Agreement" which is the same agreement referred to by Petitioner and Intervenors as the "NETS Agreement."

[27] *Id.* at 37.

Appellate Case: 19-1553    Page: 16    Date Filed: 08/14/2019 Entry ID: 4819065

use related benefits." And, even ignoring this deficiency in its rationale, FERC's claim on brief that non-usage related benefits were not covered by the Equalization Payment conflicts with the plain meaning of the agency's orders and the text of the NETS Agreement. Contrary to its assertion on brief, FERC never found the Equalization Payment failed to cover non-usage related benefits. In any event, the NETS Agreement makes clear the Equalization Payment was intended to address all benefits, including avoiding duplication of facilities.

## A. FERC Did Not Find That Equalization Payments Do Not Compensate For Non-Usage Benefits.

FERC did not find that the Equalization Payment (1) compensates only for usage related benefits provided by the NETS Agreement;[28] (2) "does not purport to quantify or equalize the other benefits realized from the joint operations of the transmission system, *such as savings from the avoidance of duplicative facilities*;"[29] or (3) covers only "interest . . . and an estimated amount for O&M expense and A&G cost."[30] Respondent and Tri-State conflate the agreed-to elements of the formula for *quantifying benefits* (*i.e.* "use" multiplied by "costs") with the *overall benefits* received by each party under the NETS Agreement.

---

[28] Respondent Br. at 33-34.

[29] *Id.* at 33.

[30] Tri-State Br. at 21-22.

Appellate Case: 19-1553    Page: 17    Date Filed: 08/14/2019 Entry ID: 4819065

1. **Equalization Payments Were Not Intended To Address Only Usage Benefits Under the NETS Agreement.**

Respondent's assertions on brief that the NETS Agreement does not involve quantification of non-use benefits relies on a single sentence from Paragraph 195 and two words from Paragraph 192 of Opinion No. 562, both taken out of context. Cobbling these together, Respondent argues that FERC found the Equalization Payments were intended to address "only" usage related benefits.

In Paragraph 195 FERC found:

> Examining these two different metrics for assessing the benefits *associated with use of* the [Joint Transmission] Agreement facilities . . . demonstrates that both Tri-State and [the Nebraska District] benefit from these facilities.[31]

By its plain meaning, this does not say that the Equalization Payment compensates only for usage related benefits. FERC refers to "use" here in addressing two disputed metrics at issue for measuring the *use* component of a two-part formula that also includes a *cost* component: NPPD relied upon the annual (1 CP) peak measure of use agreed-to 30 years ago by the parties to the NETS Agreement;[32] Tri-State disputed the accuracy of that metric and advocated

---

[31] Respondent Br. at 37, citing Opinion No. 562 at P 195 (P. Add. 099-100) (emphasis in brief).

[32] NPPD notes that FERC continues to follow the annual (1 CP) methodology. *PJM Interconnection, L.L.C.,* 109 FERC ¶ 61,012, P 44 (2004).

12

monthly (12 CP) peak use as an alternative.[33]  Although FERC determined that both metrics were appropriate measures of use,[34] it did not find that the Equalization Payment compensates only for usage related benefits and not for non-usage related benefits provided under the NETS Agreement.  To conclude otherwise is inconsistent with FERC's finding in the same paragraph of Opinion No. 562 that "the record indicates that the Annual Equalization Payment is just one measure of the relative benefits that Tri-State and NPPD receive *under the NETS Agreement*."[35]

Respondent's reliance on "in addition" in Paragraph 192 is similarly unavailing.  Paragraph 192 simply listed all benefits, including "joint use," provided by the NETS Agreement,[36] and went on to state:

> *In addition,* the NETS Agreement provides for an Annual Equalization Payment to be made 'from one Party to the other to make the benefits of each Party commensurate with its costs,' illustrating that the parties treat the joint NETS Agreement system as if a single entity owns it and that each party benefits from the NETS Agreement.[37]

---

[33] Exh. TS-001 at 22:3-10 (P. App. 050).

[34] Opinion No. 562 at P 195 (P. App. 099-100).

[35] Opinion No. 562 at P 195 (P. Add. 099) (emphasis added).

[36] *Id.* at P 192 (P. App. 098).

[37] *Id.* (P. App. 098) (emphasis added).

13

FERC here is not saying that benefits quantified by the Equalization Payment are "in addition" to other benefits obtained under the NETS Agreement.[38]  Rather, FERC simply enumerates the benefits provided under the NETS Agreement, and explains the Agreement also "provides for an Annual Equalization Payment to be made 'from one Party to the other to make the benefits of each Party commensurate with its costs.'"[39]  FERC's inclusion of "the Parties' . . . *joint use*" as among the enumerated benefits makes clear that those benefits are not "*in addition to*" the benefits quantified by the Equalization Payment.

NPPD sought rehearing of FERC's finding in Paragraphs 192 and 195 that the NETS Agreement provides substantial evidence that placing Tri-State in Zone 17 is consistent with cost causation.  Specifically, NPPD argued that FERC improperly relied upon various benefits identified in the NETS Agreement, while ignoring that the parties agreed to the Equalization Payment precisely to ensure such benefits are commensurate with costs.[40]  FERC responded not by explaining that the Equalization Payment did not address non-usage related benefits, such as avoiding duplication, but by concluding the Equalization Payment was "just one measure of the relative benefits the parties received *under the agreement*."  FERC then found

---

[38] Respondent Br. at 31.

[39] Opinion No. 562 at P 192 (P. Add. 098).

[40] NPPD Request for Rehearing at 21-24 (P. App. 490-93); Opinion No. 562-A at P 23 (P. Add. 131).

14

that applying the monthly peak methodology advocated by Tri-State shows that NPPD made greater use of the facilities.[41]  Conspicuously absent from Opinion No. 562-A is any mention of a finding in Opinion No. 562, Paragraphs 192 or 195, that the Equalization Payment was intended to address only use related benefits and not non-use benefits provided by the NETS Agreement.  Instead, FERC vaguely claimed it relied upon the "entirety of the record" to determine that benefits could be greater than quantified under the NETS Agreement.[42]  This broad presumption lacks a rational connection to any purported finding that the Equalization Payment did not provide compensation for non-use benefits such as avoided duplication of facilities.

### 2. No Party Argued That the Equalization Payment Provided Compensation Only For Usage Related Benefits.

Even assuming any ambiguity, Respondent's position is inconsistent with the fact that no party argued that the Equalization Payment compensates only for usage benefits under the NETS Agreement.  In fact, the record reflects no discussion of the issue of usage versus non-usage related benefits.  To the contrary, NPPD's witness presented testimony which treated benefits under the NETS Agreement without distinction:

> While I do agree there have been benefits from both Tri-State and NPPD from *joint planning* and joint use, such benefits are recognized and *measured* in the NETS

---

[41] Opinion No. 562-A at P 24 (P. Add. 131).

[42] *Id.* at P 25 (P. Add. 133).

> Agreement . . . by virtue of the fact that Tri-State pays NPPD approximately $1 million per year for the greater use it makes of the NPPD System, as measured by the terms of that agreement.[43]

Neither SPP nor Tri-State, the parties with the burden of proof, rebutted this testimony that the benefits of "*joint planning* . . . are recognized and *measured*" by the NETS Agreement. Section 3.09 of that agreement makes clear that the purpose of joint planning is to avoid duplication.[44] If SPP or Tri-State believed, as they now claim,[45] that the benefit of avoiding duplication is not associated with benefits compensated by the Equalization Payment, they could have raised this argument in rebuttal testimony. They did not. Nor did Tri-State or SPP argue on brief before FERC that the Equalization Payment provided compensation only for usage benefits. Thus, the Judge did not address this issue.

Based on testimony and arguments made (and not made), FERC had no reason to, and did not, find in Opinion No. 562 that Equalization Payments "do not compensate for non-usage related benefits."[46] That concept was raised for the first time in Respondent's brief. The Court should ignore counsel's *post hoc* rationale and follow the "time-honored rule that a reviewing court must judge the propriety

---

[43] Exh. NPP-008 at 10 (P. App. 103) (emphasis added).

[44] NETS Agreement, Section 3.09 (P. App. 068).

[45] SPP Br. at 13 and 36; Tri-State Br. at 3 and 21; see also Respondent Br. at 21, 23, 28, 29, 31, and 37.

[46] Respondent Br. at 33.

16

of [agency] action solely by the grounds invoked by the agency." *Western Resources, Inc.*, 9 F.3d at 1576 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

Ignoring such *post hoc* rationale, the Court must determine whether there are any benefits, beyond the NETS Agreement, that offset the large imbalance between quantified benefits under the NETS Agreement and allocated costs. Respondent makes *no* mention on brief of any other benefits beyond those provided under the NETS Agreement.[47] Tri-State at least identifies other purported benefits such as its small revenue requirement and SPP's minimum size criterion, geographic scope of the transmission system, and internalization of reliability problems within a zone.[48] While FERC identified these benefits in Opinion No. 562-A,[49] it made no attempt to quantify or to explain how much NPPD could possibly benefit, if at all.[50] Tri-State's attempt to do so epitomizes the importance of Judge Posner's directive to explain "how much" benefit NPPD and other Zone 17 customers receive. *Illinois Commission II*, 756 F.3d at 562.

---

[47] Respondent Br. 26-30.

[48] Tri-State Br. at 18-22.

[49] Opinion No. 562-A at P 20 (P. Add. 128-29).

[50] Petitioner Br. at 35-36.

17

Tri-State fails to make any rational connection between the facts of this case and SPP's criteria. The purported objective of SPP's minimum size criterion is to prevent customers in a small zone from paying a "disproportionately low" rate.[51] The undisputed facts found here demonstrate that placing Tri-State in its own zone or Zone 19 would result in Tri-State's customers paying for the costs of Tri-State's own facilities.[52] By contrast, Tri-State's placement in Zone 17 resulted in Tri-State paying disproportionately *low* rates (only $2.9 million) by shifting the remaining $4.3 million, 60 percent of its total costs, to Zone 17.[53] This demonstrates a complete lack of a "rational connection between the facts found and the [zone] choices made." *Motor Vehicle Mfrs. Ass'n.,* 463 U.S. at 43.

Contrary to the clear directive of *Illinois Commission II*, Tri-State provides no explanation of how the changes to SPP's geographic scope benefits NPPD.[54] As to internalization of reliability problems, NPPD explained on rehearing that the issue is whether *theoretical* reliability events, and *speculation* that remedies to such events may misallocate costs, is enough of a benefit to support imposing a

---

[51] Tri-State Br. at 19.

[52] Petitioner Br. at 44-47.

[53] Petitioner Br. at 6. Tri-State was able to reduce its costs for SPP NITS from $7.2 million to $2.9 million. NPPD Request for Rehearing at 20 (P. App. 489).

[54] Petitioner Br. at 35.

18

*known* $4.3 million annual cost shift on Zone 17 customers.[55]  FERC failed to

discuss this question in Opinion Nos. 562 or 562-A.[56]  Thus, like in *Illinois*

*Commission I*, "[n]othing in the Commission's opinions enable an answer to that

question."  *Illinois Commission I*, 576 F.3d at 477.  As explained by the court,

FERC cannot use a broad presumption that facilities will provide the benefit of

improved reliability to avoid the duty of comparing costs to benefits.  *Id.*

      Tri-State mistakenly claims that FERC "addressed the quantifiable benefits"

by affirming the Presiding Administrative Law Judge's decision that any

adjustments for known and measurable changes to the cost shift within five to

seven years in the future should be considered.[57]  Tri-State confuses "quantifiable

benefits" with costs.  As explained, *supra* at 5-6, the adjustments for known and

measurable changes have been factored into the calculation of the average $3.5

million cost shift that is six times larger than the $550,000 benefits calculated

under the methodology advocated by Tri-State.[58]  Contrary to Tri-State, this

evidence does not justify "the inclusion of the costs of Tri-State's facilities in Zone

17."[59]

---

[55] NPPD Request for Rehearing at 28-29 (P. App. 497-98).

[56] *Id.* at 29 (P. App. 498).

[57] Tri-State Br. at 17.

[58] *Id.* at 17-18.

[59] *Id.*

Appellate Case: 19-1553     Page: 25     Date Filed: 08/14/2019 Entry ID: 4819065

### 3. The NETS Agreement does not "narrowly define what benefits are being equalized."

Respondent argues that the NETS Agreement "narrowly define[s] what 'benefits' are being equalized in the Annual Equalization Payments calculation."[60] As support, Respondent relies upon this line of the NETS Agreement: "'Such benefits shall be in the form of transmission use of [the joint facilities] and in the form of Annual Equalization Payments from one Party to another.'"[61]

Respondent's reliance upon "use" in one section of the NETS Agreement is taken out of context, and conflicts with the stated objective of the NETS Agreement:

> 1.01 The objective of this Agreement is to provide for planning, constructing, operating, and maintaining an integrated, interconnected, adequate, and reliable joint electric power transmission system to serve the Parties' customers in Western Nebraska and *to provide for fair and equitable allocation of costs and benefits of such system.*[62]

The parties intended to achieve this broad objective by (1) keeping separate the costs of each party's separately-owned facilities, and (2) calculating an Equalization Payment.[63] Respondent's arguments that such payment was not intended to compensate for the benefit of avoiding facility duplication, and that the

---

[60] Respondent Br. at 33.

[61] *Id.,* citing NETS Agreement, Section 3.01 (P. App. 066).

[62] NETS Agreement, Section 1.01 (P. App. 063).

[63] Petitioner Br. at 37.

Appellate Case: 19-1553    Page: 26    Date Filed: 08/14/2019 Entry ID: 4819065

value of that benefit justifies rolling-in the costs of Tri-State's facilities (which results in shifting 60 percent of Tri-State's costs to NPPD), inverts the NETS Agreement's overall objective to "provide for fair and equitable allocation of costs and benefits of [the] system."[64]

**B. Even Assuming The Equalization Payment Does Not Compensate For The Benefit Of Avoiding Duplication Of Facilities, There Is No Support For Respondent's Claim That Such Benefit Constitutes Evidence That Benefits Received By NPPD Are Roughly Commensurate With Allocated Costs.**

Even assuming the Equalization Payment is associated only with usage benefits under the NETS Agreement, there is no support for Respondent's conclusion that non-use benefits, when added to benefits measured by the Equalization Payment, constitute evidence that benefits received by NPPD "are at least roughly commensurate with the costs" allocated to NPPD.[65]  As Judge Posner explained, "even the modest goal of rough commensurability requires *some* effort by the Commission . . . to quantify the benefits."  *Illinois Commission II*, 756 F.3d at 562 (emphasis in original).  FERC here, as in that case, "hasn't responded to that directive."  *Id*.  Like the situation in *Illinois Commission II*, FERC made *no* effort

---

[64] NETS Agreement, Section 1.01 (P. App. 063).

[65] Respondent Br. at 37 and 46.

21

to quantify non-use benefits or to provide a reasoned explanation of "how much benefit" NPPD and other Zone 17 customers received.[66]

### 1. FERC made no effort to quantify the benefit of avoiding duplication of facilities or any other benefit.

FERC did not "consistently find" in Opinion Nos. 562 and 562-A that benefits associated with use of the joint facilities include unquantified benefits "such as avoidance of the duplication of facilities."[67] In fact, FERC *never* made a specific finding that the benefit of avoiding the cost of duplicative facilities was an unquantifiable benefit. FERC's explanation of unquantified benefits consists of two statements from the orders under review. In Opinion No. 562, FERC concluded: "there *may* not be a specific quantification of the benefits that NPPD received and will continue to receive from the Tri-State transmission facilities…."[68] Similarly, in Opinion No. 562-A, FERC simply declared it "was not able to quantify the *exact* benefits to NPPD's customers."[69] But quantification of "*exact*" benefits aside, FERC never identified *any* specific benefits that were

---

[66] Petitioner Br. at 33 and 36.

[67] Respondent Br. at 37, citing Opinion No. 562 at PP 192-94 (P. Add 097-99), 205 (P. Add. 105-06), 207 (P. Add. 106-07); Opinion No. 562-A at P 25 (P. Add. 132-33).

[68] Petitioner Br. at 36, citing Opinion No. 562 at P 207 (P. Add. 106) (emphasis added).

[69] Opinion No. 562-A at P 25 (P. Add. 132-133) (emphasis added).

22

unquantifiable, and made no *effort* to quantify *any* benefit, including avoiding duplicative facilities.

In a classic example of being "hoisted by its own petard," Respondent now claims that FERC satisfies the directive in *Illinois Commission II* to make "*some* effort . . . to quantify the benefits"[70] by relying upon the Equalization Payment and Tri-State's alternate formula for quantifying the benefit received by NPPD from Tri-State's facilities.[71] As explained *supra,* at page 14, NPPD relied upon these two metrics to demonstrate that the costs allocated to NPPD were *six times* greater the net benefits.[72] After NPPD came forward with this evidence, Judge Posner's directive requires FERC to make some effort to quantify benefits in the "entirety of the record" that FERC concluded would fill the large gap between the benefits measured by the Equalization Payment and the costs allocated to NPPD.[73] FERC made no effort to quantify such benefits.

> ### 2. FERC did not find that avoiding duplication of facilities is "the most important" or "principal benefit" under the NETS Agreement.

Respondent now claims FERC found that each party's "most important" and "principal benefit" from the NETS Agreement is that it can avoid the cost of

---

[70] Respondent Br. at 45, citing *Illinois Commission II,* 756 F.3d at 562.

[71] Respondent Br. at 45-46.

[72] Petitioner Br. at 32-33, citing NPPD Request for Rehearing at 27 (P. App. 496).

[73] Opinion No. 562-A at P 25 (P. Add. 133).

Appellate Case: 19-1553    Page: 29    Date Filed: 08/14/2019 Entry ID: 4819065

duplicative facilities.[74]  Opinion Nos. 562 and 562-A make no such finding. Instead, FERC simply identified avoidance of duplicative facilities as one of the benefits provided by the NETS Agreement.[75]

Counsel's effort to overstate the significance of that benefit is transparent. As explained above, FERC made no effort to quantify the benefit of avoiding duplicative facilities.  Mindful of this defect, counsel for Respondent now inflates the value of that benefit *post hoc*, casting it as the "most important" and "principal benefit."  This is little more than counsel's thinly-veiled effort to embellish the value of alleged unspecified benefits "in the entirety of the record" that FERC relied upon to offset the disparity between benefits measured by the Equalization Payment and costs allocated to NPPD.  As Petitioner has explained, FERC's mere identification of benefits falls short of its obligation under governing precedent to make "some effort" to quantify the benefits.[76]

The Court, then, should reject Respondent's claim that the benefit of avoiding duplicative facilities, along with other unspecified benefits, is sufficient to fill the gap between the value of benefits calculated under the Equalization formula and the costs allocated to NPPD.  The end result – to allow Tri-State to

---

[74] Respondent Br. at 21 and 34, citing Opinion No. 562 at P 194 (P. Add. 099).

[75] *See* Opinion No. 562 at P 194 (P. Add. 099).

[76] Petitioner Br. at 35-36, quoting *Illinois Commission II*, 756 F.3d at 562.

Appellate Case: 19-1553     Page: 30     Date Filed: 08/14/2019 Entry ID: 4819065

shift $4.2 million, 60 percent of the costs of its facilities, to NPPD and other Zone 17 customers – is unjust and unreasonable.

### 3. This case is not distinguishable from *Illinois Commission* due to dollars at stake.

There is no support for Respondent's attempt to distinguish application of *Illinois Commission* on grounds that it involved allocation of hundreds of millions of dollars versus the *annual* $4.2 million allocated to Zone 17 here. The relevant fact is this: the end result of that allocation is a six to eight percent increase to rates paid by NPPD and other Zone 17 customers. Customers of small electric systems in western Nebraska are entitled to the same protection afforded customers of large utilities investing billions of dollars. The "primary aim" of the Federal Power Act is to protect consumers "from excessive rates and charges." *Xcel Energy Servs., Inc. v. FERC*, 815 F.3d 947, 952 (D.C. Cir. 2016). That case involved improper allocation of $1.98 million to an SPP rate zone. *Id.* at 951. As the Supreme Court has said in a similar context:

> Even if the effect of increased small-producer prices would make a small dent in the consumer's pocket, when compared with the rates charged by the large producers, the Act makes unlawful all rates which are not just and reasonable, and does not say a little unlawfulness is permitted.

*FPC v. Texaco Inc.*, 417 U.S. 380, 399 (1974).

25

Moreover, as explained by GridLiance, there are "many small cooperatives and public power utilities" that have not yet joined an RTO, but would like to receive "the benefits of RTO participation."[77] Vacating the orders on review will send a message to these small cooperatives and public power agencies to make their decision to join an RTO based on the overall benefits of RTO participation, rather than seeking to also maximize the shift of their costs to other existing RTO customers.

## V. FERC UNLAWFULLY IGNORED RELEVANT EVIDENCE SUBMITTED BY NPPD.

FERC ignored evidence placed into the record relevant to: (1) the nature of transmission services used to serve Tri-State's load prior to its transfer to SPP; and, (2) elimination of the substantial cost-shift to Zone 17 customers by placing Tri-State in Zone 19.

### A. Respondent Failed To Consider Evidence Concerning The Nature Of Transmission Services Utilized To Serve Tri-State Load Prior To Transfer To SPP.

Respondent's brief underscores NPPD's argument that FERC ignored evidence regarding the nature of transmission services used to deliver power to Tri-State's load prior to it joining SPP.[78] That evidence demonstrated that Tri-State predominantly used transmission services provided by the former Integrated

_____

[77] GridLiance Br. at 3.

[78] Petitioner Br. at 38-43.

System facilities that were subsequently transferred to SPP's functional control and placed in Zone 19.[79]

Respondent counters by echoing FERC's bare assertion that it "did consider" NPPD's evidence, offering as support a *non sequitur* regarding the "interdependent nature" of NPPD's and Tri-State's systems, and transmission services provided by NPPD.[80] This avoids NPPD's argument and further betrays FERC's failure to consider NPPD's evidence regarding the nature of transmission services, provided by the former *Integrated System*, now part of Zone 19.

Tri-State claims that NPPD incorrectly alleged that "Basin Electric used SPP Zone 19 Network Service, in place of the Integrated System service *and Tri-State's OATT*, to deliver power to Tri-State's load."[81] NPPD agrees that the reference to the Tri-State OATT facilities was incorrect. NPPD should have said that Basin Electric (Tri-State's supplier) used *SPP* Zone 19 Network Service, in place of the Integrated System, to deliver power to the interface with the Tri-State system. Either way, however, Tri-State was relying upon Zone 19 transmission facilities prior to joining SPP.

---

[79] Respondent Br. at 47, citing Petitioner Br. at 38-43.

[80] Respondent Br. at 49-50.

[81] Tri-State Br. at 9-10, quoting Petitioner Br. 40 (emphasis added).

27

## B. FERC Ignored NPPD's Evidence That Placing Tri-State In Zone 19 Would Eliminate The Unjust And Unreasonable Cost Shift To Zone 17 Customers.

Respondent wrongly relies on court precedent to support its position that once FERC determines it is just and reasonable to place Tri-State in Zone 17, FERC need not consider evidence that placement in Zone 19 would eliminate shifting of Tri-State costs to either zone.[82]  Those cases are inapposite because the relevant issue here is appropriate zone placement of a new Transmission Owner in the context of SPP's existing license plate rate design, the purpose of which is to avoid cost shifting.[83]  NPPD has explained that placing Tri-State in Zone 19 would provide Tri-State with the same service without any significant cost shift to other Zone 19 customers – a win-win.[84]

FERC's continued refusal to consider this evidence violates its obligation to account for whatever in the record fairly detracts from the weight of evidence it has considered.  *Universal Camera Corp.*, 340 U.S. at 488.  Where, as here, a transmission owner is interconnected to various existing zones, FERC must assess the relative economic impacts resulting from placing the new transmission owner

---

[82] Respondent Br. at 48, citing *Advanced Energy Mgmt. Alliance v. FERC*, 860 F.3d 656 (D.C. Cir. 2017), citing *City of Winnfield v. FERC*, 744 F.2d 871 (D.C. Cir. 1985).

[83] Petitioner Br. at 4; SPP Br. at 49.

[84] Petitioner Br. at 44.

in those zones.  FERC has failed to engage in such analysis, or to consider relevant evidence NPPD has proffered.

## VI.   CONCLUSION

This Court should vacate and remand Opinion Nos. 562 and 562-A because cost shifts that result in significant rate increases to customers, but which are unaccompanied by commensurate benefits, are unjust and unreasonable.  On remand, the Court should direct FERC to consider evidence demonstrating that placing Tri-State in Zone 19 would eliminate cost shifting while providing Tri-State *full* benefits of RTO membership.  That result is just and reasonable, and consistent with cost causation principles because all load would be paying the costs of facilities built to serve them.[85]

Respectfully submitted,

*/s/ David D'Alessandro*
David D'Alessandro
Jonathan P. Trotta
STINSON LLP
1775 Pennsylvania Ave., NW
Suite 800
Washington, DC  20006
(202) 785-9100
david.dalessandro@stinson.com
jtrotta@stinson.com

*Counsel for Petitioner*
Dated: August 12, 2019          *Nebraska Public Power District*

---

[85] *Midwest ISO Transmission Owners,* 373 F.3d 1361, 1368 (D.C. Cir. 2004), quoting *KN Energy, Inc. v. FERC,* 968 F.2d 1295, 1300 (D.C. Cir. 1992).

29

# CERTIFICATE OF COMPLIANCE

1. Pursuant to Fed. R. App. P. 32(a)(7)(B), the undersigned certifies that this brief complies with the applicable type-volume limitation.  Excluding parts of the brief exempted by Fed. R. App. P. 32(f), the document contains 6,316 words, including footnotes, as determined by the word-count function of Microsoft Word.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared by Microsoft Office Word 2016 in 14-point Times New Roman font.

3. Pursuant to Eighth Circuit Rule 28A(h)(2), the undersigned certifies that the electronic version of this brief and the attached addendum has been scanned for viruses and are virus-free.

*/s/ Jonathan P. Trotta*
Jonathan P. Trotta
STINSON LLP
1775 Pennsylvania Ave., NW
Suite 800
Washington, DC  20006
(202) 785-9100
jtrotta@stinson.com

*Counsel for Petitioner*
*Nebraska Public Power District*

Dated: August 12, 2019

Appellate Case: 19-1553     Page: 36     Date Filed: 08/14/2019 Entry ID: 4819065

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25(c), 25(d), and Circuit Rule 25A, I hereby certify that I have this day electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Eighth Circuit, via the Court's CM/ECF system. Participants in this case who are registered CM/ECF users will be served via the Court's CM/ECF system.

*/s/ Jonathan P. Trotta*
Jonathan P. Trotta
STINSON LLP
1775 Pennsylvania Ave., NW
Suite 800
Washington, DC 20006
(202) 785-9100
jtrotta@stinson.com

*Counsel for Petitioner*
*Nebraska Public Power District*

Dated: August 12, 2019